**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

| | |
|---|---|
| **ELISABETH CLEVELAND, AMY LARCHUK, CHRISTOPHER REDMON, DHAVAL SHAH, and THOMAS McCORMICK,** on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>WHIRLPOOL CORPORATION,<br><br>Defendant. | **CASE NO. 20-cv-1906-WMW-JFD** |

## <u>JOINT DECLARATION OF PROPOSED CLASS COUNSEL</u>

1.      This declaration is being submitted by Harper T. Segui and Rachel Soffin of Milberg Coleman Bryson Phillips Grossman LLP ("Class Counsel"). We offer this declaration in support of Plaintiffs' Motion for Award of Attorneys' Fees, Litigation Costs and Service Awards ("Motion"). We each have personal knowledge of the facts set forth in this declaration and could testify competently as to these facts if called upon to do so.

2.      Prior to June of 2021, attorneys for Whitfield Bryson LLP and Greg Coleman Law PC, performed work in this litigation. Declarants were members of both firms, with Ms. Segui a member of Whitfield Bryson LLP and Ms. Soffin a member of Greg Coleman Law PC. In June of 2021, Whitfield Bryson LLP, Greg Coleman Law PC, and Milberg LLP merged to form Milberg Coleman Bryson Phillips Grossman PLLC (collectively

**EXHIBIT 1**

"Milberg"). In addition to the Milberg attorneys, additional law firms performed work on this case as local counsel, including attorneys from Gustafson Gluek PLLC and Wexler Boley & Elgersma LLP.  Accordingly, this declaration is collectively on behalf of the attorneys who performed work in this litigation from all three firms, and local counsel.

## Background and Relevant Procedural History

3.      Proposed Class Counsel were contacted in early 2020 by various consumers claiming that their Whirlpool manufactured dishwashers ("Class Dishwashers" or "Dishwashers"[1]) were leaking at the diverter motor seal ("Diverter Motor Seal"), a component of the sump assembly, as identified by repair technicians. The exact cause of the leakage from that location was unknown at that time; however, research revealed leakage at the Diverter Motor Seal was widely reported by consumer around the United States.

4.      Consequently, prior to initiating this litigation, Proposed Class Counsel spent many hours investigating the claims of allegedly defective Whirlpool manufactured Dishwashers on behalf of several potential plaintiffs and other consumers across. Proposed Class Counsel interviewed numerous Dishwasher owners, researched the possible root defect and resulting leakage, dishwasher components, and design and manufacture of the dishwashers. Proposed Class Counsel also gathered and reviewed significant documents, photographs, and videos pertaining to Dishwashers, including warranties and user and care manuals.

---

[1] The models of Class Dishwashers are identified in Exhibit 2 of the Settlement Agreement.

2

5.      To further aid in the investigation and identification of the defect, Proposed Class Counsel engaged multiple well-qualified engineering experts related to failure analysis in appliances, materials analysis, and related issues. The experts collectively performed water testing of the Dishwashers, disassembled sample Dishwashers during the class period and after, researched the product specifications, installation instructions of the Diverter Motor Seal at issue, industry standards, and alternative feasible designs.

6.      Through significant expert investigation and Proposed Class Counsel's investigation, it was determined that the Diverter Shaft Seal in the Dishwashers is uniformly defective in its design and/or manufacture in that is incorrectly oriented, accelerating degradation of the seal and creating a buildup of debris that prevents the shaft seal spring from properly sealing the diverter shaft and sump ("Diverter Shaft Seal Defect" or "Defect"). *See* Plaintiffs' Consolidated Amended Complaint (For the Purpose of Settlement) ("CAC") (ECF Doc. No. 63),  at ¶7. As a result of the uniform Diverter Shaft Seal Defect, Plaintiffs and Class Members' Dishwashers can and have experienced significant leakage through the Diverter Shaft Seal, flowing out of the dishwasher to areas below and surrounding the dishwasher, exposing consumers to unexpected water leaks.  *Id.*

7.      On September 4, 2020, Plaintiff Cleveland filed her class action Complaint alleging that Whirlpool designed, manufactured, distributed, marketed, and sold the Dishwashers with the uniform Diverter Shaft Seal Defect, described *supra*, that can and has caused the Dishwashers to leak ("Minnesota Action"). Related actions were filed by the undersigned proposed Class Counsel on September 10, 2020, in the United States District Court for the Eastern District of Pennsylvania (*Larchuk v. Whirlpool Corp.*, No.

2:20-cv-04442-BMS (E.D. Pa.)) ("Pennsylvania Action); on November 6, 2020, in the United States District Court for the Northern District of Illinois (*Redmon v. Whirlpool Corp.,* No. 1:20-cv-06626 (N.D. Ill.) ("Illinois Action)); and on April 16, 2021, in the United States District Court for the Northern District of California (*Shah v. Whirlpool Corp.,* No. 3:21-cv-02739 (N.D. Cal)) ("California Action"), (collectively referred to as "Coordinated Actions)."

8.      Each of the Coordinated Actions involved claims that the Class Dishwashers contained the Defect, resulting in premature failure and damage to Plaintiffs and putative Class Members Dishwashers.

9.      Prior to negotiating the Settlement in this Action, the Parties engaged in hard-fought litigation in the related actions. Initially, for the effective and efficient coordination and scheduling, the Parties entered into an agreed upon Joint Case Management Plan.  The Parties spent considerable time developing the Joint Case Management Plan to be applied across all four (4) Coordinated Actions. Settlement Class Counsel and Whirlpool's Counsel engaged in numerous meet and confer discussions, both via telephone and in writing, regarding the Joint Case Management Plan to be proposed in each of the actions. The Joint Case Management Plan provided each of the Courts with, inter alia, the agreed upon, (1) coordinated schedules, (2) number of discovery requests permitted by each side; (3) number of depositions that could be taken, (4) deposition protocols, (5) methodology for coordinating and designating discovery across all coordinated actions; and (6) methodology for seeking resolution of discovery disputes.  On April 23, 2021, the Joint Case Management Plan was submitted to this Court (Minnesota Action, ECF. No. 44), and

on April 29, 2021, this Court granted the parties Joint Discovery Plan. (Minnesota Action, ECF No. 46). Likewise, the Joint Case Management Plan was submitted in the Illinois and Pennsylvania Actions, and subsequently adopted by those courts.

10.     Additionally, Whirlpool filed motions to dismiss in each of the Coordinated Actions. On October 29, 2020, Whirlpool filed its first motion to dismiss in this action (Minnesota Action, ECF Nos. 16 and 18), and Plaintiff Cleveland filed an Amended Complaint on November 25, 2020 (Minnesota Action, ECF No. 25). On December 15, 2020, Whirlpool renewed its motion to dismiss in the Minnesota Action, seeking to dismiss Plaintiff Cleveland's claims in their entirety and with prejudice for failure to state a claim upon which relief can be granted. (Minnesota Action, ECF Nos. 27 and 29). On January 15, 2021, Plaintiff Cleveland filed her response in opposition to Whirlpool's motion to dismiss (Minnesota Action, ECF No. 32) and Whirlpool filed its reply in support of its motion to dismiss on February 1, 2021 (Minnesota Action, ECF No. 35).

11.     On February 26, 2021, this Court heard oral argument from both parties on Whirlpool's motion to dismiss. On July 27, 2021, this Court entered an Order Granting in Part and Denying in Part Defendant's Motion to dismiss, granting without prejudice Whirlpool's motion to dismiss Plaintiff Cleveland's claims for Breach of Contract and Unjust Enrichment, and denying the motion to dismiss for Plaintiff Cleveland's claims alleging breach of express and implied warranty, violations of the Minnesota Consumer Fraud Act (MCFA), the Minnesota Uniform Deceptive Trade Practices Act (MDTPA), and the Minnesota Unlawful Trade Practices Act (MUTPA). The Parties also attended several

status conferences with the Magistrate Judge Menendez court by telephone, including for the discussion of the submitted Joint Case Management Plan.

12.     Whirlpool also filed a motion to dismiss in the Illinois Action on February 3, 2021, seeking to dismiss Plaintiff Redmon's claims in their entirety.  (Illinois Action, ECF No. 11 and 12).  Plaintiff Redmond responded to the motion to dismiss on March 10, 2021 (Illinois ECF No. 22), and Whirlpool filed its reply on March 6, 2021 (Illinois Action, ECF No. 24).  On April 28, 2021, the court granted in part and denied in part Whirlpool's motion to dismiss, granting Whirlpool's motion to dismiss without prejudice as to Plaintiff Redmon's express warranty claim beyond the actual written product warranty, breach of implied warranty and fraudulent concealment, and with prejudice, Plaintiff Redmon's claims for negligence and injunctive relief.  The court denied the motion to dismiss Plaintiff Redmon's claim for breach of the express warranty as to the product warranty, and for the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 et seq., unjust enrichment, and breach of contract. (Illinois Action, ECF No. 31). The Parties also attended multiple status conferences with the Illinois court by telephone, including for the discussion of discovery, case scheduling, and coordination of the litigation among all the courts including the submitted Joint Case Management Plan. Plaintiff Redmon voluntarily dismissed his action on August 20, 2021, as a result of the settlement. (Illinois Action, ECF No. 48).

13.     Whirlpool also filed a motion to dismiss in the Pennsylvania Action on January 7, 2021 (Pennsylvania Action, ECF No. 20). Plaintiff Larchuk responded in opposition on February 8, 2021 (Pennsylvania Action, ECF No. 21), and Whirlpool filed

its reply in support of its motion to dismiss on February 22, 2021 (Pennsylvania Action, ECF No. 22).  Plaintiff Larchuk voluntarily dismissed her action on August 23, 2021, as a result of the settlement. (Pennsylvania Action, ECF No. 32). The Parties also submitted the Joint Case Management Plan utilized in this action.

14.     Whirlpool also filed a motion to dismiss in the California Action on June 28, 2021.  (California Action, ECF No. 21). The Parties subsequently appeared via Zoom for a Case Management Conference to discuss coordination of the case and other preliminary matters. After the court expressed concern over the number of actions filed, Plaintiff Shah dismissed the California Action without prejudice on July 29, 2021 (California Action, ECF No. 29) prior to filing a response to Whirlpool's motion to dismiss, so the Parties could incorporate Plaintiff Shah's claims into one of the other pending cases.  Plaintiff Shah's claims were ultimately incorporated into the CAC in the Minnesota Action (Minnesota Action, ECF No. 63).

15.     In addition to briefing the various motions to dismiss, presenting arguments in the Minnesota Action, the Parties engaged in significant discovery. Specifically, the Parties served and responded to written discovery requests, and Whirlpool produced, and Plaintiff reviewed voluminous amounts of data and documents. Plaintiffs also served eleven third-party subpoenas to retailers of the Dishwashers, as well as serving both a subpoena for documents on, and subpoena for the Fed. R. Civ. P. 30(b)(6) deposition of the manufacturer of the Diverter Shaft Seal.

16.     Further, throughout the litigation, Plaintiffs' experts continued to provide ongoing assistance to Class Counsel during litigation, including, inter alia, assistance with

the formulation of discovery questions, deposition areas of inquiry, and requests for information pursuant to Fed. R. Evid. 408.

**The Settlement Achieves an Excellent Result for the Class and is the Result of Extensive Investigation, Hard-Fought Litigation and Arms-Length Negotiations**

17.     The Parties began preliminary settlement discussions in March of 2021, and agreed to mediate the Coordinated Actions with an eye towards nationwide resolution of Plaintiffs' and putative Class Members claims.

18.     Subsequently, the Parties' agreed to utilize Atlanta based mediator Hunter R. Hughes, III, who is experienced in resolving class action litigation.

19.     Prior to mediation, the Parties exchanged requests for information pursuant to Fed. R. Evid. 408 and the Plaintiffs' made a detailed settlement demand. The Parties also provided detailed mediation statements to Hunter R. Hughes, III, which were exchanged amongst the parties on April 26, 2021.

20.     Plaintiffs and Proposed Class Counsel entered into these settlement negotiations with substantial information about the nature and extent of the challenged practices, and the merits of the legal claims and factual allegations. Plaintiffs and Class Counsel had the benefit of multiple experts' testing and investigations of the Class Dishwashers, as well as the ability to review key documents in this matter, including Whirlpool's warranty database as it pertains to the Dishwashers. Review of this information positioned Proposed Class Counsel to evaluate with confidence the strengths and weaknesses of Plaintiffs' claims and prospects for success at class certification, summary judgment, and trial.

21.     Thereafter, the Parties attended two full-day mediation sessions (on April 27, 2021 and April 29, 2021) with Hunter R. Hughes, III.  While the Parties were able to make substantial progress toward settlement of this pending litigation, the Parties were unable to fully resolve this matter at the first day of mediation.

22.     Following the second day of mediation, the Parties agreed to most of the material terms of the Settlement and exchanged a term sheet.

23.     On July 29, 2021, the Parties reached full resolution of the terms of the Settlement and continued their discussions of the finer details of the Settlement through October 2021.

24.     The Parties did not agree to attorneys' fees and costs, or service awards for Class Representatives during either mediation session, all of which was the subject of numerous follow-up discussions among the Parties, with the assistance of mediator Hunter R. Hughes, III.

25.     During the six months of negotiations, the Parties worked diligently and expended a substantial amount of time and effort to finalize the terms of the Settlement Agreement and ancillary documents, and the plan for Class Notice, which was completed in October of 2021.

26.     Further, up until the Parties finalized the material terms of the settlement in July of 2021, they continued to litigate the Coordinated Actions, including supplementing discovery requests, scheduling depositions, scheduling inspections of Dishwashers, and moving towards expert disclosures and motions for class certification.

**Terms of the Settlement**

27.     The Settlement Class consists of the following, as defined in Section I (JJ)

of the Settlement Agreement:

> All persons in the United States and its territories who either (a) purchased a new
> Class Dishwasher, or (b) acquired a new Class Dishwasher as part of the purchase
> or remodel of a home, or (c) received as a gift, from a donor meeting those
> requirements, a new Class Dishwasher not used by the donor or by anyone else after
> the donor purchased the Class Dishwasher and before the donor gave the Class
> Dishwasher to the Settlement Class Member.

28.     "Class Dishwashers" or "Dishwashers" means Whirlpool-manufactured

Amana, Ikea, Jenn-Air, Kenmore, KitchenAid, or Whirlpool-branded dishwashers

manufactured with a hydraulic rotation diverter system from January 1, 2010 through

December 31, 2017, and bearing a model number and serial number within the range on

the list attached as Exhibit 2 to the Settlement Agreement.  *See* Settlement Agreement,

Section I (I), Attached hereto as Exhibit A.

29.     Whirlpool has provided documentation that it distributed more than

6,700,000 of the Dishwashers into the consumer marketplace.

30.     The Settlement Agreement provides benefits to the Settlement Class related

to "Diverter Seal Leaks"[2] resulting from the alleged Defect, as follows:

- Compensation to Settlement Class Members for Past Diverter Seal Leaks.

  Settlement Class Members who have experienced a documented Past Diverter

  Seal Leak within eight years after manufacture of their Dishwasher will be

---

[2] "[A] water leak that originated at the location of the diverter motor shaft and diverter seal found
in the sump assembly parts listed in Exhibit 3" of the Settlement Agreement. Section I (JJ) of the
Settlement Agreement.

entitled to reimbursement of certain out-of-pocket expenses incurred as a result of that Past Diverter Seal Leak.

- <u>Compensation to Settlement Class Members for Future Diverter Seal Leaks:</u> Settlement Class Members who experience a documented Diverter Seal Leak after the Notice Date but within eight years after manufacture of their Dishwasher will be entitled reimbursement of certain out-of-pocket expenses incurred as a result of that Future Diverter Seal Leak.

31.    These benefits include the ability to make claims for repair or replacement *beyond the one-year warranty accompanying the purchase of a Dishwasher for either past or future diverter seal leaks*, including reimbursement for Paid Qualifying Repairs or Paid Qualifying Replacements of the Dishwashers.

32.    Specifically, depending upon the age of the Dishwasher at the time of a Paid Qualifying Repair or Paid Qualifying Replacement, as defined in the Settlement Agreement, Section I (X-Y), the Settlement Class Members are entitled to receive reimbursement of up to $225.00[3] or receive a cash rebate towards the purchase of certain Whirlpool manufactured dishwashers so long as the qualifying event occurred within eight years of manufacture of their Class Dishwasher-- a benefit that adds repair protection for seven years beyond the limited warranty accompanying the purchase of the Dishwashers.

33.    Proposed Class Counsel have engaged a qualified expert, Frank Bernatowicz, to value the settlement benefits to the Settlement Class. Mr. Bernatowicz found that the

---

[3] $225.00 is the average cost of repair, including parts and labor. *See* Section I (E) of the Settlement Agreement.

total cash value of the settlement, which is uncapped and ensures that Settlement Class Members will receive the full value of up to $225.00 for the cost of repairing or replacing their Dishwasher as a result of the alleged Defect, is $1,874,157.00 (based on a 1% failure rate) to $7,496,629 (based on a 4% failure rate). Mr. Bernatowicz further found that the value of the non-monetary relief (the extended service plan coverage) is $13,831,171.00, for a total of $15.71 to $21.33 million. *See* Expert Report of Frank Bernatowicz, attached hereto as Exhibit B.

34.     In addition, Whirlpool shall pay all Notice and Administration Costs directly to the Settlement Administrator as such costs and expenses are invoiced.  Angeion, the notice and claims administrator, estimates that the total costs notice and administration will be $1,200,401.

35.     Thus, the total benefits available to the class based on Mr. Bernatowicz analysis, and also including the costs of notice and claims administration, are $16,905,729-$22,528,201.  *See e.g. Hamm et al. v. Sharp Electronics Corp.*, No. 5:19-cv-00488-JSM-PRL, Doc. No. 62 (M.D. Fla. Jan 7, 2021)(in class action involving defective microwave drawers, evaluating *Johnson* factors, and  treating uncapped, claims-made settlement as constructive common fund with ascertainable benefits involving value of extended warranty, replacement microwaves and reimbursement of labor and service costs, and finding "[c]ommon-fund settlements need not specify a maximum value, artificially limiting the class recovery. Common funds may be unlimited, where a defendant agrees to pay all valid claims with no cap on the potential recovery."), attached hereto as Exhibit C.

36.     As agreed, pursuant to Settlement Agreement, Section VIII (B), following

preliminary approval of the Settlement, Proposed Class Counsel may submit a Fee Application to the Court. Defendant has agreed not to oppose up to $1,500,000 as the reasonable amount of attorney fees, reimbursement of costs, and service awards of $2,500.00 to each Class Representative (for a total of $10,000). Defendant will pay this amount to Class Counsel and Plaintiffs subject to Court approval.

37.    Importantly, none of the attorneys' fees, expenses, or Plaintiffs' service awards negatively impact the Class benefits, and specifically are not paid out of any settlement proceeds secured for the Settlement Class by Class Counsel.  As a result, the attorneys' fees, expenses, and service awards have no impact on the benefits available to the Settlement Class.

38.    The benefits afforded by the Settlement reflect a reasoned compromise which takes into consideration the risks inherent in all complex, class litigation, and the numerous issues particular to this action. Plaintiffs and Class Counsel are confident in the strength of their case, but they are also pragmatic in their awareness of the various defenses available to Whirlpool, which are complex.  The risks and obstacles in this case are just as great as those in other product defect class actions and this case would likely have taken years to successfully prosecute, with the risk that there would be no recovery at all.  Recovery, if any, by any means other than settlement would require additional years of litigation in the district courts and on appeal.  Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement is the best vehicle for the Settlement Class to receive the relief to which they are entitled in a prompt and efficient manner.

### The Skill, Experience, Reputation and Ability of Class Counsel

39.     Class Counsel has significant experience in the litigation, certification, trial, and settlement of national class actions, including numerous claims against appliance and product manufacturers, and have recovered hundreds of millions of dollars for the classes they have  represented.  Class Counsel's firm has substantial appellate expertise, which was used to extensively analyze the chances of success in both in the Federal Appellate Courts and the U.S. Supreme Court. The experience, resources, and knowledge Proposed Class Counsel brings to this Action is extensive and formidable.

40.     Class Counsel has devoted substantial time and resources to this Action, is qualified to represent the Settlement Class, and will, along with the Class Representatives, vigorously protect the interests of the Settlement Class. *See Exhibit* D (Firm Resume of Proposed Class Counsel).

41.     Harper Segui is a partner and practice leader in the Consumer Products Group at Milberg.  Ms. Segui is an experienced litigator who focuses her practice on representing plaintiffs in complex class action litigation, including defective products, false advertising and mislabeling, and data breaches. She is admitted in the bars of Georgia and South Carolina, as well as federal courts for the Northern District of Illinois, Northern and Middle Districts of Georgia, and District of South Carolina.  Ms. Segui has actively led a variety of complex cases across the country, having been instrumental in procuring millions of dollars in recoveries for plaintiffs and class members. In addition to individual class actions, Ms. Segui has enjoyed playing active roles in multidistrict litigation and has several times been appointed by courts to serve on Plaintiffs' Steering Committees. This

14

year, she was appointed as Co-Lead Counsel in *In Re: Blackbaud, Inc., Customer Data Breach Litigation*, 3:20-mn-02972-JMC, MDL No. 2972 (D.S.C.), and *In Re: All-Clad Metalcrafters, LLC, Cookware Marketing and Sales Practices Litigation*, 2:21-mc-491-NR, MDL No. 2988 (W.D. Pa.). Ms. Segui has a broad spectrum of class actions and complex litigation experience that includes consumer product defects, building product defects, construction defects, unlawful fee charges, automobile defects, false advertising, and data breaches. Although integrally involved in every aspect of her cases, Ms. Segui has particularly honed technical skills which arm her with the ability to develop complex issues of science and technology at the heart of her cases, including the ability to engage experts and present these technical aspects in court. She been appointed to a number of leadership roles, and provided integral support for many more.   Representative cases include *In Re: Windsor Wood Clad Windows Prods. Liab. Litig*., 16-md-02668, MDL No. 2688 (E.D. Wis.) *and In Re: Allura Fiber Cement Siding Litig*., No. 2:19-mn-02886 (D.S.C.), where she also serves as Co-Class Settlement Counsel in a $12.5 million settlement. She also played essential supporting roles, including as a member of expert teams, in *In Re: MI Windows and Doors, Inc, Prods. Liab. Litig.*, 2:12-mn-00001, MDL No. 2333 (D.S.C.), *In Re: Pella Corp. Architect and Designer Series Windows, Mktg., Sales Prac. and Prods. Liab. Litig*., 2:14-mn-00001, MDL No. 2514 (D.S.C.), *Hamm v. Sharp Electronics Corp.*, No. 5:19-cv-00488 (M.D. Fla.) (over $100 million value settlement in action involving allegedly defective microwaves). Ms. Segui has been regularly selected to Super Lawyers as a Top-Rated Attorney in the areas of "Class Action & Mass Torts." She has co-authored several publications on product liability and other

topics, and has been a lecturer on complex legal issues.

42.     Rachel Soffin is a partner and practice leader in the Consumer Products
Group at Milberg. Currently, Ms. Soffin serves as court-appointed counsel on the
Plaintiffs' Steering Committee in litigation involving defective breast implants, *In re:
Allergan Biocell Textured Breast Implant Product Liability Litigation*, No. 2:19-md-
02921-BRM-ESK (D.N.J.), where she has been appointed to the law and briefing and class
certification committees. Ms. Soffin also currently serves as court-appointed Co-Lead
Counsel in the deceptive representations and omissions cookware MDL, *All-Clad
Metalcrafters, LLC, Cookware Marketing and Sales Practices Litigation*, No. 2:21-mc-
00491-NR (W.D. Pa.).  Ms. Soffin has represented consumers and served as class counsel
in numerous successful class actions.  Representative cases include the following: *In Re:
Allura Fiber Cement Siding Prods. Liability Litig.*, No. 2:19-mn-02886-DCN (D.S.C.)
($12.5 million settlement involving allegedly defective fiber cement siding); *Hamm v.
Sharp Electronics Corp.*, No. 5:19-cv-00488 (M.D. Fla.) (over $100 million value
settlement in action involving allegedly defective microwaves); *Berman et al v. General
Motors LLC*, No. 2:18-cv-14371-RLR (S.D. Fla.) (over $40 million settlement for
consumers whose vehicles experienced excessive oil consumption and resulting damages);
*De Leon v. Bank of America, N.A.* (USA), No. 6:09-cv-01251-JA-KRS (M.D. Fla.), ($10
million settlement for consumers subjected to violations of the Fair Credit Billing Act, a
breach of their Cardholder Agreement and deceptive trade practices); *Swift v. Bank of
America*, No. 3:14-cv-01539 (M.D. Fla) ($1 million settlement for consumers subjected to
TCPA violations); *In re: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales*

*Practice Litigation*, 1:12-MD-02324-JAL (S.D. Fla.) ($1.3 million settlement value for consumers subjected to deceptive trade practices for misrepresentations regarding a milk product); *In re: Tracfone Unlimited Service Plan Litigation*, No. 13-cv-03440-EMC (N.D. Cal) ($40 million settlement for consumers subjected to deceptive cellular phone data plan practices).  In addition, Ms. Soffin has been designated by Super Lawyers as a Florida Rising Star (2011-2013), and as a Florida Super Lawyer (2014-2018, 2022) in the fields of Class Actions/Mass Torts, and has also spoken at numerous conferences on class action topics.

43.     Milberg stands on a long reputation of fighting for consumers. Milberg was founded in 1965, taking the lead in landmark cases that have set groundbreaking legal precedents and prompted changes in corporate governance benefiting shareholders and consumers. For more than 50 years, Milberg has protected victims' rights, recovering over $50 billion in verdicts and settlements. Milberg was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. Milberg pioneered this type of litigation and became widely recognized as a leader in defending the rights of victims of corporate and other large-scale wrongdoing.

44.     Milberg has offices in New York, California, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Kentucky, Tennessee and Puerto Rico.  Recently, Milberg opened an office in London that serves clients in the European Union. In addition, Milberg has expanded in South America, with primary emphasis in Brazil.

45.     A detailed description of Milberg is available on its website at https://milberg.com/, as well as attached hereto as Exhibit A.

### **Plaintiffs' Counsel's Lodestar**

46.     Plaintiffs' Counsel's work in this litigation is extensive and comprehensive, including case tasks from beginning through settlement. Specifically, these tasks include investigating the facts and possible claims of the Plaintiffs with co-counsel, performing research, briefing motions, assisting with discovery matters, preparing for, and participating in mediation and settlement discussions, and preparing settlement documents.

47.     The combined lodestar for Milberg Coleman Bryson Phillips Grossman, as well Gustafson Gluek PLLC and Wexler Boley & Elgersma LLP, incurred by each individual biller from inception to present is as follows:

| Name | Position | Hours | Hourly Rate | Lodestar |
|------|----------|-------|-------------|----------|
| Harper T. Segui | Partner | 476.5 | $764.00 | $363,702.20 |
| Rachel Soffin | Partner | 269.4 | $764.00 | $205,821.60 |
| Erin Ruben | Associate | 105.3 | $676.00 | $71,182.80 |
| Ryan McMillan | Senior Associate | 59.7 | $676.00 | $40,357.20 |
| Gregory Coleman | Senior Partner | 36.15 | $919.00 | $33,221.85 |
| Daniel K. Bryson | Senior Partner | 18.6 | $919.00 | $17,093.40 |
| Michelle Looby | Partner | 32 | $764.00 | $24,448.00 |
| Raina C. Borelli | Associate | 18 | $764.00 | $13,752.00 |
| Tyler Story | Associate | 9.9 | $676.00 | $6,692.40 |
| Lisa White | Senior Attorney | 6 | $676.00 | $4,056.00 |
| Will Ladnier | Associate | 2 | $468.00 | $936.00 |
| Vince Carnevale | Associate | 1.8 | $764.00 | $1,375.20 |
| Jason S. Kilene | Senior Partner | 1 | $919.00 | $919.00 |
| Jonathan Cohen | Senior Attorney | .4 | $764.00 | $305.60 |
| Daniel E. Gustafson | Senior Partner | .25 | $919.00 | $229.75 |
| Daniel C. Hedlund | Senior Partner | .25 | $919.00 | $229.75 |
| Kim Welch | Paralegal | 87.7 | $208.00 | $18,241.60 |
| Jordan Crowe | Paralegal | 75 | $208.00 | $15,600.00 |
| | | | | |
| Collective[4] | Paralegal | 56.3 | $208.00 | $11,710.4 |
| **TOTAL** | | | | **$829,824.75** |

48.     We have reviewed the time entries, and believe the hours expended were reasonable and necessary to securing the result in this case.

49.     The hourly rates above are the historical hourly rates for our firm at the time the work was performed.

---

[4] Several individuals serving as paralegals and legal assistants contributed to the case but had comparatively fewer hours. Accordingly, these individuals' hours are reported as a collective.

50.     The hourly rates above are the usual and customary rates charged by each applicable biller in Plaintiffs' Counsel's cases, which is based on each attorney's position within their firm and also the number of years the lawyer has been practicing.

51.     The Milberg's hourly rates are regularly accepted by courts throughout the country for purposes of class action fee awards. Recently, several prime billers in this litigation had a percentage of the fund approval, as well as rates approved based on the Laffey Matrix adjusted rates in *In Re: Allura Fiber Cement Siding Litigation*, 2:19-mn-02886-DCN, ECF No. 33, pp. 10-13 (May 21, 2021 D.S.C.)(approving petition for *billers in this litigation*[5] where the fees were based on a 33% of a common fund with a lodestar crosscheck based on adjusted Laffey Matrix rates of up to $894/hour, and further noting, "Class Counsel's hourly rates are conservatively based on adjusted Laffey Matrix rates, which are comparable to those rates charged in South Carolina, despite the fact that this case is national in scope and required construction and product defect class action specialists from across the country who typically charge higher rates."). These hourly rates are also consistent with rates accepted in this district in class action litigation. *See e.g. Fath v. American Honda Motor Co.,* No. 0:18-cv-01549-NEB-LIB, Doc. No. 148, at 9 (D. Minn. Sept. 11, 2020) (in class action involving defective automobile, approving "[h]ourly rates for the attorneys and paralegals involved ranged from $300 to $950 and $150 to $203, respectively."), attached hereto as Exhibit E.

---

[5] Daniel K. Bryson was co-lead counsel in this litigation, and Harper T. Segui, Rachel Soffin, and Gregory F. Coleman were members of the Plaintiffs' Steering Committee.

52.     Generally, these rates are in line with national surveys including National Association of Legal Fee Analysis ("NALFA") 2020 Litigation Hourly Rate Range Growth Matrix[6] and the Laffey Matrix.[7] *See also*, National Law Journal's 2014 Billing Survey, showing the top billing firms in the Chicago area were billing up to $1,130/hour for partners and up to $925.00/hour for associates.[8]

**C.     Milberg 's Litigation Expenses**

53.     Milberg's litigation expenses are as follows as of November 9, 2021:

| Expense Type | Total |
|---|---|
| Expert Fees | $7,656.08 |
| Mediator Fees | $20,035.11 |
| Service Related Fees | $556.61 |
| Westlaw/Lexis | $220.76 |
| Court Filing Fees | $3,089.04 |
| Travel | $2,437.77 |
| Conferencing | $2.30 |
|  |  |
| **Total** | **$33,997.67** |

54.     The expenses incurred by Milberg are reflected in the electronic records of Milberg. The records are prepared from expense vouchers, invoices, receipts, and other reasonable supporting records and are an accurate record of the expenses incurred.

55.     All expenses were reasonably incurred and necessary to litigating this matter.

---

[6] https://www.thenalfa.org/blog/nalfa-releases-3-models-of-growth-for-litigation-hourly-rates/ (demonstrating that average rates for lawyers who have been practicing for 25+ years are between $801.00-$1200/hour).
[7] http://www.laffeymatrix.com/see.html
[8] https://www.law.com/nationallawjournal/almID/1202636785489/?slreturn=20211009144901

56.     To date, Milberg has not received any compensation for the work performed in this litigation and has not been reimbursed for the reasonable expenses reflected herein.

57.     In our experience from the above referenced *Sharp* and *Allura* litigation, as well as other consumer class settlements, the number of additional hours related to serving as Class Counsel, including assisting with claims and appeals, will far exceed another 100 attorney hours.  This is particularly true given the number of Class Members who may be considering or submitting claims.

58.     In our opinion, based on our substantial experience as outlined above, the settlement in this case warrants the Court's final approval. The settlement terms are fair, reasonable, and adequate, and provide concrete and certain results to class members.

59.     We declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

We declare under penalty of perjury that the foregoing is true and correct.

Executed on February 24, 2022.


*Harper T. Segui*
Harper   T. Segui


*Rachel Soffin*
Rachel  Soffin

## CLASS ACTION SETTLEMENT AGREEMENT AND RELEASE

This Class Action Settlement Agreement and Release ("Agreement") is made and entered into as of this *29th* day of October, 2021, by Elizabeth Cleveland, Christopher Redmon, Amy Larchuk, Dhaval Shah, and Thomas McCormick ("Plaintiffs"), on behalf of themselves and the Settlement Class, as defined below, and Defendant Whirlpool Corporation ("Whirlpool"), to settle, fully and finally, all of the claims that have been or could have been brought in the four putative class-action Lawsuits (defined in Section I.A. herein) against Whirlpool relating to certain dishwashers described below.

1.    A dispute has arisen between the Parties concerning certain Whirlpool-manufactured dishwashers specifically defined in Section I(I);

2.    Plaintiffs filed four putative class-action Lawsuits alleging, among other things, that the Class Dishwashers are defective, in that the diverter shaft seal in the Class Dishwashers' sump assembly could allow a leak to develop;

3.    Whirlpool categorically denies Plaintiffs' allegations, denies that it has committed or engaged in any misconduct, wrongdoing, or other actionable conduct, denies that the Class Dishwashers are defective, denies that the diverter shaft seal regularly develops leaks during normal use, denies all liability, and asserts numerous defenses to Plaintiffs' allegations;

4.    The Parties to this Agreement, after engaging in extensive motion practice across the four cases, and after engaging in confirmatory discovery—which included collecting and analyzing thousands of pages of documents; conducting extensive interviews with Whirlpool witnesses, the named plaintiffs, and putative class members; producing highly relevant, targeted, and sufficient documents and data by both Whirlpool and Plaintiffs; and consulting with various experts—and after conducting a formal mediation, engaging in substantial settlement negotiations

<div align="center" style="color:#8B0000">EXHIBIT A</div>

over a period of four months with the help and oversight of a highly experienced mediator, now wish to resolve all claims, disputes, and differences among them;

5.      Class Counsel has reviewed and analyzed the data and documents produced by Whirlpool and those obtained via their own investigation; consulted with experts; examined and considered the benefits to be provided to the Settlement Class Members under the Settlement provided for in this Agreement; considered the applicable laws of the several states potentially at issue, including California, Minnesota, Illinois, Pennsylvania, and others, and the claims that could be asserted under those laws regarding Class Dishwashers; considered the risks, costs, and time associated with prosecuting this case through one or more trials and appeals; and believe the Agreement to be in the best interest of the Settlement Class Members, taking into account the risks and costs of continued litigation, and the length of time that would be required to complete the litigation and any appeals;

6.      Whirlpool has at all times disputed, and continues to dispute, Plaintiffs' allegations in the Lawsuits and denied any liability for any of the claims that have or could have been raised regarding the Class Dishwashers by Plaintiffs or Settlement Class Members, but believes that the comprehensive resolution of the issues in the Lawsuits as provided in this Agreement will avoid the substantial costs and disruptions of continued litigation, is in the best interest of the Settlement Class, and is in the best interests of Whirlpool, its employees, and its trade partners, and is the most effective and least costly resolution of the Lawsuits;

7.      The Parties understand, acknowledge, and agree that this Agreement constitutes the compromise of disputed claims and that it is their mutual desire and intention that the Lawsuits be settled and dismissed, on the merits and with prejudice, and that the Released Claims be finally and fully settled and dismissed, subject to and according to the below terms and conditions.

NOW, THEREFORE, the Parties agree and covenant as follows:

## I.   DEFINITIONS

As used in this Agreement, the following definitions shall apply:

A.   "Actions" or "Lawsuits" means the following four putative class-action lawsuits: (1) *Cleveland v. Whirlpool Corp.*, Case No. 0:20-cv-01906-WMW-KMM (D. Minn.), (2) *Larchuk v. Whirlpool Corp.*, Case. No. 2:20-cv-04442-BMS (E.D. Pa.), (3) *Redmon v. Whirlpool Corp.*, Case No. 1:20-cv-06626 (N.D. Ill.), and (4) *Shah v. Whirlpool Corp.*, Case No. 3:21-cv-02739-JD (N.D. Cal.). The Lawsuits have been consolidated in *Cleveland* through a First Amended Consolidated Class Action Complaint, filed on August 20, 2021 (Doc 63).

B.   "Administration and Notice Expenses" means reasonable fees and expenses incurred for (1) preparing, mailing, and emailing the Summary Notice and FAQ; (2) the costs of Publication Notice; (3) receiving and adjudicating claims submitted by Settlement Class Members for compensation under this Settlement, including the costs of administering a Settlement Website for the review of the Settlement Notice and submission of claims; (4) receiving and processing Objections to the Settlement and Opt-Out Forms submitted by Settlement Class Members who wish to exclude themselves from the Class; (5) preparing status reports to the Parties and the Court; (6) preparing tax returns for any Settlement bank accounts; (7) distributing Settlement payments or other benefits to Settlement Class Members who timely submit Valid Claims; and (8) other costs of notice and administration of the Settlement that may be mutually-agreed upon by Whirlpool and Class Counsel, including administration of claims made for Future Diverter Seal Leaks defined herein.

3

C. "Agreement" or "Settlement Agreement" means this Class Action Settlement Agreement and Release and the exhibits attached hereto.

D. "Attorney Fees and Expenses" means the amount of any attorney fees and reimbursement of litigation expenses awarded to Class Counsel pursuant to their Fee Petitions.

E. "Average Cost of Repair" is the average cost to repair a Diverter Seal Leak, which the Parties agree is $225.

F. "Claims Deadline" means 180 days after the Notice Date.

G. "Claim Form" means the forms attached as Exhibit 1, to be approved by the Court and to be submitted to the Settlement Administrator by Settlement Class Members who wish to make a claim.

H. "Class Counsel" means Harper Segui and Rachel Soffin of Milberg Coleman Bryson Phillips Grossman.

I. "Class Dishwashers" or "Dishwashers" means Whirlpool-manufactured Amana, Ikea, Jenn-Air, Kenmore, KitchenAid, or Whirlpool-branded dishwashers manufactured with a hydraulic rotation diverter system from January 1, 2010 through December 31, 2017, and bearing a model number and serial number within the range on the list attached as Exhibit 2.

J. "Class Representatives" or "Plaintiffs" means Elizabeth Cleveland, Christopher Redmon, Amy Larchuk, Dhaval Shah, and Thomas McCormick.

K. "Court" means the United States District Court for the District of Minnesota.

L. "Customer Information Databases" means Whirlpool's Siebel, eCRM, Sensus, and Service Bench databases, which contain production registration data (i.e., owner-warranty registrations and consumer contact records), and no others.

M.   "Defendant" means Whirlpool Corporation.

N.   "Diverter Seal Leak" means a water leak that originated at the location of the diverter motor shaft and diverter seal found in the sump assembly parts listed in Exhibit 3.

O.   "Effective Date" means the first date that is three business days after all of the following have occurred: (i) the Court has entered an order granting final approval of the Settlement Agreement in accordance with the terms of this Agreement; (ii) the time for any challenge to the Settlement, both in the Court and on appeal, has elapsed; and (iii) the Settlement has become final, either because no timely challenge was made to it or because any timely challenge has been finally adjudicated and rejected. For purposes of this Section, an "appeal" shall not include any appeal that concerns solely the issue of Class Counsel's Attorney Fees and Expenses or the Service Awards to the Class Representatives.

P.   "Fairness Hearing" means the final hearing, to be held after notice has been provided to the Settlement Class in accordance with this Agreement to: (1) determine whether to grant final approval, and (a) re-affirm certification of the Settlement Class, (b) designate Class Representatives, (c) designate Class Counsel as counsel for the Settlement Class, and the Settlement; (2) consider whether to enter the Final Approval Order; and (3) to rule on Class Counsel's Fee Petitions and Class Representative Service Awards.

Q.   "FAQ" means the long-form notice to the Settlement Class in the form of Frequently Asked Questions and Answers attached as Exhibit 4, to be approved by the Court and posted on the Settlement Website in accordance with this Agreement.

R.   "Fee Petition" means the application to be filed by Class Counsel by which they will seek an award of attorney fees and reimbursement of litigation expenses incurred by them in prosecuting the Lawsuits, and all aspects of the settlement of them, as well as a Service Award to be paid to Plaintiffs.

S.   "Final Approval Order" means the proposed Order Granting Final Approval to the Settlement, to be entered by the Court with terms to be agreed upon by the Parties and consistent with this Agreement.

T.   "Future Diverter Seal Leak" is a Diverter Seal Leak that occurs on or after the Notice Date.

U.   "Notice Date" means the date on which the Settlement Administrator completes the initial mailing of Summary Notices to Class Members.

V.   "Notice of Claim Denial" means the form that the Settlement Administrator will send, by first-class United States Mail, to each Person who has submitted a Claim Form that the Settlement Administrator has determined, subject to review and approval by Class Counsel, to not be a Valid Claim.

W.   "Opt-Out" means the process by which a member of the Settlement Class may submit a request for exclusion in the manner and time prescribed by the Court in the Preliminary Approval Order.

X.   "Paid Qualifying Repair" means where a Settlement Class Member actually paid some out-of-pocket cost for a repair of his or her Dishwasher that included the replacement of either the diverter motor, diverter seal, sump, or sump assembly parts listed in Exhibit 3 in response to a Diverter Seal Leak.

Y.      "Paid Qualifying Replacement" means where a Settlement Class Member actually paid some out-of-pocket cost to replace, rather than repair, their Dishwasher in response to a Diverter Seal Leak.

Z.      "Parties" means Plaintiffs and Whirlpool, collectively.

AA.     "Past Diverter Seal Leak" means a Diverter Seal Leak that occurred prior to the Notice Date.

BB.     "Person" means any natural person.

CC.     "Preliminary Approval Order" means the proposed Order Granting Preliminary Approval to Class Action Settlement, to be entered by the Court with terms to be agreed upon by the Parties and consistent with this Agreement.

DD.     "Publication Notice" means the proposed notice attached as Exhibit 5, with the terms and form to be approved by the Court and to be published in accordance with the notice plan set forth in Section V of this Agreement.

EE.     "Released Claims" means all claims released by Plaintiffs and all Settlement Class Members pursuant to the release and waiver set forth in Section IX of this Agreement.

FF.     "Releasees" means (i) Defendant, together with its predecessors and successors in interest, parents, subsidiaries, affiliates, and assigns; (ii) each of Defendant's past, present, and future officers, directors, agents, representatives, servants, employees, attorneys, and insurers; and (iii) all distributors, retailers, suppliers, and other entities who were or are in the chain of design, testing, manufacture, assembly, distribution, marketing, sale, installation, or servicing of the Class Dishwashers, all of whom will be parties to the releases set forth in Sections IX and X.

GG.  "Service Award" means a reasonable payment, subject to Court approval, made to a Plaintiff as compensation for his or her efforts in pursuing these Actions.

HH.  "Settlement" means the settlement provided for in this Agreement.

II.  "Settlement Administrator" means Angeion Group.

JJ.  "Settlement Class" means all persons in the United States and its territories who either (a) purchased a new Class Dishwasher, or (b) acquired a new Class Dishwasher as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Class Dishwasher not used by the donor or by anyone else after the donor purchased the Class Dishwasher and before the donor gave the Class Dishwasher to the Settlement Class Member. Excluded from the Settlement Class are (i) officers, directors, and employees of Whirlpool or its parents, subsidiaries, or affiliates, (ii) insurers of Settlement Class Members, (iii) subrogees or all entities claiming to be subrogated to the rights of a Class Dishwasher purchaser, a Class Dishwasher owner, or a Settlement Class Member, (iv) persons who acquired an other-than-new Class Dishwasher, (v) issuers or providers of extended warranties or service contracts for Class Dishwashers, and (vi) persons who timely and validly exercise their right to be removed from the Settlement class, as described below.

KK.  "Settlement Class Member" means all Persons who are members of the Settlement Class who do not Opt-Out.

LL.  "Settlement Website" means a website created by the Settlement Administrator to facilitate notice and claims administration, as detailed in Section V(J) of this Agreement.

8

MM.   "Summary Notice" means the proposed postcard and email notice attached as Exhibit 6, to be approved by the Court and to be mailed by the Settlement Administrator to each address of record in Whirlpool's databases (after being run through the National Change of Address database), and emailed to Settlement Class Members for whom valid email addresses are known to Whirlpool.

NN.   "Valid Claim" means a Claim Form that (i) is timely submitted by a Settlement Class Member in accordance with the requirements of this Agreement and the Preliminary Approval Order, (ii) is signed with a certification that the information is true and correct to the best of the claimant's knowledge and recollection, and (iii) contains all of the attestations, certifications, information, and documentation required for that Settlement Class Member to be eligible to receive one or more of the benefits provided in Section IV of this Agreement.

OO.   "Whirlpool" means Whirlpool Corporation and its consolidated subsidiaries, including their successors, predecessors, assigns, affiliates, subsidiaries, shareholders, officers, directors, agents, insurers, attorneys, and employees.

## II.   CONDITIONAL CERTIFICATION OF NATIONWIDE SETTLEMENT CLASS

For purposes of implementing this Agreement, and for no other purpose, Whirlpool stipulates to the conditional certification of the nationwide Settlement Class. If, for any reason, this Agreement should fail to become effective, Whirlpool's stipulation to certifying the nationwide Settlement Class shall be null and void, and the Parties shall return to their prior positions in the Lawsuits.

## III.   REQUIRED EVENTS

A.   As soon as practicable after executing this Agreement, Plaintiffs shall take all necessary steps to file with the Court in *Cleveland* a motion seeking entry of the

Preliminary Approval Order, which by its terms shall accomplish all of the following:

1.      Preliminarily approve the Settlement and this Agreement as fair and reasonable to the Settlement Class;

2.      Conditionally certify the Settlement Class as a nationwide class for purposes of effectuating the Settlement;

3.      Designate Plaintiffs as the Class Representatives;

4.      Designate Class Counsel as counsel for the Settlement Class;

5.      Designate Angeion Group as the Settlement Administrator and instruct the Settlement Administrator to perform the following functions in accordance with the terms of this Agreement and the Preliminary Approval Order:

   a.      Disseminate the Summary Notice by email if available or first-class United States Mail if email is not available;

   b.      Establish the Settlement Website with the Settlement Agreement, FAQ, and other information that Whirlpool and Class Counsel jointly agree to post concerning the nature of the case and the status of the Settlement, including relevant pleadings such as the operative Complaint, papers in support of preliminary and final approval of the Settlement, and Class Counsel's Fee Petition, plus relevant orders of the Court;

   c.      Prior to mailing the Settlement Notice or publishing Publication Notice, establish a toll-free telephone number that Class Members can call to request hard copies of the Claim Forms and FAQ be sent

to them by mail and obtain additional information regarding the Settlement;

d.  Receive, evaluate, and either approve completed Claim Forms sent by Persons seeking to receive compensation as meeting the requirements of the Agreement or disapprove as failing to meet those requirements, including claims for Past Diverter Seal Leaks and claims for Future Diverter Seal Leaks;

e.  Subject to the provisions of Section V(D) of this Agreement, 35 days before mailing Notices of Claim Denial, provide to Whirlpool and Class Counsel (i) a list of the names and addresses of all Settlement Class Members who have submitted Claim Forms and whose Claim Forms the Settlement Administrator has determined to be Valid Claims; and (ii) a separate list of the names and addresses of all Persons who have submitted Claim Forms and whose Claim Forms the Settlement Administrator has determined not to be Valid Claims, by category of benefit. Whirlpool and Class Counsel shall then have an opportunity to review the Valid Claims and the Notices of Claim Denial and request a meet and confer should they decide to challenge any Valid Claims or Notices of Claim Denial. In the event Class Counsel challenges a Notice of Claim Denial, that Notice shall not be sent to the Class Member until Class Counsel and counsel for Defendant meet and confer to arrive at a resolution, which must occur within at least 28 days of the Settlement Administrator's provision of the lists described above to Class Counsel and counsel

for Defendant. Legitimate grounds for Whirlpool and Class Counsel to challenge a claim shall include, but are not limited to, inadequate documentation and inconsistency with Whirlpool's records, all of which is subject to Section V(D) below discussing the Class Member's opportunity to cure a deficiency with their claim;

f.    Effect Publication Notice through appropriate media for the Settlement Class;

g.    Send, by email if available or first-class United States Mail if email is not available, to each Person who has submitted a Claim Form that the Settlement Administrator has determined not to be a Valid Claim, and which has not been challenged by Class Counsel, a Notice of Claim Denial or a notice of claim deficiency;

h.    Process requests for exclusion from the Settlement in accordance with this Agreement;

i.    Process objections to the Settlement in accordance with this Agreement;

j.    Within 35 days after the payment of all Valid Claims for monetary compensation by the Settlement Administrator, provide to Whirlpool and Class Counsel, under penalty of perjury, a statement of the total number of claims submitted (in total and by category of benefit), the total number of claims adjudicated as Valid Claims (in total and by category of benefit), and the total dollar amount paid to Settlement Class Members (in total and by category of benefit); and

k.    Process Future Diverter Seal Leak claims following the same procedures as set forth in (d) and (e) above, and providing the reports and related information set forth in those provisions to Whirlpool every 35 days to address Future Diverter Seal Leaks on a rolling basis through the last qualifying date on December 31, 2025.

6.    Approve the form, contents, and methods of notice to be given to the Settlement Class and direct the Settlement Administrator to provide and cause to be provided such notices and to file with the Court a declaration detailing the scope, methods, and results of the notice program;

7.    Establish procedures and schedule deadlines for Settlement Class Members to object to the Settlement or certification of the Settlement Class, to exclude themselves from the Settlement, and to submit Claim Forms to the Settlement Administrator, all consistent with the terms of this Agreement;

8.    Schedule the Fairness Hearing; and

9.    Schedule deadlines for the filing of (a) papers in support of final approval of the certification of the Settlement Class, the designation of Plaintiffs as representatives of the Settlement Class, the appointment of Class Counsel as counsel for the Settlement Class, and the Settlement; (b) Class Counsel's Petition for Fees and Service Awards for Class Representatives; and (c) objections to certification of the Settlement Class, to the designation of Plaintiffs as the representatives of the Settlement Class, to the appointment of Class Counsel as counsel for the Settlement Class, or to the Settlement.

B.    At the Fairness Hearing, Whirlpool and Class Counsel will jointly request the Court to enter a Final Approval Order that (1) certifies the Settlement Class, designates

Plaintiffs as Class Representatives, and designates Class Counsel as counsel for the Settlement Class; (2) grants final approval of the Settlement and this Agreement as fair, reasonable, and adequate to the Settlement Class Members; (3) finds that the Class Notice complied with all laws, including, but not limited to Federal Rule of Civil Procedure 23 and the due Process Clause of the United States Constitution; (4) provides for the release of all Released Claims and enjoins Settlement Class Members from asserting, filing, maintaining, or prosecuting any of the Released Claims in the future; (5) orders the dismissal with prejudice of all claims, causes of action, and counts alleged in the Lawsuits, and incorporates the releases and covenant not to sue stated in this Agreement, with each of the Parties to bear its, his, or her own costs and attorney fees, except as provided in Section VIII, below; (6) authorizes the payment by Whirlpool of Valid Claims approved by the Settlement Administrator as Valid Claims, and otherwise reviewed by Class Counsel and Counsel for Whirlpool and determined to be Valid Claims, in accordance with the terms of the Agreement; and (7) preserves the Court's continuing jurisdiction over the administration of the Settlement and enforcement of this Agreement. In addition, Class Counsel will move the Court for entry of a separate order approving the following: (1) Service Awards to Plaintiffs as described in this Agreement, and (2) attorney fees and costs to Class Counsel in an amount as approved by the Court and consistent with the terms of this Agreement.

C.   Whirlpool, Plaintiffs, and Class Counsel will cooperate and take all reasonable actions to accomplish the above. If the Court fails to enter either the Preliminary Approval Order or the Final Approval Order, Whirlpool, Plaintiffs, and Class Counsel will use all reasonable efforts that are consistent with this Agreement to

cure any defect identified by the Court. If, despite such efforts, the Court does not enter the Preliminary Approval Order and Final Approval Order, the Parties will return to their positions in the Lawsuits as they were immediately before the execution of the Settlement Agreement.

## IV.   SETTLEMENT BENEFITS

For any Settlement Class Member who can provide sufficient documentary proof that (1) within eight years after manufacture, the Settlement Class Member's Dishwasher experienced a Diverter Seal Leak, and (2) the Settlement Class Member incurred out-of-pocket expenses for either (i) a Paid Qualifying Repair, or (ii) a Paid Qualifying Replacement within six weeks of the Diverter Seal Leak, rather than a repair of their Dishwasher, Whirlpool will partially reimburse those out-of-pocket expenses subject to the limitations set forth below.

A.   <u>Compensation to Settlement Class Members for Past Diverter Seal Leaks</u>. Settlement Class Members who have experienced a documented Past Diverter Seal Leak within eight years after manufacture of their Dishwasher will be entitled to reimbursement of certain out-of-pocket expenses incurred as a result of that Past Diverter Seal Leak. To be eligible for compensation for a Past Diverter Seal Leak, a Settlement Class Member must submit to the Settlement Administrator within 180 days of the Notice Date:

1.   A properly completed claim form showing a valid Dishwasher model and serial-number combination, together with documentary proof showing that the Settlement Class Member either purchased a Dishwasher new, or acquired a Dishwasher as part of the purchase or remodel of a home, or received as a gift, from a donor meeting those requirements, a new Dishwasher not used by the donor or by anyone else after the donor

purchased the Dishwasher and before the donor gave the Dishwasher to the Settlement Class Member. Sufficient documentary proof includes, but is not limited to, purchase receipts, credit card statements, and warranty registrations. If no such documentary proof is available, then the claimant shall provide a claim-form declaration, signed under oath, that the claimant cannot locate sufficient documentary proof, and that the claimant meets the Settlement Class definition in Section I(JJ), above. If the Settlement Class Member does not provide a valid model and serial number, the Settlement Class Member will not be entitled to compensation. Additionally, if the Settlement Class Member does not provide documentary proof, or does not provide a claim-form declaration, signed under oath, proving that the Settlement Class Member is a member of the Settlement Class, the Settlement Class Member will not be entitled to compensation.

2. The following are forms of sufficient documentary proof that (a) within eight years of manufacture, (b) the Settlement Class Member's Dishwasher experienced a Diverter Seal Leak, and either (c) the Settlement Class Member actually made a Paid Qualifying Repair, or (d) the Settlement Class Member made a Paid Qualifying Replacement, rather than repair, of their Dishwasher in response to a Diverter Seal Leak:

   a. The submission of a valid model and serial number is sufficient documentary proof of the date of manufacture.

   b. For purposes of claims to receive reimbursements for Paid Qualifying Repairs, sufficient documentary proof that the claimant actually experienced a Diverter Seal Leak includes, but is not

limited to, service tickets, service estimates, and service receipts. If no such documentary proof is available, then the claimant shall provide a claim-form declaration, signed under oath, that the claimant experienced, within eight years after manufacture, a Diverter Seal Leak. If the Settlement Class Member does not provide documentary proof or a declaration, the Settlement Class Member will not be entitled to compensation.

c.    For purposes of claims to receive reimbursements for Paid Qualifying Repairs, sufficient documentary proof that the claimant experienced a Paid Qualifying Repair includes, but is not limited to, service tickets, service receipts, cancelled checks, and/or credit card statements. If the documentary proof is insufficient to demonstrate that (1) a Qualifying Repair occurred and (2) the Settlement Class Member paid some amount out of pocket for the Qualifying Repair, the Settlement Class Member will not be entitled to compensation.

d.    For purposes of claims to receive reimbursements for Paid Qualifying Replacements, sufficient documentary proof that the claimant actually experienced a Diverter Seal Leak before the Qualifying Replacement includes, but is not limited to, service tickets, service estimates, and/or service receipts. If the Settlement Class Member does not provide documentary proof, the Settlement Class Member will not be entitled to compensation. A claim form declaration of a Diverter Seal Leak is not sufficient documentary

proof of a Diverter Seal Leak for purposes of a Paid Qualifying Replacement claim.

e.    For purposes of claims to receive reimbursements for Paid Qualifying Replacements, sufficient documentary proof that the claimant experienced a Paid Qualifying Replacement includes, but is not limited to, purchase receipts, credit card statements, and warranty registrations. If the documentary proof is insufficient to demonstrate that a Qualifying Replacement occurred, including that it occurred within six weeks of the Diverter Seal Leak, the Settlement Class Member will not be entitled to compensation.

3.    Settlement Class Members who meet and satisfy the threshold requirements of Section IV(A)(1)-(2) above will be entitled to reimbursement of certain out-of-pocket expenses constituting a Paid Qualifying Repair or Paid Qualifying Replacement, as follows:

a.    For purposes of claims to receive reimbursements for Paid Qualifying Repairs, the claimant will be entitled to a cash payment equivalent to a percentage of the Average Cost of Repair, as follows:

i.    for Paid Qualifying Repairs in years one (1) or two (2) after manufacture, 100% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase of a new Whirlpool-brand or Maytag-brand dishwasher;

ii.    for Paid Qualifying Repairs in year three (3) after manufacture, 90% of the Average Cost of Repair, <u>or</u> a cash

rebate of $200 for the purchase a new KitchenAid-brand dishwasher, or a cash rebate of $150 for the purchase of a new Whirlpool-brand or Maytag-brand dishwasher;

iii. for Paid Qualifying Repairs in years four (4) or five (5) after manufacture, 80% of the Average Cost of Repair, or a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, or a cash rebate of $150 for the purchase of a new Whirlpool-brand, or Maytag-brand dishwasher;

iv. for Paid Qualifying Repairs in year six (6) after manufacture, 60% of the Average Cost of Repair, or a cash rebate of $175 for the purchase a new KitchenAid-brand dishwasher, or a cash rebate of $125 for the purchase of a new Whirlpool-brand, or Maytag-brand dishwasher;

v. for Paid Qualifying Repairs in year seven (7) after manufacture, 30% of the Average Cost of Repair, or a cash rebate of $100 for the purchase of a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher; or

vi. for Paid Qualifying Repairs in year eight (8) after manufacture, a cash rebate of $100 for the purchase of a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher.

b. For purposes of claims for Paid Qualifying Replacements, the claimant will be entitled to a cash payment equivalent to a percentage of the Average Cost of Repair, as follows:

i.       for Paid Qualifying Replacements in years one (1) or two (2) after manufacture, 100% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand or Maytag-brand dishwasher;

ii.      for Paid Qualifying Replacements in year three (3) after manufacture, 90% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand or Maytag-brand dishwasher;

iii.     for Paid Qualifying Replacements in years four (4) or five (5) after manufacture, 80% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

iv.     for Paid Qualifying Replacements in year six (6) after manufacture, 60% of the Average Cost of Repair, <u>or</u> a cash rebate of $175 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $125 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

v.      for Paid Qualifying Replacements in year seven (7) after manufacture, 30% of the Average Cost of Repair, <u>or</u> a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher; or

vi.    for Paid Qualifying Replacements in year eight (8) after manufacture, a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher.

B.    <u>Compensation to Settlement Class Members for Future Diverter Seal Leaks</u>. Settlement Class Members who experience a documented Diverter Seal Leak after the Notice Date but within eight years after manufacture of their Dishwasher will be entitled reimbursement of certain out-of-pocket expenses incurred as a result of that Future Diverter Seal Leak. To be eligible for compensation for a Future Diverter Seal Leak, a Settlement Class Member must submit to the Settlement Administrator within 90 days of the Diverter Seal Leak:

1.    A properly completed claim form showing a valid Dishwasher model and serial-number combination, together with documentary proof showing that the Settlement Class Member either purchased a Dishwasher new, or acquired a Dishwasher as part of the purchase or remodel of a home, or received as a gift, from a donor meeting those requirements, a new Dishwasher not used by the donor or by anyone else after the donor purchased the Dishwasher and before the donor gave the Dishwasher to the Settlement Class Member. Sufficient documentary proof includes, but is not limited to, purchase receipts, credit card statements, and warranty registrations. If no such documentary proof is available, then the claimant shall provide a claim-form declaration, signed under oath, that the claimant cannot locate sufficient documentary proof, and that the claimant meets the Settlement Class definition in Section I(JJ), above. If the Settlement Class

Member does not provide a valid model and serial number, the Settlement Class Member will not be entitled to compensation. Additionally, if the Settlement Class Member does not provide documentary proof, or does not provide a claim-form declaration, signed under oath, proving that the Settlement Class Member is a member of the Settlement Class, the Settlement Class Member will not be entitled to compensation.

2.  The following forms of sufficient documentary proof that (a) after the Notice Date but within eight years of manufacture, (b) the Settlement Class Member's Dishwasher experienced a Diverter Seal Leak, and either (c) the Settlement Class Member actually paid some out-of-pocket cost for a Paid Qualifying Repair, or (d) the Settlement Class Member actually paid some out-of-pocket cost for a Paid Qualifying Replacement:

    a.  The submission of a valid model and serial number is sufficient documentary proof of the date of manufacture.

    b.  For purposes of claims to receive reimbursements for Paid Qualifying Repairs, sufficient documentary proof that the claimant actually experienced a Diverter Seal Leak includes, but is not limited to, service tickets, service estimates, and service receipts. If no such documentary proof is available, then the claimant shall provide a claim-form declaration, signed under oath, that the claimant experienced, after the Notice Date but within eight (8) years after manufacture, a Diverter Seal Leak. If the Settlement Class Member does not provide documentary proof or a declaration, the Settlement Class Member will not be entitled to compensation.

c.      For purposes of claims to receive reimbursements for Paid Qualifying Repairs, sufficient documentary proof that the claimant experienced a Paid Qualifying Repair includes, but is not limited to, service tickets, service receipts, cancelled checks, and credit card statements. If the documentary proof is insufficient to demonstrate that a Qualifying Repair occurred and the Settlement Class Member paid some amount out of pocket for the Qualifying Repair, the Settlement Class Member will not be entitled to compensation.

d.      For purposes of claims to receive reimbursements for Paid Qualifying Replacements, sufficient documentary proof that the claimant actually experienced a Diverter Seal Leak before the Qualifying Replacement includes, but is not limited to, service tickets, service estimates, and service receipts. If the Settlement Class Member does not provide documentary proof, the Settlement Class Member will not be entitled to compensation.

e.      For purposes of claims to receive reimbursements for Paid Qualifying Replacements, sufficient documentary proof that the claimant experienced a Paid Qualifying Replacement includes, but is not limited to, purchase receipts, credit card statements, and warranty registrations. If the documentary proof is insufficient to demonstrate that a Qualifying Replacement occurred, or occurred within six weeks of the Diverter Seal Leak, the Settlement Class Member will not be entitled to compensation.

3.      Settlement Class Members who meet and satisfy the threshold requirements of Section IV(B)(1)-(2) above will be entitled to reimbursement of certain out-of-pocket expenses incurred as a result of the Future Diverter Seal Leak[1] and Paid Qualifying Repair or Paid Qualifying Replacement, as follows:

a.      For purposes of claims to receive reimbursements for Paid Qualifying Repairs, the claimant will be entitled to a cash payment equivalent to a percentage of the Average Cost of Repair, or a cash rebate, as follows:

i.      for Paid Qualifying Repairs in years one (1) or two (2) after manufacture, 100% of the Average Cost of Repair, or a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, or a cash rebate of $150 for the purchase of a new Whirlpool-brand or Maytag-brand dishwasher;

ii.     for Paid Qualifying Repairs in year three (3) after manufacture, 90% of the Average Cost of Repair, or a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, or a cash rebate of $150 for the purchase of a new Whirlpool-brand or Maytag-brand dishwasher;

iii.    for Paid Qualifying Repairs in years four (4) or five (5) after manufacture, 80% of the Average Cost of Repair, or a cash rebate of $200 for the purchase a new KitchenAid-brand

[1] Because the class period ends with Dishwasher production through December 31, 2017, the most recently-manufactured Dishwashers will be at least four (4) years old as of the anticipated notice date in 2021.

dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

iv. for Paid Qualifying Repairs in year six (6) after manufacture, 60% of the Average Cost of Repair, <u>or</u> a cash rebate of $175 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $125 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

v. for Paid Qualifying Repairs in year seven (7) after manufacture, 30% of the Average Cost of Repair, <u>or</u> a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher; or

vi. for Paid Qualifying Repairs in year eight (8) after manufacture, a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher.

b. For purposes of claims to receive reimbursements for Paid Qualifying Replacements, the claimant will be entitled to a cash payment equivalent to a percentage of the Average Cost of Repair, as follows:

i. for Paid Qualifying Replacements in years one (1) or two (2) after manufacture, 100% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand or Maytag-brand dishwasher;

ii.      for Paid Qualifying Replacements in year three (3) after manufacture, 90% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand or Maytag-brand dishwasher;

iii.      for Paid Qualifying Replacements in years four (4) or five (5) after manufacture, 80% of the Average Cost of Repair, <u>or</u> a cash rebate of $200 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $150 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

iv.      for Paid Qualifying Replacements in year six (6) after manufacture, 60% of the Average Cost of Repair, <u>or</u> a cash rebate of $175 for the purchase a new KitchenAid-brand dishwasher, <u>or</u> a cash rebate of $125 for the purchase a new Whirlpool-brand, or Maytag-brand dishwasher;

v.      for Paid Qualifying Replacements in year seven (7) after manufacture, 30% of the Average Cost of Repair, <u>or</u> a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher; or

vi.      for Paid Qualifying Replacements in year eight (8) after manufacture, a cash rebate of $100 for the purchase a new KitchenAid-brand, Whirlpool-brand, or Maytag-brand dishwasher.

4.      If any Settlement Class Member previously has received from Whirlpool any form of compensation for a Diverter Seal Leak with the claimant's Dishwasher (*e.g.*, a policy-adjust cash payment, a partial refund, a discount off the regular price of a new dishwasher, a coupon applicable to the purchase of a new dishwasher that was redeemed), any compensation to which the claimant would otherwise be entitled shall be reduced as follows: (i) for any policy-adjust cash payment, cash refund, or other cash payment, the amount of that payment; (ii) for any specified dollar-discount off the price of any new dishwasher, the specified dollar amount; (iii) for any specified percentage-discount off the price of any new dishwasher, the dollar amount determined by applying that percentage to the regular, then-prevailing price of that product; and (iv) for any coupon redeemed for the purchase of a new dishwasher, the dollar amount specified on the face of the coupon redeemed. Claimants who did not receive such compensation will be required to check an eligibility box on their claim form attesting that they did not receive any of these customer-satisfaction benefits from Whirlpool related to a Diverter Seal Leak with their Dishwasher.

5.      No claimant who received from Whirlpool either a full refund of the purchase price he or she paid for the Dishwasher or a free exchange of the Dishwasher for a new dishwasher of any model will be entitled to any payment or other compensation under the terms of this Term Sheet, unless the claimant paid for a Qualifying Repair in either the original or new Dishwasher.

6.      Settlement Class Members will have up to 180 days after the Notice Date to submit a claim form for a settlement payment for a Diverter Seal Leak that occurred prior to the Notice Date. Settlement Class members who elect a rebate benefit shall be required to register for the rebate program within 180 days after the Notice Date. The Settlement Administrator shall then issue a validly-requested rebate form.

7.      All claims for Future Diverter Seal Leaks, i.e., those that occur on or after the Notice Date, must be submitted within 90 days after the claimant's first experience of a Diverter Seal Leak. Settlement Class members who elect a rebate benefit shall be required to register for the rebate program within 90 days after the claimant's first experience of a Diverter Seal Leak. The Settlement Administrator shall then issue a validly-requested rebate form.

8.      Settlement Class Members shall be required to mail or email to the Settlement Administrator their completed rebate form and proof of purchase no later than 120 days after receipt of the rebate form.

9.      The rebate relief provided for in this Agreement shall apply only to purchases of eligible products made on or after the date the Settlement Class Member makes a claim for rebate benefits under this Agreement. The rebate amount shall be calculated on the best negotiated retail purchase price (not including sales taxes, delivery fees, or installation charges) of eligible products. The rebate form to be provided to Settlement Class Members who file Valid Claims is transferable, stackable, and will be redeemable by mail. All rebate forms provided to Settlement Class Members shall contain a unique authorization code, which code the Settlement Administrator shall

honor only one time to prevent fraudulent claims that seek to re-use the same authorization code.

## V.  SETTLEMENT ADMINISTRATION AND NOTICE EXPENSES

A.  All notice, publication and claims administration activities shall be carried out exclusively by the Settlement Administrator, including the evaluation of documentary proof submitted by Settlement Class Members.

B.  Whirlpool agrees to pay for reasonable Administration and Notice Expenses, and shall enter into a separate agreement with the Settlement Administrator to pay those expenses. Whirlpool shall not be responsible for any additional administration expenses that may be incurred by Plaintiffs or Class Counsel in (a) responding to inquiries about the Agreement, the Settlement, or the Lawsuits; (b) defending the Agreement or the Settlement against any challenge to it; or (c) defending against any challenge to any order or judgment entered pursuant to the Agreement, unless otherwise specifically agreed.

C.  The Settlement Administrator shall process all claims made by Settlement Class Members who experienced a Diverter Seal Leak before or after the Notice Date, including the evaluation of the documentary proof submitted by such Settlement Class Members to substantiate a Qualifying Repair or Qualifying Replacement subject to relief as set forth in this Agreement.

D.  Before denying any claim on the basis of insufficient documentary proof, the Settlement Administrator shall send by email if available or first-class United States Mail if email is not available a written notice of deficiency to the Settlement Class Member identifying the insufficient proof that may cause the claim to be denied and giving the Settlement Class Member no more than 30 days to cure the

deficiency. Insufficient documentary proof shall be the only claim deficiency for which an opportunity to cure will be provided. Examples of insufficient documentary proof include illegible or incomplete documents. The absence of required documentary proof or incomplete or disqualifying claim form responses are not deficiencies for which an opportunity to cure will be provided.

E.      If any Settlement Class Member disputes the Settlement Administrator's denial of a claim for any reason, the Settlement Administrator shall send the claim to Whirlpool for Whirlpool to determine the claim's validity. Whirlpool's determination shall be final and binding unless Class Counsel, within 30 days of notification of Whirlpool's determination, contests Whirlpool's determination by first attempting to resolve the claim in dispute directly with Defendant's counsel and, if those efforts are unsuccessful, by presenting the matter for determination by the Court within 30 days of the completion of Whirlpool's and Class Counsel's conferral.

F.      The Parties agree that Angeion Group will serve as the Settlement Administrator, subject to the Court's approval.

G.      With the exception of decisions regarding claims adjudication, for which the respective rights and responsibilities of Whirlpool, Class Counsel, the Settlement Administrator, and the Court are addressed elsewhere in this Agreement, all decisions regarding notice and settlement administration shall be made jointly between Whirlpool and Class Counsel. Class Counsel and counsel for Whirlpool shall have the ability to communicate with the Settlement Administrator without the need to include each other in each of those communications. Disputes, if any, shall be resolved by the Court.

H.    The Settlement Administrator will provide the Summary Notice by email to all members of the Settlement Class for whom valid email addresses are known to Whirlpool. Subject to approval by the Settlement Administrator, for all Settlement Class Members for whom Whirlpool only has a physical mailing address, or whose email notice bounced back from an undeliverable address, the Settlement Administrator will utilize a reverse look-up service to obtain additional email addresses, and email the Summary Notice to all members of the Settlement Class for whom an email can be identified through the reverse look-up service. The Settlement Administrator will mail a Summary Notice to each member of the Settlement Class for whom an address can be found in Whirlpool's databases but who do not have an identifiable email address. The Settlement Administrator will perform a national change of address search and forward notice packages that are returned by the U.S. Postal Service with a forwarding address.

I.    The Settlement Administrator also will provide publication notice to the Settlement Class using appropriate media outlets, and media notices shall be approved by Whirlpool and Plaintiff's counsel before the notices are published.

J.    The Settlement Administrator will create a Settlement Website that will include all necessary and pertinent information for Settlement Class Members, including the Claim Form, the FAQ, and information relating to relevant deadlines. The Settlement Website will also permit Settlement Class Members to submit claims online, including uploading any necessary documentation. The Settlement Website will also include information that Whirlpool and Class Counsel jointly agree to post concerning the nature of the case and the status of the Settlement, including relevant pleadings such as the operative Complaint, papers in support of preliminary and

31

final approval of the Settlement, Class Counsel's Fee Petition, plus relevant orders of the Court.

K.     The Settlement Administrator will provide to Class Counsel and Whirlpool periodic status reports regarding claims.

L.     The Parties agree that the Summary Notice, FAQ, Publication Notice, Claim Form, and Settlement Website provide information sufficient to inform Settlement Class Members of the essential terms of this Agreement, appropriate means for obtaining additional information regarding the Agreement and the Lawsuits, appropriate information about the procedure for challenging or excluding themselves from the Settlement, if they should wish to do so, and appropriate means for and information about submitting a claim for compensation pursuant to the Settlement. The Parties also agree that the dissemination of notice of the Settlement in the manner specified in this Agreement and on the Settlement Website satisfies the notice requirements of due process and Rule 23 of the Federal Rules of Civil Procedure, subject to Court approval.

M.     The Parties will jointly request the Court to approve, in the Preliminary Approval Order, the method of notice described in this Agreement.

N.     As soon as practicable, but no later than 10 days after the Parties file this Agreement with the Court, Whirlpool shall comply with the notice provisions of the Class Action Fairness Act, 28 U.S.C. section 1715.

## VI.     PROCEDURES FOR SETTLEMENT APPROVAL

A.     The Parties shall use their best efforts to effectuate this Agreement, including cooperating in drafting the preliminary approval documents and securing the prompt, complete, and final dismissal, with prejudice, of the Lawsuits.

B.    Preliminary Approval

1.    As soon as practicable, the Parties shall jointly move the Court for preliminary approval of the Settlement; for authorization to publish the Publication Notice and to disseminate the Summary Notice contemplated by this Agreement to all members of the Settlement Class; and for a stay of all proceedings in the consolidated Lawsuits, except in connection with this Agreement as set forth herein (the "Motion"). The Motion shall include the proposed Preliminary Approval Order, proposed forms of the Summary Notice, Publication Notice, and Claim Form, and the methods and proposed dates of their dissemination to the Settlement Class, and the proposed schedule through final approval of the Agreement.

2.    The deadlines established in the proposed Preliminary Approval Order are as follows:

a.    42 days after entry of the Preliminary Approval Order: The Settlement Administrator shall mail and email the Summary Notice.

b.    49 days after entry of the Preliminary Approval Order: The Settlement Administrator shall publish the Publication Notice.

c.    63 days after entry of the Preliminary Approval Order: The Settlement Administrator shall file with the Court a declaration of compliance with the notice requirements, including a statement of the number of persons to whom the Summary Notice was emailed and mailed.

d.      70 days after entry of the Preliminary Approval Order: Class Counsel shall file their Fee Petition, which shall also be posted on the settlement website.

e.      91 days after entry of the Preliminary Approval Order: Any objectors shall file objections, together with all supporting memoranda and other material, with the Court, and serve that filing on Class Counsel and counsel for Defendant. This includes objections to: certification of the Settlement Class, the designation of Plaintiffs as Class Representatives, the appointment of Class Counsel, the Settlement, the Agreement, and Class Counsel's Fee Petition. Objections must comply with Section VII of this Agreement to be valid.

f.      91 days after entry of the Preliminary Approval Order: Requests by Class Members to be excluded from the Settlement must be either postmarked by the U.S. Postal Service (in the case of mailed exclusions) or actually received by the Settlement Administrator (in the case of electronically submitted exclusions). Exclusion requests must comply with Section VII of this Agreement to be valid.

g.      91 days after entry of the Preliminary Approval Order: Any Person or attorney seeking to appear at the Fairness Hearing must file with the Court and serve on Class Counsel and counsel for Defendant an entry of appearance in the consolidated Lawsuits and notice of intention to appear at the Fairness Hearing. This includes any person objecting to any or all of the certification of the Settlement Class,

designation of Plaintiffs as Class Representatives, appointment of Class Counsel, the Settlement, the Agreement, or Class Counsel's Fee Application. This notice of intention to appear must comply with Section VII of this Agreement to be valid.

h.      105 days after entry of the Preliminary Approval Order: The Settlement Administrator must file a list of all exclusions with the Court.

i.      105 days after entry of the Preliminary Approval Order: Class Counsel shall file their reply, if any, in support of their Fee Application.

j.      105 days after entry of the Preliminary Approval Order: Class Counsel shall file the proposed Final Approval Order and memorandum in support of Final Approval. Defendant may separately file a memorandum in support of Final Approval by this deadline.

k.      140 days after entry of the Preliminary Approval Order: The Court, at its convenience, will hold the Fairness Hearing.

l.      180 days after entry of the Preliminary Approval Order: Claims Deadline: All claims by Settlement Class Members to the Settlement Administrator for benefits, except as otherwise provided in Section IV(B) of this Agreement, shall be postmarked by the U.S. Postal Service (in the case of mailed Claim Forms) or received (in the case of electronic Claim Forms). Claims received after this date shall not be Valid Claims. The Claims Deadline is a material term of the

Settlement, without which Defendant would not have entered into this Agreement.

m. For the purpose of computing deadlines, the Parties incorporate Federal Rule of Civil Procedure 6(a)(1).

C. Final Approval

1. At the Fairness Hearing, the Parties will jointly request the Court to enter the Final Approval Order, which (i) grants final approval of the certification of the Settlement Class, designation of the Class Representatives, and designation of Class Counsel, all as conditionally approved in the Preliminary Approval Order; (ii) grants final approval to the Settlement and this Agreement as fair, reasonable, and adequate to the Settlement Class; (iii) provides for the release of all Released Claims and enjoins Settlement Class Members from asserting, filing, maintaining, or prosecuting any of the Released Claims in the future; (iv) orders the dismissal with prejudice of all claims, causes of action, and counts alleged in the Lawsuits, and incorporates the releases and covenant not to sue stated in this Agreement; (v) authorizes the payment by Whirlpool of claims approved by the Settlement Administrator as Valid Claims in accordance with the terms of the Agreement; and (vi) preserves the Court's continuing jurisdiction over the administration of the Settlement and enforcement of the Agreement.

2. In addition, Class Counsel will move the Court for entry of a separate order approving: (1) Service Awards as set forth herein; and (2) attorney fees and costs to Class Counsel consistent with this Agreement.

## VII.    REQUESTS FOR EXCLUSION & OBJECTIONS

A.    Any Class Member shall have the right to be excluded by providing a written request postmarked no later than 91 days following the entry of the Preliminary Approval Order, which deadline shall be set forth in the Summary Notice, FAQ, and Publication Notice. These Notices shall provide instructions to Class Members who wish to exclude themselves from the Settlement Class regarding the Exclusion Procedure that must be followed to be excluded from the Settlement Class. Each Class Member wishing to be excluded from the settlement shall request from the Settlement Administrator a Request for Exclusion where the Class Member shall include their name, email address, and mailing address together with the model number and serial number of their Class Dishwasher. To be valid, Requests for Exclusion must include all of the information listed above, must be individually signed by each Class Member wishing to be excluded, and must be submitted to the Settlement Administrator individually. The Settlement Administrator shall assign a unique identifier to each properly-submitted Request for Exclusion to individually track those individuals who shall be reported to the Court as having been excluded from the Settlement Class.

B.    Within 7 days after the Court-ordered Exclusion deadline, the Settlement Administrator shall provide to counsel for Defendant and Class Counsel a list of the names and addresses of the members of the Settlement Class who have requested to be excluded.

C.    If the number of Class Members who properly request exclusion totals 10,000 or more, Whirlpool, in its sole option, shall have the right to withdraw from the settlement and terminate this Agreement.

D.      The Notices also shall state that any Class Member who wishes to appear to oppose the reasonableness and fairness of the Settlement at the Fairness Hearing must file with the Court an objection in writing, stating the basis of the objection. Objections must also be served on Class Counsel and counsel for Whirlpool by the stated deadline. Any objections must include (i) the Class Member's full name and current address and telephone number; (ii) the model number and serial number of the Class Dishwasher the Class Member owns or owned; (iii) a description of all of the Class Member's objections, the specific reasons therefore, and any and all supporting papers, including, without limitation, all briefs, written evidence, and declarations; and (iv) the Class Member's signature.

E.      Class Members submitting objections who wish to appear either personally or through counsel at the Fairness Hearing and present their objections to the Court orally must include a written statement of intent to appear at the Fairness Hearing in the manner prescribed by the Notice. Only Class Members who specify in their objections that they intend to appear personally or through counsel at the Fairness Hearing will have the right to present their objections orally at the Fairness Hearing. Settlement Class Members who do not submit timely written objections will not be permitted to present their objections at the Fairness Hearing.

F.      Any Class Member who does not so object by the timely filing and delivery of an objection (pursuant to the procedures set forth in the Notice) to the Court and to counsel for the Parties, shall be deemed to have waived, and shall forever be foreclosed from raising, any objection to the Settlement.

VIII. **CLASS COUNSEL'S APPLICATION FOR AN AWARD OF ATTORNEY FEES AND COSTS AND SERVICE AWARDS TO PLAINTIFFS**

A.      As part of this Settlement, Defendant has agreed to pay Class Counsel reasonable attorney fees and costs together with service awards to Plaintiffs, without reducing the amount of money available to pay Valid Claims submitted by Settlement Class Members or the amount of money to be paid for work performed by the Settlement Administrator.

B.      The amount of attorney fees and costs to be paid to Class Counsel shall be determined by the Court. After the Court preliminarily approves the Settlement, Class Counsel may submit a Fee Application to the Court. Class Counsel agree to request, and Defendant agrees not to oppose, up to $1,500,000.00 as the reasonable amount of attorney fees and costs and service awards to be paid by Defendant to Class Counsel and Plaintiffs, subject to Court approval. Class Counsel shall not seek and Defendant shall not pay supplemental attorney fees or costs for any work performed in the Lawsuits, the settlement of them, the administration of the Settlement, or in any appeal, after the date of the Fee Application.

C.      Defendant shall pay the Court-approved amount of attorney fees and costs and service awards, up to $1,500,000.00, in the form of one or more checks or wire transfers delivered into trust accounts to be identified by Class Counsel, within 7 days after the Effective Date. Class Counsel shall provide to Defendant's counsel in a timely manner all wiring and account information necessary to enable Whirlpool to make such deposits within the time required. Under no circumstances will Defendant pay more than $1,500,000.00 to Class Counsel and Plaintiffs for attorney fees and costs and service awards.

D.  Defendant shall not oppose a Service Award of $2,500.00 each to Elizabeth Cleveland, Amy Larchuk, Thomas McCormick, Christopher Redmon, and Dhaval Shah in recognition of their representation of the Settlement Class. This agreed amount will be subject to Court approval and will be included in Class Counsel's Fee Petitions.

E.  Class Counsel shall have the authority to determine and make an allocation of their respective awards of attorney fees and costs to any counsel representing any of the Settlement Class who claim an entitlement to share in any fees or costs approved by the Court and paid by Whirlpool. Such allocations shall be made consistent with any agreements between and among those counsel. Any disputes regarding such allocations shall be resolved by the Court.

F.  Any issues relating to attorney fees and costs or to any Service Award are to be considered by the Court separately from the Court's consideration of the fairness, reasonableness, and adequacy of this Agreement and the Settlement. The Court's or an appellate court's failure to approve, in whole or in part, any award of attorney fees and costs to Class Counsel, or any Service Award, shall not affect the validity or finality of the Settlement, nor shall such non-approval be grounds for rescission of the Agreement, as such matters are not the subject of any agreement among the Parties other than as set forth above. In the event the Court declines to approve, in whole or in part, the payment of attorney fees or costs to Class Counsel or the payment of any Service Award in the amount sought by Class Counsel, the remaining provisions of this Agreement shall remain in full force and effect.

## IX. RELEASES

A. Plaintiffs and all Settlement Class Members who do not timely exclude themselves from the Settlement do forever release, acquit, and discharge Releasees from all manner of actions, causes of action, administrative claims, demands, debts, damages, costs, attorney fees, obligations, judgments, expenses, or liabilities for economic loss, in law or in equity, whether now known or unknown, contingent or absolute, including all claims that Plaintiffs or Settlement Class Members now have or, absent this Agreement, may in the future have had, against Releasees, by reason of any act, omission, harm, matter, cause, or event whatsoever that has occurred from the beginning of time up to and including the Effective Date of this Agreement, and that arise from or relate to any of the defects, malfunctions, or inadequacies of the Class Dishwashers that are alleged or could have been alleged in the Lawsuits arising out of or relating to the diverter motors, diverter shafts, diverter shaft seals, and sump assemblies featuring those parts that are alleged to have the potential to result in a leak, or to any act, omission, damage, matter, cause, or event whatsoever arising out of the initiation, defense, or settlement of the Lawsuits or the claims or defenses asserted in the Lawsuits, including without limitation all claims for out-of-pocket expense, diminution-in-value, benefit-of-the-bargain, cost-of-repair, cost-of-replacement, statutory, or premium-price damages or restitution (the "Released Claims").

B. This release, however, will not extinguish, and the Released Claims do not include, claims for personal injury or for damage to property other than to the Class Dishwasher itself.

C. By executing this Agreement, the Parties acknowledge that, upon entry of the Final Approval Order by the Court, the Lawsuits shall be dismissed with prejudice, an order of dismissal with prejudice shall be entered, and all Released Claims shall thereby be conclusively settled, compromised, satisfied, and released as to the Releasees. The Final Approval Order shall provide for and effect the full and final release, by Plaintiffs and all Settlement Class Members, of all Released Claims.

D. Plaintiffs (and not other Settlement Class members) also agree to participate in good faith, to the extent possible, to support any of the Releasees' efforts to resolve (whether by a negotiated settlement or otherwise) any claims or causes of action brought against Releasees, including any action for contribution or indemnity, that may hereafter at any time be asserted against any of the Releasees by Plaintiffs, or by anyone subrogated to the Plaintiffs' rights in any capacity, and that arise from any loss, injury, property damage, or expense, including, but not limited to, all incidental and consequential damages, lost wages, lost income, lost profits, loss of use, and loss of or damage to any items in the Class Dishwasher arising out of or relating to the diverter motors, diverter shafts, diverter shaft seals, and sump assemblies featuring those parts that are alleged to have the potential to result in a leak.

E. Future or Unknown Harm and Waiver of Statutory Rights: It is possible, although unlikely, that other injuries, damages, losses, or future consequences or results of the sale, purchase, use, non-use, need for repair, or repair of the Class Dishwashers are not currently known by Plaintiffs and Settlement Class Members and will develop or be discovered. The Release in this Agreement, and the compromise on which it is based, is expressly intended to cover and include a release by Plaintiffs

and each Settlement Class Member of all such future injuries, damages, losses, or future consequences or results, excluding any future injury to person or to property other than the Class Dishwasher itself, and including a release and waiver of all rights, causes of actions, claims, and lawsuits against the Releasees that may exist or arise in the future because of such future injuries, damages, losses, or future consequences or results of known or unknown injuries arising out of or relating to the diverter motors, diverter shafts, diverter shaft seals, and sump assemblies featuring those parts that are alleged to have the potential to result in a leak.

F.      Plaintiffs and each Settlement Class Member hereby expressly, knowingly, and voluntarily, waive any right conferred on him or her by Section 1542 of the California Civil Code, which provides as follows:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN HIS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM MUST HAVE MATERIALLY AFFECTED HIS SETTLEMENT WITH THE DEBTOR.

Plaintiffs and Settlement Class Members expressly waive and relinquish all rights and benefits that they may have under, or that may be conferred upon them by, the provisions of Section 1542 of the California Civil Code and of all similar laws of other States, to the fullest extent that they may lawfully waive such rights or benefits pertaining to the Released Claims. In connection with such waiver and relinquishment, Plaintiffs and the Settlement Class Members hereby acknowledge that they are aware that they or their attorneys may hereafter discover claims or facts in addition to or different from those which they now know or believe to exist with respect to the Released Claims, but that it is their intention to hereby fully, finally, and forever settle and release all of the Released Claims, known or

unknown, suspected or unsuspected, that they have against Releasees. In furtherance of such intention, the release herein given by Plaintiffs and the Settlement Class Members to the Releasees shall be and remain in effect as a full and complete general release of all claims arising out of or relating to the diverter motors, diverter shafts, diverter shaft seals, and sump assemblies featuring those parts that are alleged to have the potential to result in a leak notwithstanding the discovery of existence of any such additional or different claims or facts.

G.    Plaintiffs and the Settlement Class Members expressly consent that this release shall be given full force and effect according to each of its terms and provisions, including those relating to unknown and unspecified claims, injuries, demands, rights, lawsuits, or causes of action as referenced above. Plaintiffs and the Settlement Class Members acknowledge and agree that this waiver is an essential and material term of this release and the compromise settlement that led to it, and that without this waiver the compromise settlement would not have been accomplished. Plaintiffs have been advised by their attorneys with respect to this waiver and, being of competent mind, understand and acknowledge its significance.

H.    Each Party hereto expressly accepts and assumes the risk that if facts with respect to matters covered by this Agreement are found hereafter to be other than or different from the facts now believed or assumed to be true, this Agreement shall nevertheless remain effective. It is understood and agreed that this Agreement shall constitute a general release and shall be effective as a full and final accord and satisfaction and is a bar to all actions, causes of action, costs, expenses, attorney fees, damages, claims, and liabilities whatsoever, whether or not now known,

suspected, claimed or concealed, pertaining to the Released Claims of this Agreement.

I.      Notwithstanding the above, the Court shall retain jurisdiction over the Parties and the Agreement with respect to the future performance of the terms of the Agreement, and to assure that all payments and other actions required of any of the Parties by the Settlement are properly made.

## X.    COVENANT NOT TO SUE

Plaintiffs (i) covenant and agree that neither they, nor anyone authorized to act on their behalf, will commence, authorize, or accept any benefit from any judicial or administrative action or proceeding, other than as expressly provided for in this Agreement, against the Releasees, or any of them, in either their personal or corporate capacity, with respect to any claim, matter, or issue that in any way arises from, is based on, or relates to any alleged loss, harm, or damages allegedly caused by the Releasees, or any of them, in connection with the Released Claims; (ii) waive and disclaim any right to any form of recovery, compensation, or other remedy in any such action or proceeding brought by or on behalf of them or any putative class of Class Dishwasher owners arising out of or relating to the diverter motors, diverter shafts, diverter shaft seals, and sump assemblies featuring those parts that are alleged to have the potential to result in a leak; and (iii) agrees that this Agreement shall be a complete bar to any such action by Plaintiffs.

## XI.   REPRESENTATIONS AND WARRANTIES

Each of the Parties represents and warrants to, and agrees with, each of the other Parties as follows:

A.      To the extent permitted by law and the applicable rules of professional conduct, Class Counsel represent and warrant that they do not have any present intention to file any class action lawsuit in any jurisdiction, including other states or countries,

relating to the claims released in this case. Class Counsel further represent and warrant that they will not contact any other attorney or law firm to discuss or encourage pursuing litigation related to the claims released in this case. The foregoing shall not restrict the ability of Class Counsel to fulfill their responsibilities to absent Settlement Class Members in connection with the settlement proceedings in the Lawsuits.

B.   To the extent permitted by law and the applicable rules of professional conduct, the Settlement is conditioned on the Class Representatives' and Class Counsel's agreement not to cooperate with any other lawyers who are litigating or who wish to litigate the claims released in this case. The foregoing shall not restrict the ability of Class Counsel to fulfill their responsibilities to absent Settlement Class Members in connection with the Settlement proceedings, nor shall it restrict Class Counsel's responsibility to respond to orders of any court or other legal obligation.

C.   Each Party has had the opportunity to receive, and has received, independent legal advice from his, her, or its attorneys regarding the advisability of making the Settlement, the advisability of executing this Agreement, and the legal and income-tax consequences of this Agreement, and fully understands and accepts the terms of this Agreement.

D.   Plaintiffs represent and warrant that no portion of any claim, right, demand, action, or cause of action against any of the Releasees that Plaintiffs have or may have arising out of the Lawsuits or pertaining to the design, manufacture, testing, marketing, purchase, use, sale, servicing, or disposal of the Class Dishwashers or otherwise referred to in this Agreement, and no portion of any recovery or settlement to which Plaintiffs may be entitled, have been assigned, transferred, or

conveyed by or for Plaintiffs in any manner; and no Person or entity other than Plaintiffs has any legal or equitable interest in the claims, demands, actions, or causes of action referred to in this Agreement as those of Plaintiffs themselves.

E.     None of the Parties relies or has relied on any statement, representation, omission, inducement, or promise of the other Party (or any officer, agent, employee, representative, or attorney for the other Party) in executing this Agreement, or in making the Settlement provided for herein, except as expressly stated in this Agreement.

F.     Each of the Parties has investigated the facts pertaining to the Settlement and this Agreement, and all matters pertaining thereto, to the full extent deemed necessary by that Party and his, her, or its attorneys.

G.     Each of the Parties has carefully read, knows, and understands the full contents of this Agreement and is voluntarily entering into this Agreement after having had the opportunity to consult with, and having in fact consulted with, his, her, or its attorneys.

H.     Each term of this Agreement is contractual and not merely a recital.

## XII.    NO ADMISSION OF LIABILITY

It is understood and agreed that the Settlement sums and the benefits provided in this Agreement, and this Settlement and release, are for the compromise of disputed claims and are not to be construed as or deemed to be an admission of any liability, fault, or responsibility on the part of any of the Releasees, by whom liability and fault are, and always have been, expressly and completely denied.

# XIII. ADDITIONAL TERMS

A.   <u>Extensions of Time</u>: Unless otherwise ordered by the Court, the Parties may agree to reasonable extensions of time to carry out any of the terms of this Agreement and Settlement without needing Court approval, so long as all actions required by this Agreement are concluded prior to the close of the claims period 180 days after entry of the Preliminary Approval Order.

B.   <u>Cooperation</u>: The Parties agree that they will abide by this Agreement and do all such acts, and prepare, execute, and deliver all such documents, as may reasonably be required to carry out the stated objectives of this Agreement.

C.   <u>Interpretation and Construction</u>: Each Party has participated in the negotiation and drafting of all provisions of this Agreement, has had an adequate opportunity to read, review, and consider with his, her, or its own counsel the effect of the language of this Agreement, and has agreed to its terms. Accordingly, the legal maxim that "ambiguity shall be interpreted against the drafter" has no relevance to the interpretation or construction of this Agreement.

D.   <u>Conditional Nature of Agreement</u>:

1.   At Plaintiffs' option, expressed in written notice to Defendant's counsel, this Agreement shall become null and void, and no obligation on the part of any of the Parties will accrue, if the Court materially alters any of the terms of this Agreement to the detriment of Plaintiffs or the Settlement Class, or fails to enter the Preliminary Approval Order or the Final Approval Order in substantially the form submitted by the Parties.

2.   At Defendant's option, expressed in written notice to Class Counsel, this Agreement shall become null and void, and no obligation on the part of any

48

of the Parties will accrue, if (a) the Court declines to certify the Settlement Class as provided in the Preliminary Approval Order; or (b) the Court materially alters any of the terms of this Agreement to the detriment of Defendant, or fails to enter the Preliminary Approval Order or the Final Approval Order in substantially the form submitted by the Parties.

E. <u>Severance/Severability</u>: With the exception of the provision for attorney fees and costs to Class Counsel and Service Awards to Plaintiffs, none of the terms of this Agreement is severable from the others. If the Court or an appellate court should rule that any term is void, illegal, or unenforceable for any reason, however, Defendant, in its sole discretion, and Plaintiffs, in their sole discretion (but acting in accord with their duties and obligations as Class Representatives), may elect to waive any such deficiency and proceed with the Settlement under the terms and conditions ultimately approved by the Court.

F. <u>Return or Destruction of Confidential Documents</u>: Within thirty (30) days of the Effective Date, the Parties agree to return to the producing Party or destroy (with written confirmation of such destruction) all documents marked confidential pursuant to the Protective Order entered in the Lawsuits.

G. <u>Governing Law</u>: With the exception of the Court's determination of a reasonable award of attorney fees and costs to Class Counsel, which the Parties agree shall be governed by federal law, this Agreement has been, and shall for all purposes be deemed to have been, negotiated, executed, and delivered within the State of Michigan, and the rights and obligations of the Parties shall be construed and enforced in accordance with, and governed by, the laws of the State of Michigan.

H.    <u>Entire Agreement of the Parties</u>: This Agreement constitutes and comprises the entire agreement between the Parties with respect to the subject matter hereof. It supersedes all prior and contemporaneous oral and written agreements and discussions. It may be amended only by an agreement in writing, signed by the Parties.

I.    <u>Binding on Agents, Successors, and Assigns</u>: This Agreement is binding on, and shall inure to the benefit of, the Parties and their respective agents, employees, representatives, officers, directors, subsidiaries, assigns, heirs, executors, administrators, insurers, and predecessors and successors in interest.

J.    <u>Draft by All Parties</u>: Each Party has participated in, and in any construction to be made of this Agreement shall be deemed to have equally participated in, the negotiating, drafting, and execution of this Agreement.

K.    <u>No Extension of Whirlpool's Written Warranties</u>: In connection with this Agreement and Settlement, Whirlpool has not agreed to any extension of its written warranties for the Class Dishwashers. The only Settlement benefits are those expressly described in this Agreement.

L.    <u>Court Approval</u>:  The parties agree to seek approval of this proposed Settlement in the United States District Court for the District of Minnesota in *Cleveland v. Whirlpool Corp.*, Case No. 0:20-cv-01906-WMW-KMM (D. Minn.).

Dated: September ___, 2021


_____
PLAINTIFF ELIZABETH CLEVELAND




_____
PLAINTIFF AMY LARCHUK




_____
PLAINTIFF THOMAS MCCORMICK




_____
PLAINTIFF CHRISTOPHER REDMON




_____
PLAINTIFF DHAVAL SHAH




WHIRLPOOL CORPORATION

By: _____
Authorized Representative

READ AND APPROVED:

By: _____          By: _____
    Harper Segui                              Rachel Soffin
    Class Counsel                             Class Counsel

By: _____
    Galen Bellamy
    Counsel for Defendant

Dated: September ___, 2021

_____
PLAINTIFF ELIZABETH CLEVELAND

_____
PLAINTIFF AMY LARCHUK

_____
PLAINTIFF THOMAS MCCORMICK

_____
PLAINTIFF CHRISTOPHER REDMON

_____
PLAINTIFF DHAVAL SHAH

WHIRLPOOL CORPORATION

By: _Emily Maki-Rusk_____
Authorized Representative

Dated: October ___, 2021


Elisabeth Cleveland
_____
PLAINTIFF ELIZABETH CLEVELAND



_____
PLAINTIFF AMY LARCHUK



_____
PLAINTIFF THOMAS MCCORMICK



_____
PLAINTIFF CHRISTOPHER REDMON



_____
PLAINTIFF DHAVAL SHAH



WHIRLPOOL CORPORATION

By: _____
Authorized Representative

51

READ AND APPROVED:

By: _____          By: _____
       Harper Segui                                  Rachel Soffin
       Class Counsel                                 Class Counsel


By: _____
       Galen Bellamy
       Counsel for Defendant

**Signature:** *Elisabeth Cleveland*
Elisabeth Cleveland (Oct 26, 2021 22:40 CDT)

**Email:** emcleveland2@hotmail.com

52

Dated: October ___, 2021


_____
PLAINTIFF ELIZABETH CLEVELAND


*Amy Larchuk*
_____
PLAINTIFF AMY LARCHUK



_____
PLAINTIFF THOMAS MCCORMICK



_____
PLAINTIFF CHRISTOPHER REDMON



_____
PLAINTIFF DHAVAL SHAH



WHIRLPOOL CORPORATION

By: _____
Authorized Representative

51

Dated: October \_\_\_, 2021

_____
PLAINTIFF ELIZABETH CLEVELAND

_____
PLAINTIFF AMY LARCHUK

Thomas McCormick
_____
PLAINTIFF THOMAS MCCORMICK

_____
PLAINTIFF CHRISTOPHER REDMON

_____
PLAINTIFF DHAVAL SHAH

WHIRLPOOL CORPORATION

By: _____
Authorized Representative

51

READ AND APPROVED:

By: _____          By:_____
       Harper Segui                                    Rachel Soffin
       Class Counsel                                   Class Counsel

By:_____
       Galen Bellamy
       Counsel for Defendant

**Signature:**
Thomas McCormick (Oct 22, 2021 12:16 PDT)

**Email:** tmccormick8612@gmail.com

52

Dated: October ___, 2021

_____
PLAINTIFF ELIZABETH CLEVELAND

_____
PLAINTIFF AMY LARCHUK

_____
PLAINTIFF THOMAS MCCORMICK

Christopher Redmon
_____
PLAINTIFF CHRISTOPHER REDMON

_____
PLAINTIFF DHAVAL SHAH

WHIRLPOOL CORPORATION

By: _____
Authorized Representative

READ AND APPROVED:

By: _____          By:_____
     Harper Segui                              Rachel Soffin
     Class Counsel                             Class Counsel

By:_____
     Galen Bellamy
     Counsel for Defendant

**Signature:** _____
     Christopher Redmon (Oct 26, 2021 17:53 CDT)

**Email:** redmonct@gmail.com

Dated: October ___, 2021


_____
PLAINTIFF ELIZABETH CLEVELAND



_____
PLAINTIFF AMY LARCHUK



_____
PLAINTIFF THOMAS MCCORMICK



_____
PLAINTIFF CHRISTOPHER REDMON



*Dhaval Shah*
_____
PLAINTIFF DHAVAL SHAH



WHIRLPOOL CORPORATION

By: _____
Authorized Representative

51

READ AND APPROVED:

By:_____     By:_____
      Harper Segui                                      Rachel Soffin
      Class Counsel                                     Class Counsel

By:_____
      Galen Bellamy
      Counsel for Defendant

**Signature:** *B.D. Shah*
      B.D.Shah (Oct 26, 2021 10:01 PDT)

**Email:** supermom650@gmail.com

52

WPL-GN

**C   F r   I r**

The Parties have reached a settlement agreement in a class action lawsuit concerning Plaintiffs' allegations that certain Whirlpool-manufactured dishwashers built from 2010-2017 can be susceptible to diverter shaft seal leaks, which may cause the diverter motor to malfunction and in some instances result in water leaking onto the floor (a "Diverter Seal Leak"). If you believe you are a member of this Class, you must complete and submit the enclosed Claim Form online or by U.S. Mail at the addresses provided below. Detailed information about qualifying "Class Dishwashers," as well as benefits available under the terms of the settlement, can be found at  www.WEBSITE.com .

**WEB**                    .WEBSITE.

**MAIL**:          *Cleveland v. Whirlpool Corp.*
          Class Action Administrator
          1650 Arch Street, Suite 2210
          Philadelphia, PA 19103

**I    r    D d**    Claim Forms for Past Diverter Seal Leaks must be submitted online or postmarked  180 DAYS FROM ORDER OF PRELIM APPROVAL . Claim Forms for Future Diverter Seal Leaks, for repairs or replacements occurring    **r**  DATE , must be submitted online or postmarked          **d**  of any Future Diverter Seal Leak occurring.

**P        B**        If you experienced or experience a Diverter Seal Leak within eight years of your Class Dishwasher's date of manufacture and you incurred documented, out-of-pocket expenses to repair or replace your Class Dishwasher due to the Diverter Seal Leak, you may be eligible for a rebate or reimbursement up to $225 as follows:

> $225.00 cash reimbursement, or $200 cash rebated on a KitchenAid dishwasher or $150 cash rebated on a Maytag or Whirlpool dishwasher, for a Diverter Seal Leak occurring within the second (2nd) years following the date of manufacture;

> $202.50 cash reimbursement, or $200 cash rebated on a KitchenAid dishwasher or $150 cash rebated on a Maytag or Whirlpool dishwasher, for a Diverter Seal Leak occurring within the third (3rd) year following the date of manufacture;

> $180.00 cash reimbursement, or $200 cash rebated on a KitchenAid dishwasher or $150 cash rebated on a Maytag or Whirlpool dishwasher, for a Diverter Seal Leak occurring within the fourth (4th) or fifth (5th) years following the date of manufacture;

> $135.00 cash reimbursement, or $175 cash rebated on a KitchenAid dishwasher or $125 cash rebated on a Maytag or Whirlpool dishwasher, for a Diverter Seal Leak occurring within the sixth (6th) year following the date of manufacture;

> $67.50 cash reimbursement, or $100 cash rebated on a KitchenAid, Maytag or Whirlpool dishwasher, for a Diverter Seal Leak occurring within the seventh (7th) year following the date of manufacture; or

> $100 cash rebated on a KitchenAid, Maytag or Whirlpool dishwasher for a Diverter Seal Leak occurring within the eighth (8th) year following the date of manufacture.

**M        C**        To make a claim for a Past Diverter Seal Leak you must (1) complete this entire Claim Form (pages 2 through 5), (2) attach copies of all required documentary proof, and (3) submit the completed Claim Form and attached documentation by U.S. Mail or online at  www.WEBSITE.com   180 DAYS FROM ORDER OF PRELIM APPROVAL . To make a claim for a Future Diverter Seal Leak you must (1) complete this entire Claim Form (pages 2 through 5), (2) attach copies of all required documentary proof, and (3) submit the completed Claim Form and attached documentation by U.S. Mail or online at  www.WEBSITE.com
    **d**  of the Future Diverter Seal Leak occurring.

 If you are making claims for more than one Class Dishwasher, please complete a separate Claim Form for each Class Dishwasher.

  If you have questions about completing the Claim Form, please visit  www.WEBSITE.com , or contact the Claims Administrator at  EMAIL  or  PHONE .

**EXHIBIT 1**

**CLAIM FORM CHECKLIST**

Before Completing Your Claim Form, Please Make Sure You Have:

☐ Completed all fields in Section A (Name and Contact Information).

☐ Provided the Model Number and Serial Number of your Dishwasher and answered every question in Section B, including by providing documentation where required.

☐ Signed the Certification in Section C.

*Please keep a copy of your completed Claim Form for your records.*

| | | |
|---|---|---|
| Your Claim Number (located on your postcard) | Whirlpool Model and Serial Number Dishwasher Defect Settlement Claim Form | **WPL-GN** **PART ONE** |

---

## SECTION A    NAME AND CONTACT INFORMATION

Provide your name and contact information below. <u>It is your responsibility to notify the Claims Administrator of any changes to your contact information after submitting your Claim Form.</u>

| | |
|---|---|
| First Name | Last Name |

Street Address

| | | |
|---|---|---|
| City | State | Zip Code |

| | |
|---|---|
| Phone Number | E-Mail Address |

## SECTION B    INFORMATION ABOUT YOUR CLASS DIS   WAS   ER

| | |
|---|---|
| | |

**M  d  N      r   C   D          r**          **S  r   N      r   C   D          r**

> **N    :** To locate the model and serial   , look for the tag on the inside frame of your dishwasher door. If you cannot provide a valid model and serial number you are not entitled to any benefit.

| | | |
|---|---|---|
| 1. | Are you a resident of the United States or its territories who purchased, received as a gift, or acquired as part of the purchase or remodeling of a home, a new Class Dishwasher (i.e., a Whirlpool-manufactured dishwasher with a model and serial number listed as eligible for settlement benefits on  www.WEBSITE.com )<br><br>(If you answered "**N  **" to this question, **STOP**; you are not entitled to any compensation or benefit under this Settlement.) | Question 1:<br><br>Yes ⬭      No ⬭ |
| 2. | Do you have documentation showing that you purchased a Class Dishwasher new, or acquired a new Class Dishwasher as part of a purchase or remodel of a home, or received a new Class Dishwasher as a gift<br><br>(If you answered "Yes" to this question, gather and prepare to upload or mail your documents, and skip to Question 4. If you answered "No" to this question, proceed to Question 3.)<br><br>**I        r  d  Y           MUST        r   d        d   r        r  d              r          d              r        d   r   S          .** | Question 2:<br><br>Yes ⬭      No ⬭ |
| 3. | **DECLARATION**   I declare under penalty of perjury of the laws of the United States that I have searched for but am unable to find documentary proof, but that I qualify for membership in the class because I either purchased a Class Dishwasher new, acquired a new Class Dishwasher as part of a purchase or remodel of a home, or received a new Class Dishwasher as a gift.<br><br>**S        r                                    D** | If you were unable to sign the Declaration to the left, **STOP**; you are not entitled to any benefit. If you signed the Declaration, PROCEED TO QUESTION 4. |
| 4. | Was your Class Dishwasher for personal or household use<br><br>(If you answered No to this question, **STOP**; you are not entitled to any compensation or benefit under this Settlement.) | Question 4:<br><br>Yes ⬭      No ⬭ |
| 5. | Have you previously received from Whirlpool any form of compensation or customer-satisfaction benefit or other goodwill for problems with your Class Dishwasher (e.g., a free or discounted out-of-warranty repair, a free gift card, a cash payment, a partial refund of the Dishwasher's purchase price, a gift of a new product, a discount off the regular price of a new dishwasher, or any other product that you redeemed) | Question 5:<br><br>Yes ⬭      No ⬭<br><br>If yes, provide the dollar amount of the benefit already received:<br><br>$ _____ |
| 6. | Do you have documentation showing that within eight years of the date of manufacture you paid out-of-pocket to repair or replace your Class Dishwasher in response to a Diverter Seal Leak, i.e., a leak through the diverter shaft seal and onto the diverter motor or onto the floor to the rear of the dishwasher<br><br>Examples of sufficient documentation for Question 6 include, but are not limited to, service tickets, service estimates, and service receipts that show you experienced this problem. | Question 6:<br><br>Yes ⬭      No ⬭ |

(If you answered... to this question, give your address and... of benefits... answered "**N**" to this question, **STOP**; you are not entitled to any compensation or benefit under this Settlement.)

**I** r d Y **MUST** r d d r r d r
d r d r S .

| 7. | Of the potential benefits described above, do you wish to request cash reimbursed for eligible amounts you paid out-of-pocket to repair a Diverter Seal Leak, or do you wish to request cash rebated on the purchase of a new dishwasher  Select only one option or the other. If you select to have cash rebated on the purchase of a new dishwasher you will receive a rebate form with further instructions. | Question 7:<br><br>Cash Reimbursement<br><br>◯<br><br>Cash Rebate<br><br>◯ |

---

## SECTION C   PAYMENT SELECTION

Please select ___ of the following payment options:

☐ **P  P** - Enter your PayPal email address: _____

☐ **V** Enter the mobile number associated with your Venmo account: _____-_____-_____

☐ Enter the mobile number or email address associated with your Zelle account: _____

☐ **P  C** Payment will be mailed to the address provided above.

---

**F  I  r** Once you have completed this Claim Form and gathered all required documentary proof, **d d C r S** , below. You may then submit your completed Claim Form, including a copy of your documentary proof, online by email to  claims  WEBSITE.com , or U.S. Mail to the Settlement Administrator at the address printed on the Claim Form-Instructions. You may also complete your Claim Form online at  www.WEBSITE.com  and upload any supporting documentation, there. Please keep your original documentary proof, and send only copies to the Settlement Administrator. **I  r d r  d r r  d  d r  r d r r  d  r  d r S .**

## SECTION D   CERTIFICATION STATEMENT

---

**CERTIFICATION STATEMENT  *Please note that you will not be eligible to receive any settlement benefit unless you sign and date this statement*.**   I declare under penalty of perjury of the laws of the United States that all information provided in this Claim Form is true and accurate.

| | |
|---|---|
| | |
| Signature | Date |

| |
|---|
| |
| Print Name |

4

Exhibit 2 -- Engineering Models in Production through 12/31/2017

**Engineering Model**

| | | | | | | |
|---|---|---|---|---|---|---|
| 12093K210 | 13223N412 | 13699N410 | IUD8010DS2 | KDTE104DBL0 | KUDE20FBBL0 | WDF775SAYM3 |
| 12413N410 | 13223N413 | 13699N411 | IUD8010DS3 | KDTE104DBL1 | KUDE20FBBL1 | WDF775SAYW0 |
| 12413N411 | 13223N414 | 13699N412 | IUD8500BX0 | KDTE104DBL2 | KUDE20FBSS0 | WDF775SAYW1 |
| 12413N412 | 13229N410 | 14522N610 | IUD8500BX1 | KDTE104DSS0 | KUDE20FBSS1 | WDF775SAYW2 |
| 12723K310 | 13229N411 | 14522N611 | IUD8555DX0 | KDTE104DSS1 | KUDE20FBWH0 | WDF775SAYW3 |
| 12762K310 | 13229N412 | 14523N610 | IUD8555DX1 | KDTE104DSS2 | KUDE20FBWH1 | WDF780SLYB0 |
| 12762K311 | 13229N413 | 14523N611 | IUD8555DX2 | KDTE104DWH0 | KUDE20IXBL9 | WDF780SLYB1 |
| 12762K312 | 13229N414 | 14529N610 | IUD8555DX3 | KDTE104DWH1 | KUDE20IXSS9 | WDF780SLYB2 |
| 12762K313 | 13252K110 | 14529N611 | IUD8555DX4 | KDTE104DWH2 | KUDE20IXSSA | WDF780SLYB3 |
| 12762K314 | 13252K111 | 14542N710 | JDB8000AWB1 | KDTE104EBL0 | KUDE20IXWH9 | WDF780SLYM0 |
| 12763K310 | 13252K113 | 14543N710 | JDB8000AWB2 | KDTE104EBL1 | KUDE40FXPA6 | WDF780SLYM1 |
| 12763K311 | 13252K115 | 14543N711 | JDB8000AWB3 | KDTE104EBL2 | KUDE40FXSP0 | WDF780SLYM2 |
| 12763K312 | 13255K110 | 14545N710 | JDB8000AWC2 | KDTE104EBL3 | KUDE40FXSP1 | WDF780SLYM3 |
| 12763K313 | 13255K111 | 14545N711 | JDB8000AWS1 | KDTE104EBL4 | KUDE40FXSP2 | WDL785SAAM1 |
| 12763K314 | 13255K113 | 14549N710 | JDB8000AWS2 | KDTE104EBS1 | KUDE40FXSP3 | WDL785SAAM3 |
| 12769K310 | 13255K115 | 14549N711 | JDB8000AWS3 | KDTE104EBS2 | KUDE40FXSP4 | WDT710PAHB0 |
| 12769K311 | 13259K110 | 14562N610 | JDB8200AWP1 | KDTE104EBS3 | KUDE40FXSP5 | WDT710PAHB1 |
| 12769K312 | 13259K111 | 14562N611 | JDB8200AWP2 | KDTE104EBS4 | KUDE40FXSS6 | WDT710PAHW0 |
| 12769K313 | 13259K113 | 14563N610 | JDB8200AWP3 | KDTE104ESS0 | KUDE48FXBL5 | WDT710PAHW1 |
| 12772K310 | 13259K115 | 14563N611 | JDB8200AWP5 | KDTE104ESS1 | KUDE48FXBL6 | WDT710PAHZ0 |
| 12772K311 | 13262K110 | 14565N610 | JDB8200AWS1 | KDTE104ESS2 | KUDE48FXPA5 | WDT710PAHZ1 |
| 12772K312 | 13262K111 | 14565N611 | JDB8200AWS2 | KDTE104ESS3 | KUDE48FXPA6 | WDT720PADB0 |
| 12772K313 | 13262K112 | 14569N610 | JDB8200AWS3 | KDTE104ESS4 | KUDE48FXSP5 | WDT720PADB1 |
| 12772K314 | 13262K114 | 14569N611 | JDB8200AWS4 | KDTE104EWH0 | KUDE48FXSP6 | WDT720PADB3 |
| 12773K310 | 13263K110 | 14572N610 | JDB8200AWS5 | KDTE104EWH1 | KUDE48FXSS5 | WDT720PADB3 |
| 12773K311 | 13263K111 | 14572N611 | JDB8500AWF1 | KDTE104EWH2 | KUDE48FXSS6 | WDT720PADE0 |
| 12773K312 | 13263K112 | 14572N612 | JDB8500AWF2 | KDTE104EWH3 | KUDE48FXWH5 | WDT720PADE0 |
| 12773K313 | 13263K114 | 14573N610 | JDB8500AWF3 | KDTE104EWH4 | KUDE48FXWH6 | WDT720PADE1 |
| 12773K314 | 13269K110 | 14573N611 | JDB8500AWX1 | KDTE204DBL0 | KUDE50CXSS9 | WDT720PADE2 |
| 12774K310 | 13269K111 | 14573N612 | JDB8500AWX2 | KDTE204DBL1 | KUDE50FBSS0 | WDT720PADE3 |
| 12774K311 | 13269K112 | 14579N610 | JDB8500AWX3 | KDTE204DBL2 | KUDE60FXPA1 | WDT720PADH0 |
| 12774K312 | 13269K113 | 14579N611 | JDB8500AWY1 | KDTE204DSS0 | KUDE60FXPA2 | WDT720PADH1 |
| 12774K313 | 13269K114 | 14579N612 | JDB8500AWY2 | KDTE204DSS1 | KUDE60FXPA3 | WDT720PADH2 |
| 12774K314 | 13272K110 | 14703N510 | JDB8500AWY3 | KDTE204DSS2 | KUDE60FXSS5 | WDT720PADH3 |
| 12776K310 | 13272K113 | 14703N511 | JDB8700AWP1 | KDTE204DWH0 | KUDE60HXSS5 | WDT720PADM0 |
| 12776K311 | 13272K115 | 14703N512 | JDB8700AWP2 | KDTE204DWH1 | KUDE60HXSS6 | WDT720PADM1 |
| 12776K312 | 13272K117 | 14712N710 | JDB8700AWP3 | KDTE204EBL0 | KUDE70FXBL5 | WDT720PADM2 |
| 12776K314 | 13272K118 | 14715N710 | JDB8700AWS1 | KDTE204EBL1 | KUDE70FXBL6 | WDT720PADM3 |
| 12779K310 | 13273K110 | 14719N710 | JDB8700AWS2 | KDTE204EBL2 | KUDE70FXPA5 | WDT720PADW0 |
| 12779K311 | 13273K113 | 14742N510 | JDB8700AWS3 | KDTE204EBL3 | KUDE70FXPA6 | WDT720PADW1 |
| 12779K312 | 13273K115 | 14742N511 | JDB8700AWS4 | KDTE204EBL4 | KUDE70FXSS5 | WDT720PADW2 |
| 12779K313 | 13273K116 | 14742N512 | JDB8700AWS5 | KDTE204EPA0 | KUDE70FXSS6 | WDT720PADW3 |
| 12779K314 | 13273K117 | 14742N513 | JDB9000CWB1 | KDTE204EPA1 | KUDE70FXWH5 | WDT730PAHB0 |
| 12782K310 | 13273K118 | 14743N510 | JDB9000CWB2 | KDTE204EPA2 | KUDE70FXWH6 | WDT730PAHV0 |
| 12782K311 | 13279K110 | 14743N511 | JDB9000CWB3 | KDTE204EPA3 | KUDL15FXSS6 | WDT730PAHW0 |
| 12782K312 | 13279K113 | 14743N512 | JDB9000CWP1 | KDTE204EPA4 | KUDL15FXSS7 | WDT750SAHB0 |
| 12782K313 | 13279K115 | 14743N513 | JDB9000CWP2 | KDTE204ESS0 | WDF560SAFB0 | WDT750SAHB0 |
| 12783K310 | 13279K117 | 14749N510 | JDB9000CWP3 | KDTE204ESS1 | WDF560SAFB1 | WDT750SAHW0 |
| 12783K311 | 13279K118 | 14749N511 | JDB9000CWS1 | KDTE204ESS2 | WDF560SAFB2 | WDT750SAHW0 |
| 12783K312 | 13282K110 | 14749N512 | JDB9000CWS2 | KDTE204ESS3 | WDF560SAFM0 | WDT750SAHZ0 |
| 12783K313 | 13282K113 | 14749N513 | JDB9000CWS3 | KDTE204ESS4 | WDF560SAFM1 | WDT770PAYB0 |
| 12789K310 | 13282K115 | 14752N510 | JDB9200CWP1 | KDTE204EWH0 | WDF560SAFM2 | WDT770PAYB1 |
| 12789K311 | 13282K116 | 14752N511 | JDB9200CWP2 | KDTE204EWH1 | WDF560SAFT1 | WDT770PAYB2 |
| 12789K312 | 13282K117 | 14752N512 | JDB9200CWS1 | KDTE204EWH2 | WDF560SAFT2 | WDT770PAYM0 |
| 12789K313 | 13282K118 | 14753N510 | JDB9200CWS2 | KDTE204EWH3 | WDF560SAFW0 | WDT770PAYM2 |
| 12813N310 | 13283K110 | 14753N511 | JDB9200CWS3 | KDTE204EWH4 | WDF560SAFW1 | WDT770PAYM3 |
| 12813N311 | 13283K113 | 14753N512 | JDB9200CWX2 | KDTE204GPS0 | WDF560SAFW2 | WDT770PAYW0 |
| 12813K313 | 13283K115 | 14754N510 | JDB9200CWX3 | KDTE234GBL0 | WDF730PAYB0 | WDT770PAYW1 |

EXHIBIT 2

Exhibit 2 -- Engineering Models in Production through 12/31/2017

| | | | | | | |
|---|---|---|---|---|---|---|
| 13032K110 | 13283K116 | 14754N511 | JDB9200CWX4 | KDTE234GBS0 | WDF730PAYB1 | WDT770PAYW2 |
| 13032K112 | 13283K117 | 14754N512 | JDB9200CWY1 | KDTE234GPS0 | WDF730PAYB2 | WDT780SAEM0 |
| 13032K113 | 13283K118 | 14759N510 | JDB9200CWY2 | KDTE254GWH0 | WDF730PAYB3 | WDT780SAEM1 |
| 13032K115 | 13289K110 | 14759N511 | JDB9800CWP1 | KDTE254EBL0 | WDF730PAYB4 | WDT780SAEM2 |
| 13032K116 | 13289K113 | 14759N512 | JDB9800CWP2 | KDTE254EBL1 | WDF730PAYB5 | WDT790SAYB0 |
| 13033K110 | 13289K115 | 14762N510 | JDB9800CWP3 | KDTE254EBL2 | WDF730PAYB6 | WDT790SAYB1 |
| 13033K112 | 13289K117 | 14763N510 | JDB9800CWS1 | KDTE254EBL3 | WDF730PAYB7 | WDT790SAYB2 |
| 13033K113 | 13289K118 | 14769N510 | JDB9800CWS2 | KDTE254ESS0 | WDF730PAYM0 | WDT790SAYB3 |
| 13033K114 | 13292K110 | 14792N510 | JDB9800CWS3 | KDTE254ESS1 | WDF730PAYM1 | WDT790SAYM0 |
| 13033K115 | 13292K112 | 14792N511 | JDB9800CWX1 | KDTE254ESS2 | WDF730PAYM2 | WDT790SAYM1 |
| 13033K116 | 13292K114 | 14792N512 | JDB9800CWX2 | KDTE254ESS3 | WDF730PAYM3 | WDT790SAYM3 |
| 13039K110 | 13292K116 | 14793N510 | JDTSS243GX0 | KDTE254EWH0 | WDF730PAYM4 | WDT790SAYW0 |
| 13039K112 | 13293K110 | 14793N511 | JDTSS244GP0 | KDTE254EWH1 | WDF730PAYM5 | WDT790SAYW1 |
| 13039K113 | 13293K112 | 14793N512 | JDTSS244GS0 | KDTE254EWH2 | WDF730PAYM6 | WDT790SAYW2 |
| 13039K114 | 13293K114 | 14799N510 | JDTSS245GX0 | KDTE254EWH3 | WDF730PAYM7 | WDT790SAYW3 |
| 13039K115 | 13293K116 | 14799N511 | JDTSS246GP0 | KDTE304DBL0 | WDF730PAYT0 | WDT790SAYW3 |
| 13039K116 | 13299K110 | 14799N512 | JDTSS246GS0 | KDTE304DBL2 | WDF730PAYT1 | WDT790SLYM0 |
| 13042K110 | 13299K112 | 14812N610 | KDFE104DBL0 | KDTE304DPA0 | WDF730PAYT2 | WDT790SLYM1 |
| 13042K112 | 13299K114 | 14812N611 | KDFE104DBL1 | KDTE304DPA2 | WDF730PAYT3 | WDT790SLYM2 |
| 13042K113 | 13299K116 | 14812N612 | KDFE104DBL2 | KDTE304DSS0 | WDF730PAYT4 | WDT790SLYM3 |
| 13042K114 | 13402N410 | 14813N610 | KDFE104DBL3 | KDTE304DSS1 | WDF730PAYT5 | WDT790SLYW2 |
| 13042K115 | 13402N411 | 14813N611 | KDFE104DBL4 | KDTE304DSS2 | WDF730PAYT6 | WDT790SLYW3 |
| 13042K116 | 13402N412 | 14813N612 | KDFE104DBL5 | KDTE304DWH0 | WDF730PAYT7 | WDT910SAYE0 |
| 13043K110 | 13403N410 | 14815N610 | KDFE104DSS0 | KDTE304DWH2 | WDF730PAYW0 | WDT910SAYE1 |
| 13043K112 | 13403N411 | 14815N611 | KDFE104DSS1 | KDTE304GPS0 | WDF730PAYW1 | WDT910SAYE3 |
| 13043K113 | 13403N412 | 14815N612 | KDFE104DSS2 | KDTE334DBL0 | WDF730PAYW2 | WDT910SAYH0 |
| 13043K114 | 13409N410 | 14819N610 | KDFE104DSS3 | KDTE334DBL2 | WDF730PAYW3 | WDT910SAYH1 |
| 13043K115 | 13409N411 | 14819N611 | KDFE104DSS4 | KDTE334DSS0 | WDF730PAYW4 | WDT910SAYH2 |
| 13043K116 | 13409N412 | 14819N612 | KDFE104DSS5 | KDTE334DSS1 | WDF730PAYW5 | WDT910SAYH2 |
| 13044K110 | 13472N410 | 15692K210 | KDFE104DWH0 | KDTE334DSS2 | WDF730PAYW6 | WDT910SAYH3 |
| 13044K112 | 13472N411 | 15692K212 | KDFE104DWH1 | KDTE334DWH0 | WDF730PAYW7 | WDT910SAYM0 |
| 13044K113 | 13472N412 | 15693K210 | KDFE104DWH2 | KDTE334GBS0 | WDF735PABB0 | WDT910SAYM1 |
| 13044K114 | 13472N413 | 15693K212 | KDFE104DWH3 | KDTE334GPS0 | WDF750SAYB0 | WDT910SAYM2 |
| 13044K115 | 13473N410 | 15699K210 | KDFE104DWH4 | KDTE404DBL0 | WDF750SAYB1 | WDT910SAYM3 |
| 13044K116 | 13473N411 | 15699K212 | KDFE104DWH5 | KDTE404DBL2 | WDF750SAYB2 | WDT910SSYB0 |
| 13049K110 | 13473N412 | 7WDT950SAYM1 | KDFE204EBL0 | KDTE404DSP0 | WDF750SAYB3 | WDT910SSYB1 |
| 13049K112 | 13473N413 | ADB1500ADB1 | KDFE204EBL1 | KDTE404DSS0 | WDF750SAYM0 | WDT910SSYB3 |
| 13049K113 | 13479N410 | ADB1500ADB2 | KDFE204EBL2 | KDTE404DSS1 | WDF750SAYM1 | WDT910SSYB3 |
| 13049K115 | 13479N411 | ADB1500ADB3 | KDFE204EBL3 | KDTE404DSS2 | WDF750SAYM2 | WDT910SSYM0 |
| 13049K116 | 13479N412 | ADB1500ADB4 | KDFE204EBL4 | KDTE404DWH0 | WDF750SAYM3 | WDT910SSYM1 |
| 13092N410 | 13479N413 | ADB1500ADS1 | KDFE204ESS0 | KDTE504DSS0 | WDF750SAYT3 | WDT910SSYM2 |
| 13092N411 | 13492N410 | ADB1500ADS2 | KDFE204ESS1 | KDTE504DSS2 | WDF750SAYW0 | WDT910SSYW3 |
| 13092N412 | 13492N411 | ADB1500ADS3 | KDFE204ESS2 | KDTE554CSS0 | WDF750SAYW1 | WDT910SSYW0 |
| 13092N413 | 13492N412 | ADB1500ADS4 | KDFE204ESS3 | KDTE554CSS1 | WDF750SAYW2 | WDT910SSYW1 |
| 13093N410 | 13493N410 | ADB1500ADW1 | KDFE204ESS4 | KDTE554CSS2 | WDF750SAYW3 | WDT910SSYW2 |
| 13093N411 | 13493N411 | ADB1500ADW2 | KDFE204EWH0 | KDTE554CSS3 | WDF760SADB0 | WDT910SSYW3 |
| 13093N412 | 13493N412 | ADB1500ADW3 | KDFE204EWH1 | KDTE704DBL0 | WDF760SADB1 | WDT920SADE0 |
| 13093N413 | 13499N410 | ADB1500ADW4 | KDFE204EWH2 | KDTE704DBL1 | WDF760SADB3 | WDT920SADE2 |
| 13099N410 | 13499N411 | ADB1700ADB1 | KDFE204EWH3 | KDTE704DBL2 | WDF760SADB3 | WDT920SADE2 |
| 13099N411 | 13499N412 | ADB1700ADB2 | KDFE204EWH4 | KDTE704DPA0 | WDF760SADM0 | WDT920SADE3 |
| 13099N412 | 13542N410 | ADB1700ADB3 | KDFE304DBL0 | KDTE704DPA2 | WDF760SADM1 | WDT920SADH0 |
| 13099N413 | 13542N411 | ADB1700ADS1 | KDFE304DBL1 | KDTE704DSS0 | WDF760SADM2 | WDT920SADH1 |
| 13202N410 | 13542N412 | ADB1700ADS2 | KDFE304DBL2 | KDTE704DSS1 | WDF760SADM3 | WDT920SADH2 |
| 13202N411 | 13542N413 | ADB1700ADS3 | KDFE304DSS0 | KDTE704DSS2 | WDF760SADT0 | WDT920SADH3 |
| 13202N412 | 13542N414 | ADB1700ADS4 | KDFE304DSS1 | KDTE704DWH0 | WDF760SADT1 | WDT920SADM0 |
| 13203N410 | 13543N410 | ADB1700ADW1 | KDFE304DSS2 | KDTM354DSS0 | WDF760SADT2 | WDT920SADM1 |
| 13203N411 | 13543N411 | ADB1700ADW2 | KDFE304DWH0 | KDTM354DSS1 | WDF760SADT3 | WDT920SADM2 |
| 13203N412 | 13543N412 | ADB1700ADW3 | KDFE304DWH2 | KDTM354DSS3 | WDF760SADW0 | WDT920SADM2 |
| 13204N410 | 13543N413 | ADB1700ADW4 | KDFE454CSS0 | KDTM354DSS4 | WDF760SADW1 | WDT970SAHB0 |
| 13204N411 | 13543N414 | BLB14DRANA2 | KDFE454CSS1 | KDTM354DSS5 | WDF760SADW2 | WDT970SAHV0 |

Exhibit 2 -- Engineering Models in Production through 12/31/2017

| | | | | | | |
|---|---|---|---|---|---|---|
| 13204N412 | 13549N410 | BLB14DRANA5 | KDFE454CSS3 | KDTM354EBS1 | WDF760SADW3 | WDT970SAHW0 |
| 13209N410 | 13549N411 | IDT830SAGS0 | KDFE454CSS4 | KDTM354EBS2 | WDF770SAFZ0 | WDT970SAHZ0 |
| 13209N411 | 13549N412 | IUD7500BS0 | KDFE454CSS5 | KDTM354ESS0 | WDF770SAFZ1 | WDT975SAHV0 |
| 13209N412 | 13549N413 | IUD7500BS1 | KDHE404DSS0 | KDTM354ESS1 | WDF770SAFZ2 | WDT995SAFM0 |
| 13222N410 | 13549N414 | IUD7500BS2 | KDHE704DSS0 | KDTM354ESS2 | WDF775SAYB0 | WDTA50SAHB0 |
| 13222N411 | 13692N410 | IUD7555DS0 | KDPE234GBS0 | KDTM384EBS0 | WDF775SAYB1 | WDTA50SAHN0 |
| 13222N412 | 13692N411 | IUD7555DS1 | KDPE234GPS0 | KDTM384EBS1 | WDF775SAYB2 | WDTA50SAHV0 |
| 13222N413 | 13692N412 | IUD7555DS2 | KDPE334GBS0 | KDTM384EBS2 | WDF775SAYB3 | WDTA50SAHW0 |
| 13222N414 | 13693N410 | IUD7555DS3 | KDPE334GPS0 | KDTM384ESS0 | WDF775SAYM0 | WDTA50SAHZ0 |
| 13223N410 | 13693N411 | IUD8010DS0 | KDPM354GBS0 | KDTM384ESS1 | WDF775SAYM1 | WDTA75SAHZ0 |
| 13223N411 | 13693N412 | IUD8010DS1 | KDPM354GPS0 | KDTM384ESS2 | WDF775SAYM2 | |

| i er er Mo or | i er er e l | e l | Mo or | Mo or |
|---|---|---|---|---|
| W10195076 | W10195677 | W10195067 | W10455260 | W10300740 |
| W10476222 | WPW10195677 | W10195643 | W10500283 | W10300748 |
| W10537869 | | W10300747 | W10605058 | W10418331 |
| | | W10455268 | W10620220 | W10455261 |
| | | W10456967 | W10620221 | W10456966 |
| | | W10465328 | W10671941 | W10464691 |
| | | W10584463 | W10671942 | W10482482 |
| | | W10647213 | W10902323 | W10482502 |
| | | W10832796 | W11230103 | W10500284 |
| | | W10832800 | WPW10455260 | W10500285 |
| | | W11183675 | WPW10605058 | W10500286 |
| | | WPW10195643 | WPW10671941 | W10554963 |
| | | WPW10455268 | WPW10671942 | W10584461 |
| | | | | W10605057 |
| | | | | W10671873 |
| | | | | W10733484 |
| | | | | W10733486 |
| | | | | W10772940 |
| | | | | W10805015 |
| | | | | W10899563 |
| | | | | W10902307 |
| | | | | W10902314 |
| | | | | W10902326 |
| | | | | W10902330 |
| | | | | W10902372 |
| | | | | W10904995 |
| | | | | W10907620 |
| | | | | W11024424 |
| | | | | W11084657 |
| | | | | W11085683 |
| | | | | W11087376 |
| | | | | W11105853 |
| | | | | W11121727 |
| | | | | W11124371 |
| | | | | W11124384 |
| | | | | W11178672 |
| | | | | W11219382 |
| | | | | W11309335 |
| | | | | W11319349 |
| | | | | WPW10455261 |
| | | | | WPW10482482 |
| | | | | WPW10482502 |
| | | | | WPW10554963 |
| | | | | WPW10605057 |

**EXHIBIT 3**

# If you purchased a Whirlpool-manufactured dishwasher, you may be entitled to benefits from a class action settlement.

A Settlement has been reached in a class action lawsuit against Whirlpool Corp. ("Whirlpool" or "Defendant") regarding certain dishwashers manufactured from 2010 through 2017.

If you are included in the Settlement, you may qualify for a cash reimbursement or cash rebate to remedy past or future diverter seal leaks that may cause the diverter motor to malfunction and, in some instances, result in water leaking underneath your dishwasher.

**Your legal rights are affected whether you act or don't act. Read this notice carefully.**

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT | |
|---|---|
| **SUBMIT A CLAIM FORM**<br><br>Earliest Deadline: [DATE] | Submitting a Claim Form is the only way to seek benefits relating to a Class Dishwasher with diverter seal leaks. For repairs or replacements occurring prior to [DATE] your deadline to submit a claim form is [180 DAYS FROM ORDER OF PRELIM APPROVAL]. For repairs or replacements occurring after [DATE] your deadline to submit a claim is within 90 days following the repair. |
| **EXCLUDE YOURSELF**<br><br>Deadline: [DATE] | Excluding yourself, or "opting out," is the only option that allows you to ever be part of another lawsuit against Whirlpool for the legal claims resolved by this Settlement. If you exclude yourself from this Settlement, you will not be entitled to any of the benefits provided by this Settlement. |
| **OBJECT**<br><br>Deadline: [DATE] | Mailing an objection is the only way to tell the Court that you are unhappy with any aspect of the Settlement. |
| **ATTEND THE FAIRNESS HEARING**<br><br>[DATE] at [TIME] | You may request an opportunity to speak in Court about the fairness of the Settlement. |
| **DO NOTHING** | If you do not object to the settlement, exclude yourself from the settlement or make a claim for a past or future diverter seal leak as part of this settlement, you will not receive any benefits of this Settlement, and you will give up your right to ever be part of another lawsuit against Defendant about the legal claims resolved by this Settlement. |

These rights and options are explained in this Notice.

The Court in charge of this case still has to decide whether to approve the Settlement. If the Court approves the Settlement and you submit a valid claim, benefits will be issued after any appeals are resolved. Please be patient.

**EXHIBIT 4**

## BASIC INFORMATION

### 1. Why was this notice issued?

A federal court authorized this notice because you have a right to know about the proposed Settlement and about all of your options before it decides whether to approve the Settlement. This notice explains the Lawsuits, the Settlement, your legal rights, the benefits that are available, and who may qualify for those benefits.

Judge Wilhelmina M. Wright of the United States District Court, District of Minnesota is overseeing the Settlement, which resolves four similar cases filed by the same law firm, known as **d       r       r**, Case No. 0:20-cv-01906-WMW-KMM (D. Minn.), (2) **r       r       r**, Case. No. 2:20-cv-04442-BMS (E.D. Pa.), (3) **R d    .    r       r**., Case No. 1:20-cv-06626 (N.D. Ill.), and (4) **.       r       r**., Case No. 3:21-cv-02739-JD (N.D. Cal.) (the "Lawsuits"). The people who sued are called the "Plaintiffs," and the company sued, Whirlpool, is called the "Defendant."

### 2. Why did I receive this notice?

If you received a notice by mail or email, the Defendant's records indicate that you may have purchased a Whirlpool-manufactured dishwasher from 2010 through 2017 that has a model and serial number listed as eligible at [www.WEBSITE.com]. These specific dishwashers are referred to as the "Class Dishwashers" throughout this notice.

### 3. What is the lawsuit about?

The Lawsuits claim that the Class Dishwashers can be susceptible to diverter shaft seal leaks, which may cause the diverter motor to malfunction and in some instances result in water leaking onto the floor (a "Diverter Seal Leak"). The Lawsuits further claim that the Defendant breached warranties, was negligent, and fraudulently concealed diverter seal defects in connection with the manufacture and sale of the Class Dishwashers.

Defendant denies that there is any diverter seal defect in the Class Dishwashers. Defendant also denies that it violated any law or engaged in any wrongdoing.

**The Settlement does <u>not</u> include personal injury or property damage claims other than for damage to the Class Dishwasher itself, and the Settlement does not release any of these claims.**

### 4. Why is this a class action?

In a class action, one or more people called "Class Representatives" sue for all people who have similar claims. Together, these people with similar claims are called a "Settlement Class" or "Class Members." One court resolves the legal issues for all Class Members, except for those who exclude themselves from the Settlement Class.

### 5. Why is there a Settlement?

**The Court did not decide which side was right or whether the Class Dishwashers are defective**. Instead, both sides agreed to the Settlement to avoid the costs and risks of further litigation and to provide benefits to Class Members. The Settlement does not mean that the Court found that Defendant broke any laws or did anything wrong. The Class Representatives and the lawyers representing them (called "Class Counsel") believe that the Settlement is in the best interests of all Class Members.

## THE SETTLEMENT CLASS—WHO IS INCLUDED

### 6. Who is included in the Settlement?

The Settlement Class includes all residents of the United States and its territories who: (a) purchased a new Class Dishwasher; (b) acquired a Class Dishwasher as part of the purchase or remodel of a home; or (c), received a new Class Dishwasher as a gift.

## 7. How do I know if I am a Class Member?

To determine if you are a Class Member, you need to verify that the model number and serial number of your dishwasher are listed among qualifying Class Dishwashers in the Settlement. You can compare your information to a list of qualifying Class Dishwashers available at the Settlement Administrator's website, [www.WEBSITE.com].

## 8. Who is not included in the Settlement Class?

The following are not included in the Settlement Class: (1) officers, directors, and employees of Defendant and its parents and subsidiaries; (2) insurers of Class Members; (3) subrogees (someone who has assumed the rights of another person) or all entities that claim to be subrogated to the rights of a Class Dishwasher purchaser, a Class Dishwasher owner, or a Class Member; and (4) all third-party issuers or providers of extended warranties or service contracts for the Class Dishwasher.

## THE SETTLEMENT BENEFITS—WHAT YOU GET IF YOU QUALIFY

## 9. What benefits does the Settlement provide?

The Settlement provides for a rebate or cash reimbursement, up to $225 and subject to other limits, for documented out-of-pocket expenses to repair or replace your dishwasher's diverter motor or sump assembly, or to replace your dishwasher with a new model, due to a Diverter Seal Leak occurring within eight years of your dishwasher's date of manufacture.

## 10. Tell me more about the reimbursements for Past Diverter Seal Leaks.

Class Members who experienced a Diverter Seal Leak in their Class Dishwasher, and who paid out-of-pocket for either (1) a repair of their Class Dishwasher that included replacement of the diverter motor, diverter seal, sump, or sump assembly in response to a Diverter Seal Leak, or (2) replacement of their Dishwasher in response to a Diverter Seal Leak within six weeks of the leak, are entitled to their choice of (A) cash reimbursement of the actual amount the Class Member paid for repair expenses or replacement of the dishwasher, supported by documentary proof, up to up to a maximum amount determined by the age of the dishwasher, as shown in the chart below, or (B) a cash rebate toward the purchase of a new dishwasher, as shown in the chart below:

| Years From Date of Manufacture When Paid Qualifying Repair Performed or Replacement Purchased | Cash Reimbursement for Paid Qualifying Repair or Replacement | Maximum Reimbursement as % of Average Cost of Repair | Alternative Cash Rebate Toward Purchase of New Dishwasher |
|---|---|---|---|
| 1-2 | $225 | 100% | Years 1-5: $200 toward purchase of new KitchenAid-brand dishwasher, or $150 for new Whirlpool-brand or Maytag-brand dishwasher |
| 3 | $202.50 | 90% | |
| 4-5 | $157.50 | 80% | |
| 6 | $135 | 60% | Year 6: $175 toward new KitchenAid-brand dishwasher or $125 for new Whirlpool-brand or Maytag-brand dishwasher |
| 7 | $67.50 | 30% | Years 7-8: $100 toward new Kitchen-Aid, Whirlpool, or Maytag-brand dishwasher |
| 8 | $0 | 0% | |

Eligibility for this benefit requires all Class Members to submit their Class Dishwasher model and serial numbers and to prove through the submission of documentary proof or, alternatively, a declaration for some requirements, (1) that the Class Member purchased a Class Dishwasher new, or acquired a new Class Dishwasher as part of a purchase or remodel of a home, or received a new Class Dishwasher as a gift, (2) that the Class Member experienced a Diverter Seal Leak, and (3) that the Class Member paid out-of-pocket to repair or replace his or her Class Dishwasher in response to a Diverter Seal Leak;

Class Members who previously received compensation or a voluntary benefit from Whirlpool for a Diverter Seal Leak will have the amount of their reimbursement reduced by the amount of the compensation or benefit already received.

Class Members who did not incur out-of-pocket repair expenses due to a Diverter Seal Leak within eight years of the manufacture of the Class Dishwasher are not eligible for cash reimbursement or a rebate. The manufacture date is established by the serial number and will be verified by the Settlement Administrator.

### 11. What is the deadline to submit a Claim Form for a Past Diverter Seal Leak?

You will have until [180 DAYS FROM ORDER OF PRELIM APPROVAL] to submit a Claim Form and all required documentation for a Settlement payment for out-of-pocket expenses for a past Diverter Seal Leak.

### 12. Tell me more about benefits available for Future Diverter Seal Leaks.

If you are a Class Member and you experience a Diverter Seal Leak after [DATE] and within eight years of the manufacture of your Class Dishwasher, you may be eligible to receive the same benefits described for a Past Diverter Seal Leak in the response to Question 10 above.

### 13. What is the deadline to submit a claim form for a Future Diverter Seal Leak?

All claims for future Diverter Seal Leaks must be submitted within 90 days after you first experience the Diverter Seal Leak, and the Diverter Seal Leak must occur no later than eight years after the dishwasher was manufactured.

## HOW TO GET BENEFITS—SUBMITTING A CLAIM FORM

### 14. How many benefits can I receive?

If you qualify, you may receive one benefit for each Class Dishwasher that you purchased or acquired. You must submit a separate Claim Form for each Class Dishwasher. You must elect the benefit you wish to receive at the time you submit your Claim Form.

### 15. How do I get a Settlement benefit to which I may be entitled?

You must complete and submit a Claim Form, including required documentation, either on-line or via U.S. Mail within **[180 DAYS FROM ORDER OF PRELIM APPROVAL]** for a Past Diverter Seal Leak and within 90 days of experiencing a Future Diverter Seal Leak. Claim Forms are available for download and submission at [www.WEBSITE.com]. You can also contact the Settlement Administrator by telephone at [1-800-NUMBER], by email at [EMAIL@WEBSITE.com], or by writing to Dishwasher Settlement Claims Administrator, Cleveland v. Whirlpool Corp. Dishwasher Settlement, Attn: Class Action Administrator, 1650 Arch Street, Suite 2210, Philadelphia, PA 19103, to request a Claim Form. **If you fail to provide the information requested on the Claim Form or if you do not upload or mail your documentary proof, then you will not be entitled to any compensation or benefit under this Settlement.**

### 16. What rights am I giving up by getting benefits and staying in the Settlement Class?

Unless you exclude yourself, you are staying in the Settlement Class. If the Settlement is approved and becomes final, all of the Court's orders will apply to you and legally bind you. Generally, that means you won't be able to sue, continue to sue, or be part of any other lawsuit against Defendant or other released parties ("Releasees") for the legal issues and claims resolved by this Settlement. **Personal injury claims or claims for damage to property other than to the Class Dishwasher itself are <u>not</u> affected or released by this Settlement**. The specific rights you are giving up are called Released Claims (       Question 19).

## 17. What are the Released Claims?

The claims that you are releasing, the "Released Claims," are all claims for economic loss relating to the use and performance of the Class Dishwasher's diverter seal, including all claims for out-of-pocket expense, diminution-in-value, benefit-of-the-bargain, cost-of-repair, cost-of-replacement, cost-of-maintenance, or premium-price damages, arising out of the Class Members' purchases or uses of the Class Dishwashers. The released parties, also called "the Releasees," is Defendant, together with its predecessors and successors in interest, parents, subsidiaries, affiliates, and assigns; (b) each of its past, present, and future officers, directors, agents, representatives, servants, employees, attorneys, and insurers; and (c) all distributors, retailers, and other entities who were or are in the chain of design, testing, manufacture, assembly, distribution, marketing, sale, installation, or servicing of the Class Dishwashers. The Settlement is expressly intended to cover and include all such claims, actions, and causes of action for economic losses or damages (including, but not limited to, claims for diminution-in-value, benefit-of-the-bargain, cost-of-repair, cost-of-replacement, or premium-price damages), dealing whatsoever with the Class Dishwasher diverter seals, diverter motors, or sump assemblies. **The Released Claims, however, do not include any claims for damage to property other than the Class Dishwasher itself or personal injury.**

The complete Settlement Agreement describes the Released Claims in necessary legal terminology. Please read it carefully. A copy of the Settlement Agreement is available at [www.WEBSITE.com]. You can also talk to one of the lawyers listed below for free or you can, of course, talk to your own lawyer at your own expense if you have questions about the Released Claims or what they mean.

## THE LAWYERS REPRESENTING YOU AND THE SETTLEMENT CLASS

## 18. Do I have a lawyer in this case?

Yes. The Court appointed Harper Segui and Rachel Soffin of Milberg Coleman Bryson Phillips Grossman as Class Counsel, to represent you and other Class Members. You will not be charged for the services of Class Counsel. If you want to be represented by your own lawyer, you may hire one at your own expense.

## 19. How will these lawyers be paid?

Class Counsel will ask the Court to award them up to $1,500,000 for attorney fees and reimbursement of the litigation expenses and costs they incurred and/or advanced. They will also ask for service awards of $2,500.00 to be paid to Class Representatives Elizabeth Cleveland, Amy Larchuk, Thomas McCormick, Christopher Redmon, and Dhaval Shah out of the $1,500,000 for fees and expenses. If approved, Whirlpool will separately pay these fees, costs, expenses, and service awards. **These amounts will not reduce the amount of benefits available to Class Members.** In addition, Defendants have also agreed to pay the Settlement Administrator's fees and expenses, including the costs of mailing the Settlement Notices and distributing any payments owed to Class Members as part of the Settlement.

## EXCLUDING YOURSELF FROM THE SETTLEMENT CLASS

If you want to keep the right to sue or continue to sue Defendant about the legal claims in this lawsuit, and you don't want to receive benefits from this Settlement, you must take steps to exclude yourself from the Settlement. This is sometimes called "opting out" of the Settlement Class.

## 20. How do I get out of the Settlement?

To exclude yourself from the Settlement, you must request from the Settlement Administrator a Request for Exclusion. You must provide your name, email address, mailing address, model number, and serial number of your Class Dishwasher. To be valid, your Request for Exclusion must include all of the information requested, must be individually signed, and must be individually sent to the Settlement Administrator at the address below with a postmark no later than [**DATE 91 DAYS AFTER PRELIMINARY APPROVAL ORDER**].

***Cleveland v. Whirlpool Corp. Dishwasher Settlement***
Attn: Class Action Administrator
1650 Arch Street, Suite 2210
Philadelphia, PA 19103

### 21. If I exclude myself, can I still get benefits from this Settlement?

No. If you exclude yourself, you are telling the Court that you don't want to be part of the Settlement Class in this Settlement. You can only get Settlement benefits if you stay in the Settlement Class and submit a valid Claim Form for benefits as described above.

### 22. If I don't exclude myself, can I sue Defendants for the same claims later?

No. Unless you exclude yourself, you are giving up the right to sue Defendants for the claims that this Settlement resolves and releases (see Question 19). You must exclude yourself from this Settlement Class to start or continue with your own lawsuit or be part of any other lawsuit involving the same claims.

## OBJECTING TO THE SETTLEMENT

You can tell the Court if you don't agree with the Settlement or with any part of it.

### 23. How do I tell the Court if I don't like the Settlement?

If you do not exclude yourself from the Settlement, you may object to it. You can give reasons why you think the Court should not approve the Settlement. The Court will consider your views before making a decision. To object, you or your attorney must mail and cause to be postmarked a written objection and supporting papers to the Settlement Administrator, Class Counsel, and Counsel for Whirlpool. Your objection must contain: (1) the name of the Lawsuit (                    ) Case No. 0:20-cv-01906-WMW-KMM); (2) your full name and current address; (3) the serial number and model number of your Class Dishwasher; (5) the specific reasons for your objection; (6) any evidence and supporting papers (including, but not limited to, all briefs, written evidence, and declarations) that you want the Court to consider in support of your objection; (6) your signature; and (7) the date of your signature.

You must mail your written objection to the Settlement Administrator at the address listed in response to Question 20. You must mail your written objection to Class Counsel at: [NAME / ADDRESS], and to defense counsel at: Andrew M. Unthank, Wheeler Trigg O'Donnell LLP, 370 17th Street, Suite 4500, Denver CO 80202.

Your written objection must be mailed with a postmark no later than [**DATE 91 DAYS AFTER PRELIMINARY APPROVAL ORDER**].

### 24. What is the difference between objecting and asking to be excluded from the Settlement?

Objecting is simply telling the Court that you don't like something about the Settlement. You can object only if you stay in the Settlement Class (do not exclude yourself). Excluding yourself is telling the Court that you don't want to be part of the Settlement Class. If you exclude yourself, you cannot object because the Settlement no longer affects you.

## THE COURT'S FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement. You may attend and you may ask to speak at the hearing, but you don't have to.

### 25. When and where will the Court decide whether to approve the Settlement?

The Court will hold a Fairness Hearing on [DATE] at [TIME], at the U.S. District Court for the District of Minnesota, located at the Warren E. Burger Federal Building, 316 North Robert Street, Courtroom 7A, St Paul, MN 55101, to consider whether the Settlement is fair, adequate, and reasonable, and whether it should be finally approved. If there are objections, the Court will consider them. The Court will listen to people who have asked to speak at the hearing (see Question 29). The Court may also decide the amount of fees, costs and expenses to award Class Counsel and the payment amount to the Class Representatives. This hearing may be continued or rescheduled by the Court without further notice to the Settlement Class.

## 26. Do I have to come to the hearing?

No. Class Counsel is working on your behalf and will answer any questions the Court may have about the Settlement. However, you are welcome to come at your own expense. If you mail an objection to the Settlement, you don't have to come to Court to talk about it. As long as you mail your written objection on time, sign it and provide all of the required information (    Question 25) the Court will consider it. You may also pay your own lawyer to attend, but it's not necessary.

## 27. May I speak at the hearing?

Yes. You may ask the Court to speak at the Fairness Hearing. To do so, you must mail a written request to the Court stating that it is your "Notice of Intent to Appear at the Fairness Hearing in       d      r      r  , Case No. 0:20-cv-01906-WMW-KMM" and serve copies of that Notice on Class Counsel and Defendant using the addresses listed in Question 23. You must include your name, address, telephone number, and signature. If you plan to have your own attorney speak for you at the hearing, you must also include the name, address and telephone number of the attorney who will appear on your behalf. Your written Notice of Intent to Appear must be mailed to the Court by [**DATE 91 DAYS AFTER PRELIMINARY APPROVAL ORDER**].

## IF YOU DO NOTHING

## 28. What happens if I don't do anything?

If you do nothing, you won't get any benefits from this Settlement. If the Court approves the Settlement, you will be bound by its terms, and you will give up your right to start a lawsuit, continue with a lawsuit, or be part of any other lawsuit against Defendant and the other Releasees about the legal issues or claims resolved and released by this Settlement.

## GETTING MORE INFORMATION

## 29. What if I feel like I need more information about what I should or should not do?

This Notice summarizes the Settlement. More details are in the Settlement Agreement, available online at [www.WEBSITE.com]. If you have questions, you may contact the Settlement Administrator at the address listed in response to Question 20, [EMAIL@WEBSITE.com], or [PHONE], or visit Class Counsel's website (www.milberg.com) for their contact information should you wish to communicate with them directly.

**DO NOT WRITE OR CALL THE COURT, WHIRLPOOL, OR ANY APPLIANCE RETAILER, DEALER, OR AGENT FOR INFORMATION ABOUT THE SETTLEMENT OR THIS LAWSUIT.**

If you purchased a **Whirlpool-manufactured** dishwasher, you may be entitled to benefits from a class action settlement.

**Click Here**



**EXHIBIT 5**

If you purchased a **Whirlpool-manufactured** dishwasher, you may be entitled to benefits from a class action settlement.

**Click Here**







**Angeion Group**
Sponsored · 🌐

•••

If you purchased a Whirlpool-manufactured dishwasher, you may be entitled to benefits from a class action settlement.



WHIRLPOOLDISHWASHERSETTL...
**Whirlpool-Manufactured Dishwasher Diverter Seal**

LEARN MORE

👍 Like          💬 Comment          ↗ Share

**You may be eligible for a benefit as part of a class action settlement about Whirlpool-manufactured dishwashers.**

For more information on the proposed settlement, to file a claim or objection, or to exclude yourself, visit [www.WEBSITE.com] or contact the Settlement Administrator or Class Counsel.

**Do not contact the Court, Whirlpool, or any appliance retailer or dealer for information about the settlement.**

*Cleveland v. Whirlpool Corp. Dishwasher Settlement*
Class Action Administrator
1650 Arch Street, Suite 2210
Philadelphia, PA 19103

«ScanString»

Postal Service: Please do not mark barcode

Claim#: PQ12345678
Random #:
«FirstName» «LastName»
«Address1»
«Address2»
«City», «StateCd» «Zip»
«CountryCd»

**NOTICE OF PROPOSED CLASS ACTION SETTLEMENT**

**EXHIBIT 6**

A proposed settlement has been reached in a class action against Whirlpool alleging defects in certain Whirlpool-manufactured dishwashers built from 2010-2017. This notice summarizes your legal rights. You should visit [www.WEBSITE.com] to obtain more complete information about covered models, the proposed settlement, and your rights. You also can write to the Settlement Administrator at the address on the reverse side, or call [1-800-NUMBER], to have a Claim Form mailed to you.

**What is the class action about?** Plaintiffs allege that certain Whirlpool-manufactured dishwashers can be susceptible to diverter shaft seal leaks, which may cause the diverter motor to malfunction and in some instances result in water leaking onto the floor (a "Diverter Seal Leak").

**What are my rights?** The settlement class includes all persons who, while living in the United States, bought, acquired, or received as a gift new Whirlpool-manufactured dishwashers built from 2010 through 2017. You can visit [www.WEBSITE.com] to see a complete list of the dishwasher models that are included in the settlement. Whirlpool's records show that you may be a member of the settlement class and eligible to make a claim for a rebate or cash reimbursement, up to $225 and subject to other limits, for documented out-of-pocket expenses to repair or replace your dishwasher's diverter motor or sump assembly, or to replace your dishwasher with a new model, due to a Diverter Seal Leak occurring within eight years of your dishwasher's date of manufacture. To claim this reimbursement benefit for a Diverter Seal Leak, however, you must submit documentary proof of these out-of-pocket expenses. To be eligible for a Past Diverter Seal Leak claim (for a repair or replacement that occurred prior to [DATE]), you must submit a Claim Form to the Settlement Administrator online at [www.WEBSITE.com] or by mail at the address on the reverse side postmarked [180 DAYS FROM ORDER OF PRELIM APPROVAL]. If you have a Future Diverter Seal Leak on or after [DATE] and within eight years of your dishwasher's date of manufacture you can receive this same coverage for future repairs or replacements by submitting a Claim Form online or postmarked within 90 days of your Future Diverter Seal Leak. Class members who do not meet the requirements in the Claim Form are not eligible for compensation.

**How to request exclusion from the class.** If you do not wish to participate in this class action, visit [www.WEBSITE.com] to submit a Request for Exclusion. You also can write to the Settlement Administrator at the address on the reverse side, or call [1-888-000-0000], to have a Request for Exclusion mailed to you. All requests for exclusion shall be individually submitted or postmarked [90 DAYS FROM ORDER OF PRELIM APPROVAL], and must include all required information to be valid. If you do not exclude yourself, you will lose your right to sue Whirlpool and obtain any compensation from them other than through this settlement.

**How to make objections.** If you remain in the class, you can comment on or object to the proposed settlement or Class Counsel's fees by mailing a written objection to the Settlement Administrator at the address on the reverse side, Class Counsel, and defense Counsel. Mail objections to defense Counsel at: Andrew M. Unthank, Wheeler Trigg O'Donnell LLP, 370 17th Street, Suite 4500, Denver CO 80202, and to Class Counsel at the address below. The fairness hearing will be held at the Court on [DATE / TIME]. You or your attorney (if you choose to hire one) may appear at the hearing by filing a notice and entry of appearance with the Court and mailing those to Class Counsel and defense Counsel. Objections must be mailed and postmarked to the Administrator, Class

Counsel, and defense Counsel [90 DAYS FROM ORDER OF PRELIM APPROVAL]. Entries of appearance must be filed with the Court and served on Class Counsel and defense Counsel [90 DAYS FROM ORDER OF PRELIM APPROVAL].

**Class Counsel's attorney fees and contact information.** If the settlement is approved, the lawyers for Plaintiffs and the class (Class Counsel) will request an award of attorney fees, reimbursement of litigation expenses, and service awards not to exceed the total amount of $1,500,000, to be paid by Whirlpool separately from and in addition to the benefits to the Class. You can write to Class Counsel at: [NAME / ADDRESS].

1

2

3

4

5

6

7

8

9

10

11          **UNITED STATES DISTRICT COURT**
            **DISTRICT OF MINNESOTA**

12

13  **ELISABETH CLEVELAND, AMY**
    **LARCHUK, CHRISTOPHER REDMON,**       Civil Actions: 20-cv-1906 (WMW/KMM)
14  **DHAVAL SHAH, and THOMAS**
    **MCCORMICK,**
15                                          **DECLARATION OF FRANK**
    individually and on behalf of themselves  **BERNATOWICZ IN SUPPORT OF**
16  and all others similarly situated,     **PLAINTIFFS' MOTION FOR**
                                            **APPROVAL OF CLASS**
17            Plaintiffs,                   **SETTLEMENT**

18

19            v.

20  **WHIRLPOOL CORPORATION**,

21            Defendant.

22

23

24

25

26

27

28

Civil Action No. 20-cv-1906 (WMW/KMM)
DECLARATION OF FRANK BERNATOWICZ          **EXHIBIT B**

I, Frank Bernatowicz, declare as follows:

1.    I submit this declaration in support of Plaintiffs, Elizabeth Cleveland, Amy Larchuk, Christopher Redmon, Dhaval Shah, and Thomas McCormick ("Plaintiffs"), individually and on behalf of themselves and all others similarly situated. I have personal knowledge of the matters set forth herein, and if called as a witness, could and would competently testify to them.

2.    I have been retained by Milberg Coleman Bryson Phillips Grossman PLLC ("Milberg" or "Class Counsel") to review and analyze class damages for settlement purposes in connection with claims brought by Plaintiffs against Whirlpool Corporation ("Whirlpool" or "Defendant") in the above captioned class action matter.

3.    I have been a damages expert and Professional Engineer for over 37 years. I have been retained in well over 500 cases. My resume and summary of testimony experience are attached to as Exhibits A and B, respectively, where I have highlighted 151 cases in which I have testified at 39 trials and approximately 100 depositions.

4.    I received my Bachelor of Science Degree in Electrical Engineering from the University of Illinois, Champaign-Urbana in 1976. In 1981, I graduated from Loyola University with a Master of Business Administration in Finance. I became a Certified Public Accountant in 1984.

5.    Between 1976 and 1984, I was employed by Commonwealth Edison Company in various management positions including substantial "hands-on" experience in the management of engineering projects. In 1984, I joined the Brenner Group, a management consulting firm specializing in providing financial advisory and litigation services, as a senior consultant. I joined Ernst & Whinney in 1985 (now known as Ernst & Young LLP) and had been a partner in that firm with responsibility as partner-in-charge of the Midwest Region Litigation Services practice and as national director of the intellectual property practice. I joined Jay Alix & Associates in 1996 where I served as Managing Principal of the Chicago office. In 1999 I joined PricewaterhouseCoopers as Managing Partner of the Midwest Region Intellectual Property Practice. In 2001 I joined BDO Seidman as Managing Partner of Specialized Services.

6.    In 2003, I formed FAB Advisory Services, LLC, which was later acquired by Huron

Consulting Group Inc., where I was a Managing Director in the Disputes and Investigations practice. In 2008, I formed a new firm under the name of FAB Group, Inc., where I am currently the Managing Principal.

7. I am a member of the American Institute of Certified Public Accountants, the Illinois CPA Society, Licensing Executives Society, the National Society of Professional Engineers, and the Turnaround Management Association.

8. In connection with this case, I have reviewed certain pleadings, documents and sources of information provided to me by proposed Class Counsel, including the Settlement Agreement and warranty and sales documents produced by Whirlpool during discovery, as well as performed my own independent research on pertinent issues such as pricing and margin for the Class Dishwashers[1] which are the subject of this action, applicable extended warranty ("Service Plan") pricing offered from the marketplace, researched and analyzed the business terms and conditions of those Service Plans, researched and analyzed reasonable estimates of the apportioned value of such service plans reasonably tied to the plastic axel design, and reviewed and analyzed various public financial, accounting and business information pertaining to the Defendant and the Class Dishwashers.

9. Based on my knowledge and experience and my review of information in connection with this matter, I am familiar with, understand, and have knowledge of the material set forth in this declaration.

10. It is my understand that the Settlement Class is defined as: The "Settlement Class" consists of all persons in the United States and its territories who either (a) purchased a new Whirlpool-manufactured, Whirlpool, JennAir, Kenmore, KitchenAid or Maytag-brand dishwasher model identified [in Exhibit 1[2]] manufactured on or before December 31, 2017 (a "Dishwasher"), or (b) acquired a Dishwasher as part of the purchase or remodel of a home, or (c) received as a gift, from a donor meeting those requirements, a new Dishwasher not used by the donor or by

---

[1] "Class Dishwasher" means a Whirlpool-manufactured, KitchenAid-brand dishwasher manufactured with a Plastic Premium Adjusted in combination with a V-Rail System between October 2010 and the Notice Date. Order Granting Preliminary Approval, p.4.
[2] Whirlpool MOU.pdf.

Civil Action No. 20-cv-1906 (WMW/KMM)
DECLARATION OF FRANK BERNATOWICZ    2

anyone else after the donor purchased the Dishwasher and before the donor gave the dishwasher to the Settlement Class Member.

11.     As stated above, I have reviewed and analyzed class damages for settlement purposes in this class action matter, and my findings regarding two benefits (Benefit #1 and Benefit #2) to the Settlement Class under the Settlement are summarized, organized by the type of settlement benefit, below.

### Benefit #1: Extended Service Plan

12.     It is my understanding that the proposed Settlement includes a benefit wherein all Settlement Class Members receive extended service plan benefits for the Class Dishwashers for an additional seven (7) years from the expiration of the original manufacturer's warranty relating to a "Diverter Seal Leak," which is defined in the Settlement Agreement as a water leak that originated at the location of the diverter motor shaft and diverter seal found in the sump assembly parts listed in Exhibit 3 to the Settlement Agreement.

13.     Each Dishwasher is sold with a one-year limited warranty, from which Whirlpool pays for Factory Specification Parts ("FSP®") and repair labor to correct defects in material and workmanship.  Prior to the subject Settlement, if a consumer experienced a Diverter Seal Leak beyond this one-year warranty, Whirlpool did not cover the costs of parts or labor under the Dishwasher warranty.  As a result of the Settlement, Whirlpool has agreed to cover Past Diverter Seal Leaks and Future Diverter Seal Leaks for an additional seven (7) years from the expiration of the original manufacturer's warranty, or within eight years of manufacture of the Dishwasher. As defined in the Settlement Agreement, a Past Diverter Seal Leak is defined as a Diverter Seal Leak in a Class Dishwasher that occurred prior to the Notice Date, and a Future Diverter Seal Leak is defined as a Diverter Seal Leak in a Class Dishwasher that occurs on or after the Notice Date. Pursuant to the Settlement, Class Members may receive compensation for either a Paid Qualifying Repair or a Paid Qualifying Replacement. As defined in the Settlement Agreement, a "Paid

Qualifying Repair" means where a Settlement Class Member actually paid some out-of-pocket cost for a repair of his or her Dishwasher that included the replacement of either the diverter motor, sump, or sump assembly in response to a Diverter Seal Leak, and a "Paid Qualifying Replacement" means where a Settlement Class Member actually paid some out-of-pocket cost to replace, rather than repair, their Dishwasher in response to a Diverter Seal Leak. Class Members who have either a Paid Qualifying Repair or a Paid Qualifying Replacement will be entitled to compensation subject to the terms in the Settlement Agreement.

14. Because Settlement offers extended service plan benefits for Diverter Seal Leaks seven years following Whirlpool's one-year limited warranty, I have reviewed and analyzed the **Extended Service Plan** Value to the Settlement Class. For purposes of my analysis, I have assumed the following: (1) Settlement Class members whose Class Dishwashers have not yet aged out of the eight-year benefit timeline will receive an **Extended Service Plan** benefit under the proposed settlement, excluding those who have previously received compensation under the original one-year warranty or otherwise; and (2) the number of Class Dishwashers subject to this benefit is estimated to be **5,230,198**.[3] The additional 7-year **Extended Service Plan** benefit is reasonably quantified based on analytical procedures described below.

15. **Extended Service Plan Benefit** (Apportioned Dishwasher Service Plan Extension) is based on actual average five-year extended service plan pricing from three U.S. extended service plan providers in the marketplace, wherefrom I determined a reasonable 7-year extended service plan price of $214.07. Further, I apportioned an amount of the additional 7-year service plan extension to the diverter system versus the other (non-diverter system) features and components of the Dishwasher based on: (1) the average Dishwasher Price, (2) Whirlpool's cost of goods sold (COGS) markup, (3) average cost of repair (Whirlpool), and (4) reasonable estimates of parts and labor aspects related thereto. My analysis reveals the diverter system represents 12% of the Dishwasher Price. Using this percentage, the apportioned 7-year extended service plan value is $26.42. For purposes of this analysis, the extended service plan benefit is limited to the Remaining

---

[3] Whirlpool Email with Sales Breakdown (Cleveland – April 2014 through December 2017 UNITS [4762].xlsx).

Service Plan Life after 90 days from the notice date (Notice Expiration), even though plaintiff will receive the full benefit of the extended 7-year service plan. My analysis reveals a Remaining Service Plan Life after the Notice Expiration of 25% of the full 8-year period including 7-year extended service plan, weighted by shipment year Qualifying Units. Next, I reviewed and analyzed the Settlement Agreement, as well as Whirlpool's interrogatory responses and Whirlpool's Sales Breakdown for the Dishwashers, wherefrom I determined the percent average repair cost allowed. This allowance is based on an assumed failure rate in the range of 1% to 4% as reported in Whirlpool's interrogatory responses, as well as other inputs from the Settlement Agreement regarding paid qualifying repairs or reimbursements. On this basis, my analysis reveals a weighted average Service Plan Percentage Coverage of 40% for the Remaining Service Plan Life, based on the terms of the Settlement Agreement, which provided reduced compensation over the 7-year extended service plan period. To illustrate this class benefit, I then multiply the apportioned 7-year extended service plan value of $26.42 by three factors: (1) the estimated Sales Quantity of 5.23 million Class Dishwashers, (2) the 25% Remaining Extended Service Plan Life, and (3) the 40% Remaining Extended Service Plan Period Coverage.

**Apportioned 7-Year Extended Service Plan Value *multiplied by* (1) Class Dishwashers Sales Quantity by (2) Remaining Extended Service Plan Life by (3) Remaining Extended Service Plan Coverage**

16.     My analysis is based on the above findings and further includes the following analytical procedures: *First*, I reviewed and analyzed sales price and extended service plan pricing information for representative models of Class Dishwashers. From this pricing data, I determined the average price of an additional 5-year extended service plan, as well as the average price of an additional 2-year extended service plan. I then add the average 2-year and 5-year extended service plan prices together, thus estimating the reasonable value of an additional 7-year extended service plan. My analysis reveals the price of an additional 7-year extended service plan to be $214.07. (*See* Exhibits 2 and 6).

17.     **Second**, I researched and analyzed what portion of that additional 7-year extended service plan relates to the Class Dishwasher diverter system versus the other (non-diverter) features

and components. (See Exhibit 5). This market-based apportionment analysis involves a review of average Dishwasher Price, based on publicly available data from Whirlpool online, of $729.86, (2) Whirlpool's cost of goods sold (COGS) markup, based on Whirlpool's incomes statements from 2011-2017 and data from Morningstar, of 20%, (3) average cost of repair, based on Whirlpool data, of $225, and (4) reasonable estimates of parts and labor components related thereto, including estimated parts markup. My analysis reveals the diverter system represents 12% of the Dishwasher Price. Using this percentage, the apportioned 7-year extended service plan value is $26.42. (See Exhibits 1, 5, 6, and 7).

18. **Third**, I determined the Remaining Extended Service Plan Life after Notice Expiration or 4/1/22, based on 90 days from the expected notice date of 12/31/21. My analysis reveals a Remaining Extended Service Plan Life of 25% of the full 8-year coverage period including 7-year extension, weighted by Qualifying Units for shipment years 2014 through 2017. (*See* Exhibit 3).

19. **Fourth**, I reviewed and analyzed the Settlement Agreement, as well as Whirlpool's interrogatory responses and Whirlpool Sales Breakdown, wherefrom I determined the percent average repair cost allowed. This allowance is based on an assumed failure rate in the range of 1% to 4%, as well as other inputs from the Settlement Agreement regarding paid qualifying repairs or reimbursements schedules provided therein. Logically, this analyzes a reasonable estimate of the average percent of coverage under the extended service plan, based on the inputs and coverage schedules of the Settlement Agreement. My analysis reveals a weighted average Extended Service Plan Percentage Coverage of 40% for the Remaining Extended Service Plan Life. (*See* Exhibit 4B).

20. **Lastly**, I multiply the Apportioned 7-Year Extended Service Plan Value ($26.42) by 3 factors: (1) the estimated Sales Quantity of Class Dishwashers (5,230,198 million units)[4] (2) the 25% Remaining Extended Service Plan Life, and (3) the 40% Remaining Extended Service Plan Period Coverage.

---

[4] *Sales Quantity = Total Class Dishwashers (5,256,480) less estimated YR1 failures (26,282, at 4% failure rate). See* Exhibits 3 and 7.

21.     *On the aforementioned bases, in my opinion, the 7-Year Extended Service Plan Benefit for coverage of Diverter Seal Leaks amounts to $13,831,171.* (*See* Exhibits 1, 2, 3, 4B, 5, 6, 7 and 8).

## Benefit #2: Out-of-Pocket (OOP) Costs

22.     It is my understanding that the Settlement also includes a benefit wherein Settlement Class Members who have incurred qualifying out-of-pocket expenses for prior diverter system repairs may seek reimbursement for up to $225 with documented proof, subject to certain limiting assumptions and coverage schedules that step down over the term of the extended service plan benefit (Reimbursement Matrix).[5]

23.     To this regard, I have reviewed and analyzed the aforementioned *Out-of-Pocket Costs Benefit* to the Settlement Class. For purposes of my analysis, I have assumed the following: (1) the number of Class Dishwasher units is the same as stated above; (2) a reasonable estimate of the diverter system repair cost has been represented by Whirlpool to be $225; (3) a reasonable estimate for diverter system failure percent has been represented by Whirlpool to be in the range of 1% to 4%. (*See* Exhibits 4, 4A, 4B).

24.     *First*, my analysis accepts the Whirlpool average estimated repair cost related to the diverter system of $225. (*See* Exhibit 4, 4A, and 4B).

25.     *Second*, my analysis accepts the Whirlpool estimated range of relevant failure rates of 1% to 4%. (*See* Exhibit 4, 4A, and 4B).

26.     *Third,* based on the mechanics of the Reimbursement Matrix, shown in Exhibit 3 hereto, the limiting assumptions and coverage schedules that step down over the term of the extended service plan benefit provided in the Settlement Agreement are applied to the estimated Eligible Claim Units. Two alternatives are presented: (a) *ALT1* is based on a failure rate of 1%, and (b) *ALT2* is based on a failure rate of 4%. Logically, the model shows the distribution of estimated Eligible Claim Units and the respective Out-of-Pocket costs in each year of the 7-Year Extended Service Plan. (*See* Exhibit 4). I also present the model showing only *Past* Out-of-Pocket Reimbursement Benefits (Exhibit 4A) (i.e., benefits related to claims made prior to the Notice

---

[5] Whirlpool MOU.pdf.

Civil Action No. 20-cv-1906 (WMW/KMM)
DECLARATION OF FRANK BERNATOWICZ     7

Date), and also present the model showing only *Future* Out-of-Pocket Reimbursement Benefits (i.e., benefits related to claims made after the Notice date) (Exhibit 4B).

27.     ***On the aforementioned bases, in my opinion, Total Out-of-Pocket Reimbursement Benefit amounts to a range of $1,874,157 (ALT1) to $7,496,629 (ALT2).*** (*See* Exhibits 1, 4, 4A, and 4B).

28.     In my opinion, based on the aforementioned benefits illustrated above, the range of ***Total Benefits (#1 and #2) for the Settlement Class amounts to $15.71 to $21.33 million***. (*See* Exhibit 1).

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Respectfully Submitted,

Dated: October 29, 2021

*Frank Bernatowicz*

Frank Bernatowicz

EXHIBIT A



# Frank Bernatowicz
Managing Principal



P: (312) 650-5250
F: (312) 650-5286
C: (630) 888-4290
fab@fabgrp.com

400 E. Randolph
Suite 720
Chicago, IL 60601
www.fabgrp.com

Frank is the Founder and Managing Principal of FAB Group, Inc., a financial advisory services firm.

## Professional experience
Prior to forming FAB Group, Inc., Frank was the Founder and Managing Principal of FAB Advisory Services, LLC (acquired by Huron Consulting), where he provided litigation consulting and expert witness testimony, financial advisory services for companies and creditors in connection with reorganization and/or bankruptcy proceedings, turnaround consulting and interim management services, as well as general financial advisory work for troubled companies.

During his career, Frank was influential in advancing litigation consulting in the Chicago market by forming Ernst & Whinney's first stand-alone litigation consulting practice in 1985 and subsequently held senior regional and national leadership positions at the successor firm, Ernst & Young, for over 12 years. In addition, Frank was the founder of the Chicago office of Jay Alix & Associates, an internationally recognized turnaround consulting firm. He has also held senior leadership positions at PriceWaterhouseCoopers and BDO Seidman prior to forming his own firm.

Frank has extensive experience in the areas of finance, accounting, valuation, and engineering. He regularly serves as an expert witness and has substantial testimony experience in federal and state courts, as well as arbitration and mediation proceedings. Frank has served as a damages expert for over 25 years in federal and state courts on more than 400 engagements. He has vast experience in arbitration and mediation matters and has served as a court appointed expert on financial and damages matters in various jurisdictions.

Representative examples of Frank's engagement experience include:

### Litigation Consulting and Expert Testimony
Analysis and testimony on accounting, financial and economic issues over a broad range of industries including pharmaceutical, medical products, automotive, utility, construction, real estate, manufacturing, government, transportation, financial services and others related to a wide range of disputes including:

- *Intellectual property disputes* involving patent infringement, trade secrets, false advertisement, trade dress, copyright and royalty disputes
- *Construction disputes* including breach of contract, delay, lost productivity and other claims
- *Insurance claim disputes* involving business interruption, property and casualty, extra expense, directors and officers and other claims
- *Post acquisition disputes* involving price disagreements and performance issues
- *Breach of contract* matters including performance, payment, delay, termination and other issues
- *Other types of disputes* including legal and accounting malpractice, condemnation, marital dissolution, environmental claims and others
- *Arbitrator and mediator services* to a wide range of entities and industries

### Financial Recovery Services
- *Fraudulent conveyance analysis* and testimony
- *Preference payment analysis*
- *Creditor recovery services* (Ch. 7 and Ch. 11)
- *Debtor advisory services* (Ch. 7 and Ch. 11) including plans of reorganization and strategic planning
- *Crisis management* for troubled developments, projects, plants and corporations

### Commercial Fraud Investigations
- *SEC related inquiries and investigations*
- *Breach of fiduciary responsibility investigations*
- *Accounting irregularity investigations*

## Education and certifications
- MBA, Loyola University
- Bachelor of Science in Electrical Engineering, University of Illinois
- Certified Public Accountant (CPA)
- Registered Professional Engineer (PE)

## Professional associations
- Illinois CPA Society
- American Institute of Certified Public Accountants
- National Society of Professional Engineers
- Turnaround Management Association
- Licensing Executives Society

# FRANK BERNATOWICZ
## EXPERT TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|---|---|---|---|
| 1 | Flo-Rite v. Wisconsin Pharmacal (c) | Trial | George Grumley Rudnick & Wolfe |
| 2 | City of Detroit (c) v. Sisters of Mercy Health Corporation | Deposition, Mediation | Plunkett & Cooney Bill Brodhead |
| 3 | Prozeralik v. Capital Cities (c) | Trial | Andrea Moore Jaeckle, Fleischmann & Mugel |
| 4 | Prudential Insurance Co. (c) & Nippon Life v. Turner Construction Co. | Deposition, Mediation | Bill Campbell Rudnick & Wolfe |
| 5 | O'Brien Corp. (c) v. National Union Insurance Co. | Deposition, Mediation | Werner Powers Haynes & Boone |
| 6 | Aardvark Art v. Lehigh Press (c) | Depositions, Trial | Phil Kircher Schnader, Harrison, Segal & Lewis |
| 7 | CTS Corp. v. Raytheon (c) | Deposition | Rowe Snider Lord, Bissell & Brook |
| 8 | John R. Walker Co. v. Zimpro (c) | Arbitration | Tim Thornton Greensfelder, Hemker, Gale, Weiss & Chappelow |
| 9 | Hughes Masonry, Inc. v. Geupel DeMars (c) | Deposition | Alan Lobley Ice, Miller, Donadio & Ryan |
| 10 | Park Plaza Developers v. Geupel DeMars (c) | Arbitration | Alan Lobley Ice, Miller, Donadio & Ryan |
| 11 | B&I Mechanical Contractors v. Geupel DeMars (c) | Arbitration | Alan Lobley Ice, Miller, Donadio & Ryan |
| 12 | BASF v. Old World Trading Co. (c) v. Dearborn | Deposition | Mark Ferguson Bartlitt, Beck, Herman, Palenchar & Scott |
| 13 | CG&E, DP&L & C&SOE v. GE (c) | Deposition, Trial | Bill Gordon Mayer, Brown & Platt |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 14 | U.S. Industries (c) v. F. Browne Gregg | Trial | Bill Sondericker Carter, Ledyard & Milburn |
| 15 | Great Midwest Savings & Loan (c) v. Hometown, Inc. | Trial | Roger Weede Vlasak, Rosenbaum, Weede & Britton |
| 16 | Metaullics v. MMEI (c) | Trial | Ron Isroff Ulmer & Berne |
| 17 | Metaullics v. MMEI (c) | Deposition,Trial | Ron Isroff Ulmer & Berne |
| 18 | Lor-Al (c) v. Ag-Chem | Deposition | Mark Wine Oppenheimer, Wolff & Donnelly |
| 19 | Sealed Air, Inc. v. Northern Instruments (c) | Deposition | David Bishop Oppenheimer, Wolff & Donnelly |
| 20 | Axxess Entry Technologies v. Hill, Van Santen, Steadman & Simpson (c) | Deposition | Jim Nolan Clausen, Miller, Gorman, Caffrey & Witous |
| 21 | Farrall Instruments v. Ward, Lalos, Leeds, Keegan, & Lett (c) | Deposition | Jim White Welsh & Katz |
| 22 | Wells Fargo v. Pullman Construction Co. (c) | Trial | Don Zazove Tobin & Zazove |
| 23 | Forum Insurance Co. (c) v. Magnant Re Intermediaries | Deposition | Don Flayton Wildman, Harrold, Allen & Dixon |
| 24 | Illinois Central v. Alternative Transportation System (c) | Deposition | Mark Devane Menges, Millus |
| 25 | Intamin v. Figley Wright (c) | Deposition | Michael Wagner Baker & McKenzie |
| 26 | Shambaugh Electric v. Fairfield Engineering Co. (c) | Deposition | Norman Barry Baker & McKenzie |
| 27 | Driscoll/Newgard (c) v. Metro Fair & Expo. Authority | Trial | Don O'Brien O'Brien, O'Rourke, Hogan & McNulty |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 28 | Farm Fuels<br>v.<br>Grain Processing Corp. (c) | Trial | Henry Harmon<br>Grefe & Sidney |
| 29 | Recon Optical<br>v.<br>Ragnar Benson (c) | Deposition | Bill Campbell<br>Rudnick & Wolfe |
| 30 | Industrial First, Inc.<br>v.<br>Stein & Co. (c) | Arbitration | Stan Adelman<br>Rudnick & Wolfe |
| 31 | Warner Bros.<br>v.<br>County of DuPage (c) | Trial | Chuck Hoppe<br>Knight, Hoppe & Fanning |
| 32 | Armstrong Foods (c)<br>v.<br>Rose Foregrove | Deposition | Chuck Bergen<br>Grippo & Elden |
| 33 | Weyerhauser<br>v.<br>Structural Wood Corp. (c) | Deposition | Peter Tolley<br>Tolley, Fisher & Verwys |
| 34 | Sylvester Sales Company (c)<br>v.<br>Anoka Electric Co. | Trial | Jerry Rice<br>Rice & Heikes |
| 35 | Illinois Bell<br>v.<br>Garrett & West (c) | Deposition | Tom Lucas<br>Peterson & Ross |
| 36 | Laguna Hills Water Co.<br>v.<br>VSL (c) | Deposition | Jay Seashore<br>Haight, Dixon, Brown &<br>Bonesteel |
| 37 | S&S Enterprises<br>v.<br>U.S. Air Force (c) | Deposition | Herb Lyons<br>U.S. Air Force |
| 38 | Warner Bros.<br>v.<br>City of Bensenville (c) | Deposition | Bill Mahoney<br>Segal, McCambridge, Singer &<br>Mahoney |
| 39 | David Engineering (c)<br>v.<br>Bartholomew Consolidated School Corp. | Arbitration | Gary Dankert<br>Ice, Miller, Donadio & Ryan |
| 40 | Carolyn Jordan & Associates<br>v.<br>DelRicco Bros. Construction Co. (c) | Trial | Don O'Brien<br>O'Brien, O'Rourke, Hogan &<br>McNulty |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|---|---|---|---|
| 41 | Dayton Hudson<br>v.<br>Great Lakes Dredge & Dock (c)<br>& City of Chicago | Deposition | Doug Reimer<br>McDermott Will & Emery |
| 42 | Sara Creek<br>v.<br>Great Lakes Dredge & Dock (c)<br>& City of Chicago | Deposition | Doug Reimer<br>McDermott Will & Emery |
| 43 | Helmsley Spear<br>v.<br>Great Lakes Dredge & Dock (c)<br>& City of Chicago | Deposition | Doug Reimer<br>McDermott Will & Emery |
| 44 | Filenes Basement<br>v.<br>Great Lakes Dredge & Dock (c)<br>& City of Chicago | Deposition | Doug Reimer<br>McDermott Will & Emery |
| 45 | Metcalf & Eddy (c)<br>v.<br>Puerto Rican Aqueduct & Sewerage Authority | Special Master Hearings | Peter Sipkins<br>Dorsey & Whitney |
| 46 | Prudential Life & Nippon Life (c)<br>v.<br>Turner Construction Co. | Trial | Steve Harper<br>Kirkland & Ellis |
| 47 | Dakota Gasification Co.<br>v.<br>Henry J. Kaiser, et al. (c) | Deposition | Werner Polak<br>Shearman & Sterling |
| 48 | Raymond G. Tronzo (c)<br>v.<br>Biomet, Inc. | Depositions, Trial, | Robert Hackleman<br>Gunster, Yoakley, Valdes-Fauli & Stewart |
| 49 | Johnstown America Corp.<br>v.<br>Trinity Industries, Inc. (c) | Trial | Bob Chiaviello<br>Baker & Botts |
| 50 | G&K Services (c)<br>v.<br>Uniform Partners Corp. | Arbitration | Bill Mullin<br>Maslon, Edelman, Borman & Brand |
| 51 | Van Kampen Merritt (c)<br>v.<br>SMP II Limited Partnership | Trial | Tim Eaton<br>Coffield, Ungaretti & Harris |
| 52 | Rim Sales, Inc.<br>v.<br>Wilton Corporation (c) | Federal-Arbitration | Dan Sclessinger<br>Lord, Bissell & Brook |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 53 | Echo Corporation (c) <br> v. <br> Power Tools | Deposition | Susan Rentschler <br> Musada Funai Eifert & Mitchell, Ltd. |
| 54 | Black & Decker (c) <br> v. <br> The Coleman Company | Deposition | Ray Niro <br> Niro, Scavone, Haller & Niro |
| 55 | University of Georgia Research Foundation (c) <br> v. <br> Kilpatrick & Cody | Deposition | Judy Butler <br> University of Georgia Research Foundation |
| 56 | Fabrite Laminating Corporation <br> v. <br> Standard Textile Co., Inc. (c) | Trial | Bruce Tittel <br> Wood, Herron & Evans |
| 57 | Lombard Construction Co. <br> v. <br> Chicago Housing Authority (c) | Deposition | Mark Friedlander <br> Schiff, Hardin & Waite |
| 58 | Chicago Transit Authority (c) <br> v. <br> Insurers | Deposition | James O'Halloran <br> O'Halloran, Lively & Walker |
| 59 | Colonial Guild (c) <br> v. <br> Matthews | Trial | Connis Brown <br> Gunster, Yoakley, Valdes-Fauli & Stewart |
| 60 | Unofficial Creditors Committee of Alpha Tube (c) <br> Re: Acme Metals Bankruptcy | Deposition | Dennis O'Dea <br> Wolf, Block, Schorr and Solis-Cohen, LLP |
| 61 | Bradford Company (c) <br> v. <br> Jefferson Smurfit Corp. | Trial | Bruce Tittel <br> Wood, Herron & Evans |
| 62 | Medtronic (c) <br> v. <br> St. Jude Medical | Arbitration | Bill Pentelovich <br> Maslon, Edelman, Borman & Brand |
| 63 | Avery Dennison (c) <br> v. <br> Flexcon | Deposition | Joe Hosteny <br> Niro, Scavone, Haller & Niro |
| 64 | Public Service of Indiana <br> v. <br> Hartford (c) | Mediation | Tom Keegan <br> Robins, Kaplan, Miller & Ciresi |
| 65 | Edwardsville School District <br> v. <br> Sverdrup (c) | Deposition | Tim Thornton <br> Greensfelder, Hemker & Gale |
| 66 | Charles S. Anderson <br> v. <br> Imagine Publishing (c) | Deposition | Rob Phillips <br> Arnold, White & Durkee |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|---|---|---|---|
| 67 | Ohio Medical Products (c) v. Johnson & Johnson | Deposition | Greg Ahrens Wood, Herron & Evans |
| 68 | Black & Decker (c) v. Catalina Lighting | Deposition | John Janka Niro, Scavone, Haller & Niro |
| 69 | 20th Century Plastics v. Univenture (c) | Arbitration | Bruce Tittel Wood, Herron & Evans |
| 70 | IBJ Schroder Bank & Trust (c) v. Cory & Associates, Inc. | Deposition | Frank Penski Nixon & Peabody |
| 71 | Avery Dennison (c) v. Ritrama | Deposition | Joe Hosteny Niro, Scavone, Haller & Niro |
| 72 | Amphenol (c) v. Centurion | Deposition | Steve Fallon Greer Burns & Crain |
| 73 | Alla Investors v. NCI (c) | Deposition, Trial | Michael Poulos Piper Marbury Rudnick & Wolfe |
| 74 | TSE v. Franklynn (c) | Deposition, Trial | Greg Ahrens Wood, Herron & Evans |
| 75 | Bucyrus-Erie creditors (c) v. Bucyrus-Erie, debtor | Deposition | Bruce Arnold Whyte Hirschboek & Dudek |
| 76 | Barbour v. Layne Christensen (c) | Deposition | Rob Adams Shook, Hardy & Bacon |
| 77 | Lawler (c) v. Bradley | Deposition | Art Stein Barnes & Thornburg |
| 78 | Avery Dennison (c) v. UCB | Deposition | Joe Hosteny Niro, Scavone, Haller & Niro |
| 79 | Hall v. American Pavers Manufacturing (c) | Deposition, Mediation | Connis Brown III Brown, Locurto & Robert |
| 80 | Shareholders v. AEG (c) | Deposition | David Schaffer Chapman & Cutler |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 81 | Bonzel (c) <br> v. <br> Boston Scientific | Mediation | Tom Burger <br> Wood, Herron & Evans |
| 82 | Mopex (c ) <br> v. <br> American Stock Exchange | Deposition | Brad Lyerla <br> Wallenstein & Wagner |
| 83 | Ringland Johnson (c) <br> v. <br> CNA | Mediation | Mark Gravino <br> Williams & McCarthy |
| 84 | Ringland  Johnson (c) <br> v. <br> Zurich | Mediation | Mark Gravino <br> Williams & McCarthy |
| 85 | Uno Heirs (c) <br> v. <br> Mattel | Depositions | Bruce Tittel <br> Wood, Herron & Evans |
| 86 | Eazypower <br> v. <br> Vermont American (c) | Deposition | Tom Fitzsimmons <br> Greer, Burns & Crain |
| 87 | Block Financial Corp. <br> v. <br> Yodlee, Inc. (c) | Deposition | David Barkan <br> Fish & Richardson |
| 88 | TAAG/T.K. International, Inc. <br> v. <br> Roper Whitney of Rockford (c) | Deposition, Trial | Tom Boswell <br> Hinshaw & Culbertson |
| 89 | McCook Metals creditors <br> v. <br> McCook Metals, debtor (c) | Deposition, Trial | Michael Desmond <br> Figliulo & Silverman |
| 90 | American Equities Group - debtor (c) <br> Re:  Bankruptcy proceedings | Trial | Warren Graham <br> Warshaw, Burstein Cohen Schlesinger & Kuh, LLP |
| 91 | Bristol-Myers Squibb & Sanofi-Synthelabo <br> v. <br> Apotex (c) | Depositions, Trial | Allen Bernstein <br> Ceasar,  Rivise,  Bernstein,  Cohen  & Pokotilow, Ltd. |
| 92 | Tower Automotive (c) <br> v. <br> Lamb Technicon | Depositions | Dick Kay <br> Varnum, Riddering, Schmidt & Howlett LLP |
| 93 | Veeco Instruments (c) <br> v. <br> Asylum Research | Deposition | Bruce Tittel <br> Wood, Herron & Evans |
| 94 | Block Financial Corp. <br> v. <br> Yodlee (c) | Depostion | David Barkan <br> Fish & Richardson, P.C. |

# TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 95 | Access Technologies<br>v.<br>Pomeroy Computer Resources | Arbitrator | Caldwell Lowrance<br>Bass Berry & Sims PLC |
| 96 | Roper Whitney of Rockford (c)<br>v.<br>Quality Hydraulics | Meditation | Marc Gravino<br>Williams & McCarthy |
| 97 | Hill's Pet Nutrition<br>v.<br>Nutro Products (c ) | Deposition, Trial | Dick Johnson<br>Blackwell Sanders Peper Martin LLC |
| 98 | Halo – debtor<br>v.<br>Starbelly.com (c) | Deposition | Michael Desmond<br>Figliulo & Silverman |
| 99 | Eaton Corporation<br>v.<br>Rockford Linear Actuation  (c) | Mediation | Marc Gravino<br>Williams & McCarthy |
| 100 | Frazier<br>v.<br>Layne Christensen (c ) | Deposition | Dick Johnson<br>Blackwell Sanders Peper Martin LLC |
| 101 | Lurgi<br>v.<br>Adkins (c) | Arbitration | Maynerd Steinberg<br>Lord Bissell & Brook |
| 102 | North Atlantic Trading Company<br>v.<br>Republic Tobacco (c) | Deposition | Michael Kazan<br>Grippo & Elden |
| 103 | Royal Indemnity Company (c)<br>v.<br>Commercial Money Center, Inc. | Deposition, Trial | Richard Zuckerman<br>Sonnenschein Nath & Rosenthal, LLP |
| 104 | Novartis<br>v.<br>Apotex Corp. (c) | Hearing | Robert Silver<br>Ceasar, Rivise, Bernstein, Cohen & Pokotilow, Ltd. Caesar |
| 105 | Plastech Engineered Products, Inc. (c)<br>v.<br>Eisenmann Corp. | Deposition | John Wright<br>Jones Day |
| 106 | Cellularvision (c)<br>v.<br>Alltel Corporation | Deposition | Connis Brown<br>Brown Robert, LLP |
| 107 | Grand Pier Center, LLC (c)<br>v.<br>ATC Group Services, Inc., etal. | Deposition | Dan Murray<br>Johnson & Bell |
| 108 | Heartbilt (c)<br>v.<br>Timbercut | Mediation | Marc Gravino<br>Williams & McCarthy |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 109 | Unigene & Upsher-Smith<br>v.<br>Apotex Corp. (c) | Deposition | Robert Silver<br>Ceasar, Rivise, Bernstein, Cohen & Pokotilow, Ltd. |
| 110 | Hanfield (c)<br>v.<br>Nissan et al. | Deposition | Eric Acker<br>Morrison Foerster |
| 111 | IRS<br>v.<br>Rovakat (c) | Trial | William Read Rankin<br>Rankin & Associates |
| 112 | Sensient (c)<br>v.<br>Foley & Lardner | Deposition, Trial | Pete Silverman<br>Figliulo & Silverman |
| 113 | Wyeth & Altana<br>v.<br>SUN & TEVA (c) | Deposition | Robert Breisblatt<br>Katten Muchin |
| 114 | APG (c)<br>v.<br>Barnes & Thornburg | Deposition, Trial | William Johnson<br>Johnson & Bell |
| 115 | Heritage Christian<br>v.<br>Security Life of Denver (c) | Deposition | Erin Dickinson<br>Hansen Riederer Dickinson Crueger |
| 116 | Cincinnati Insurance<br>v.<br>Albert (c) | Deposition | Linda Polley<br>Hunt Suedhoff Kalamaros LLP |
| 117 | Whitserve (c)<br>v.<br>CPI | Depositions | Gene Winter<br>St.St. Onge Steward Johnston & Reens LLC |
| 118 | UEI (c)<br>v.<br>URC | Deposition, Trial | Chris Lee<br>Niro, Haller & Niro |
| 119 | Class Action (c)<br>v.<br>Bally | Deposition | Amy Keller<br>Wexler Wallace |
| 120 | Lori Roberts<br>v.<br>Guggenheim (c) | Deposition | Pete Silverman<br>Figliulo & Silverman |
| 121 | Gentex<br>v.<br>Helicopter Helmet (c) | Trial | Bruce Chasan<br>Law Offices of Bucre J. Chasas, LLC |
| 122 | Icon (c)<br>v.<br>SBC | Deposition | Chris Laney<br>Niro, Haller & Niro |

## TESTIMONY ON SELECTED LITIGATION MATTERS

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 123 | Weber (c)<br>v.<br>Sears | Deposition | Raymond Niro<br>Niro, McAndrews, Dowell & Grossman |
| 124 | Aumann (c)<br>v.<br>Hartsfield | Mediation | Marc Gravino<br>Williams & McCarthy |
| 125 | Design Basics<br>v.<br>Newport Builders (c) | Mediation | Marc Gravino<br>Williams & McCarthy |
| 126 | Design Basics<br>v.<br>Westridge Buiders (c) | Mediation | Marc Gravino<br>Williams & McCarthy |
| 127 | North American Stevedoring (c)<br>v.<br>Illinois International Port District | Deposition | John Holevas<br>Williams & McCarthy |
| 128 | Wholesale Partners (c)<br>v.<br>Masterbrand | Deposition | Chuck Crueger<br>Hansen Riederer Dickinson Crueger |
| 129 | Pacific Bearing<br>v.<br>International Distribution Alliance (c) | Mediation | Marc Gravino<br>Williams & McCarthy |
| 130 | Access Private Equity<br>v.<br>Guggenheim (c) | Arbitration | Pete Silverman<br>Figliulo & Silverman |
| 131 | RUSH University Medical Center (c)<br>v.<br>Perkins & Will and Environmental Systems Design | Mediation | Dan Brenner<br>Laurie & Brennan |
| 132 | Class Action (c)<br>v.<br>Goodman (CA) | Deposition | Joshua Ezrin<br>Audet & Partners |
| 133 | Class Action (c)<br>v.<br>Nordyne | Depositionn | Greg Coleman<br>Greg Coleman Law |
| 134 | Class Action (c)<br>v.<br>Nissan | Deposition | Greg Coleman<br>Greg Coleman Law |
| 135 | Bison Advisors<br>v.<br>Walleye Trading | Deposition | Ray Niro<br>Niro Haller & Niro |
| 136 | Grail<br>v.<br>Mitsubishi | Deposition | Ray Niro<br>Niro Haller & Niro |

**TESTIMONY ON SELECTED LITIGATION MATTERS**

| Ref. | Case | Testimony Type | Attorney Contact |
|------|------|----------------|------------------|
| 137 | Arctic Cat v. Driveline | Deposition | Joel Houtari Williams & McCarthy |
| 138 | Class Action (c) v. Rheem | Deposition | Greg Coleman Greg Coleman Law |
| 139 | Class Action (c) v. Fluidmaster | Deposition | Amy Keller Wexler Wallace |
| 140 | Design Basics v. Tim O'Brien Homes (c) | Deposition/Mediation | Marc Gravino Williams & McCarthy |
| 141 | Design Basics v. Phillippe Builders (c ) | Mediation | Marc Gravino Williams & McCarthy |
| 142 | Design Basics v. Three Hammer Construction (c) | Mediation | Marc Gravino Williams & McCarthy |
| 143 | Class Action (c) v. Sears | Deposition | Berger & Montague Michael Fantini |
| 144 | Chippewa Indians (c) v. Stifel, Nicolaus & Company | Deposition | Tim Hansen Hansen Reynolds |
| 145 | Trutee for TPP Acquisition v. Monroe Capital (c) | Deposition | Jeffrey Ganz Riemer & Braunstein |
| 146 | Karl Storz (c) v. Stryker | Deposition | Michael Kosma Whitmyer IP Group |
| 147 | OADS (c) v. L3 | Trial, Deposition | Neil Lapinski Gordon, Fournaris & Mammarella |
| 148 | Heartland Farms, Inc. and Oak Groves Farms, Inc. v. Larry T. Van Straten, et al. (c) | Mediation; Hearings | Ronald Pezze Ratzel, Pytlik & Pezze |
| 149 | Kolcraft (c) v. Chicco | Trial, Deposition | Ray Niro, Jr. Niro McAndrews |
| 150 | SNK America v. Niigata Machine Techno Co. | Mediation | Marc Gravino Williams & McCarthy |

**TESTIMONY ON SELECTED LITIGATION MATTERS**

| Ref. | Case | Testimony Type | Attorney Contact |
|---|---|---|---|
| 151 | OADS (c) v. Gulfstream | Arbitration | Neil Lapinski Gordon, Fournaris & Mammarella |

**EXHIBIT 1**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**DAMAGE ANALYSIS**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 | Col 9 | Col 10 | Col 12 | Col 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| REF | DESCRIPTION | PRICE (AVG RETAIL) | SALES QTY (6) | SERVICE PLAN $ PER UNIT - 7YR EXT | SERVICE PLAN % APPOR. TO DIVERTER/SUMP/MOTOR | SERVICE PLAN $ DW DIVERTER / SUMP / MOTOR - 7YR EXT | SERVICE PLAN 7 YR EXT LIFE REMAINING | SERVICE PLAN % COVERAGE (WGT. AVG 7 YRS) IN REMAINING YRS | BENEFIT SUMMARY (ALT 1) | BENEFIT SUMMARY (ALT 2) | EX |
| 3 | | | | | | Col5 X Col6 | | | Col4 X Col7 X Col8 X Col9 | | |
| 4 | BENEFIT #1 - 7 YR EXTENDED SERVICE PLAN | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | APPORTIONED DISHWASHER SERVICE PLAN - 7 YR EXT (1) | $ 730 | 5,230,198 | $ 214.07 | 12% | $ 26.42 | 25% | 40% | $ 13,831,171 | | 2, 3, 4B, 5, 6 |
| 7 | | | | | | | | | | | |
| 8 | BENEFIT #1 AMOUNT | | | | | | | | $ 13,831,171 | $ 13,831,171 | |
| 9 | | | | | | | | | | | |
| 10 | BENEFIT #2 - OUT OF POCKET (OOP) COSTS (4) | | | | | | | | | | |
| 11 | | | | ALT1 % | ALT2 % | | | | | | |
| 12 | Failure Rate (2) | | | 1% | 4% | | | | | | 4 |
| 13 | Eligible Claim Units (3) | | | 58,891 | 235,566 | | | | | | 4 |
| 14 | Out-of-pocket Costs (Actual) | | | | | | | | | | 4 |
| 15 | ACTUAL COST OF REPAIR (ACOR) - est. per unit (4) | $225 | | ALL REPAIRS | | | | | | | |
| 16 | | | Avg. Reimb $/unit | ALT1: Reimb $ | ALT2: Reimb $ | | | | | | |
| 17 | a. Repairs (Yr 2) | | $ 225.00 | $ 1,892,941 | $ 7,571,763 | | | | | | 3, 4 |
| 18 | b. Repairs (Yr 3) | | $ 202.50 | $ 1,703,647 | $ 6,814,587 | | | | | | 3, 4 |
| 19 | c. Repairs (Yr 4) | | $ 187.98 | $ 1,581,521 | $ 6,326,085 | | | | | | 3, 4 |
| 20 | d. Repairs (Yr 5) | | $ 187.98 | $ 1,581,521 | $ 6,326,085 | | | | | | 3, 4 |
| 21 | d. Repairs (Yr 6) | | $ 150.97 | $ 1,270,102 | $ 5,080,407 | | | | | | 3, 4 |
| 22 | e. Repairs (Yr 7) | | $ 90.04 | $ 757,528 | $ 3,030,112 | | | | | | 3, 4 |
| 23 | f. Repairs (Yr 8) | | $ 69.36 | $ 583,526 | $ 2,334,103 | | | | | | 3, 4 |
| 24 | | | $ 159.12 | $ 9,370,786 | $ 37,483,143 | | | | | | 3, 4 |
| 25 | | | | | | | | | | | |
| 26 | ACTUAL COST OF REPAIR - PAST | | $ 175.27 | $ 8,347,049 | $ 33,388,198 | | | | | | 4A |
| 27 | ACTUAL COST OF REPAIR - FUTURE | | $ 90.85 | $ 1,023,736 | $ 4,094,945 | | | | | | 4B |
| 28 | | | $ 159.12 | $ 9,370,786 | $ 37,483,143 | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | BENEFIT 2 APPLIED FOR (estimated) | | | 20% | 20% | | | | | | |
| 31 | | | | | | | | | | | |
| 32 | BENEFIT #2 AMOUNT (5) | | $ 1,874,157 | $ 7,496,629 | | | | | $ 1,874,157 | $ 7,496,629 | |
| 33 | | | | | | | | | | | |
| 34 | TOTAL SETTLEMENT CLASS BENEFITS | | | | | | | | $ 15,705,328 | $ 21,327,799 | |

Notes:
(1) Col 4 X Col 7 X Col 8 X Col 9; Apportioned SERVICE PLAN for Sump Assembly w/ adjustment for reduced recovery by age of claim & remaining SERVICE PLAN life
(2) Source: Defendant Mediation Statement - 04-22-21
(3) Source: Ex4 REF 11 Col 4 (Total) for 4% failure rate; 1% Failure Rate units = 1/4 of 4% units
(4) Source: Whirlpool MOU.pdf for ACOR & Reimb. Amt. by Yr.
(5) REF 28 X REF 30
(6) All Qualifying Shipments (after Apr 2014) less Yr 1 failures (see Ex 3)

**EXHIBIT 2**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**SERVICE PLAN PRICE BY THIRD PARTY PROVIDERS**

| REF | DESCRIPTION | SQUARE TRADE (1) | UPSIE (2) | WHIRLPOOL (3) | AVERAGE ALL | COMMENT |
|---|---|---|---|---|---|---|
| 2 | | | | | | |
| 3 | PRODUCT PRICE RANGE | $500-$700 | $500-$750 | $479-$1049 | | See Square Trade & Upsie websites |
| 4 | | | | | | |
| 5 | DISHWASHER AVG PRICE | $ 600.00 | $ 625.00 | $ 729.86 | | Avg. of REF3 price range |
| 6 | | | | | | |
| 7 | 5 YR SERVICE PLAN | $ 159.99 | $ 108.19 | $ 151.88 | | See Square Trade & Upsie websites |
| 8 | | | | | | |
| 9 | AVG 2 YR (5 YR) | $ 64.00 | $ 43.28 | $ 60.75 | | REF7 x (2/5) |
| 10 | | | | | | |
| 11 | AVG 7 YR (5 YR + 2 YR) | $ 223.99 | $ 151.47 | $ 212.63 | | AVERAGE (SquareD, Upsie) |
| 12 | | | | | | |
| 13 | PRODUCT PRICE RANGE | $700-$1000 | $750-$1000 | | | See Square Trade & Upsie websites |
| 14 | | | | | | |
| 15 | DISHWASHER AVG PRICE | $ 850.00 | $ 875.00 | | | |
| 16 | | | | | | |
| 17 | 5 YR SERVICE PLAN | $ 229.99 | $ 115.52 | | | See Square Trade & Upsie websites |
| 18 | | | | | | |
| 19 | AVG 2 YR (5 YR) | $ 92.00 | $ 46.21 | | | REF22 ÷ REF1 |
| 20 | | | | | | |
| 21 | AVG 7 YR (5 YR + 2 YR) | $ 321.99 | $ 161.73 | | | AVERAGE (SquareD, Upsie) |
| 22 | | | | | | |
| 23 | **AVERAGE PRICE RANGES** | $ 272.99 | $ 156.60 | $ 212.63 | $ 214.07 | AVERAGE (REF11, REF23) |

Notes
(1) Source: Squaretrade.com/appliance-SERVICE PLAN (appliances)
(2) Source: Upsie.com/major-appliance-SERVICE PLAN (Whirlpool dishwasher)
(3) See Ex 6

**EXHIBIT 3**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**EXTENDED SERVICE PLAN ANALYSIS**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 | | Col 9 | Col 10 | Col 12 | Col 13 | Col 14 | Col 15 | Col 16 | Col 17 | Col 18 | Col 19 | Col 20 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REF | YEAR | SHIPMENTS (1) | QUALIFYING | SERVICE PLAN START DATE | SERVICE PLAN EXPIRATION DATE | TOTAL SERVICE PLAN DAYS | REMAINING DAYS OF COVERAGE | REMAINING LIFE % (UNITS WGT'D) | FAILURE RATE % (2) | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 | YR 6 | YR 7 | YR 8 | TOTAL | COMMENT |
| 3 | 2010 | 1,242 | 0 | | | | | | | - | - | - | - | - | - | - | - | - | Col 4 X Col 9 (REF11) = 8 |
| 4 | 2011 | 173,178 | 0 | | | | | | | - | - | - | - | - | - | - | - | - | |
| 5 | 2012 | 425,233 | 0 | | | | | | | - | - | - | - | - | - | - | - | - | |
| 6 | 2013 | 677,272 | 0 | | | | | | | - | - | - | - | - | - | - | - | - | |
| 7 | 2014 | 1,088,368 | 891,317 | 8/15/2014 | 8/14/2022 | 2,921 | 135 | 41,194 | | 4,457 | 4,457 | 4,457 | 4,457 | 4,457 | 4,457 | 4,457 | 4,457 | 31,196 | |
| 8 | 2015 | 1,318,014 | 1,318,014 | 7/1/2015 | 6/30/2023 | 2,921 | 455 | 205,305 | | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 46,130 | |
| 9 | 2016 | 1,445,131 | 1,445,131 | 7/1/2016 | 6/30/2024 | 2,921 | 821 | 406,180 | | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 50,580 | |
| 10 | 2017 | 1,602,018 | 1,602,018 | 7/1/2017 | 6/30/2025 | 2,921 | 1,186 | 650,460 | | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 56,071 | |
| 11 | TOTAL | 6,730,456 | 5,256,480 | | | 11,684 | 2,597 | 1,303,139 | 4.00% | 26,282 | 26,282 | 26,282 | 26,282 | 26,282 | 26,282 | 26,282 | 26,282 | 183,977 | Failure Rate evenly spread ober 8 yrs; totale xcludes Yr 1 |
| 12 | NOTICE EXPIRATION DATE | | | | 4/1/2022 | | | | | | | | | | | | | | |
| 13 | REMAINING SERVICE PLAN LIFE % | | | | | | 22% | 25% | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | |
| 15 | PAID QUALIFYING REPAIRS | | | | | | | | $225 | 100% | 90% | 80% | 80% | 60% | 30% | 0% | | | Source: Whirlpool MOU.pdf; cash reimbursement only |
| 16 | OR | | | | | | | | | | | | | | | | | | |
| 17 | PAID REIMBURSEMENTS | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | |
| 19 | CASH CLAIMS $ | | | | | | | | | $ 225 | $ 203 | $ 180 | $ 180 | $ 135 | $ 68 | $ - | | | REF15 (Col 9) X REF 15 (Col 12 - 18) |
| 20 | OR | | | | | | | | | | | | | | | | | | |
| 21 | REBATE - KA | | | | | | | | | $ 200 | $ 200 | $ 200 | $ 200 | $ 175 | $ 100 | $ 100 | 100 | | Source: Whirlpool MOU.pdf |
| 22 | OR | | | | | | | | | | | 40% | 40% | 40% | 40% | 40% | | | See Ex8 - Brand Kitchenaid (KA) % |
| 23 | REBATE WHR/MT | | | | | | | | | $ 150 | $ 150 | $ 150 | $ 150 | $ 125 | $ 100 | 100 | | | Source: Whirlpool MOU.pdf |
| 24 | | | | | | | | | | | | | | | | 29% | 29% | | See Ex8 - Brand Whirlpool (WP) % |
| 25 | | | | | | | | | | | | | | | | | | | |
| 26 | MAXIMUM AMT | | | | | | | | | $ 225 | $ 203 | $ 200 | $ 200 | $ 175 | $ 100 | 100 | | | MAXIMUM (REF19, REF21, REF 23) |
| 27 | | | | | | | | | | | | | | | | | | | |
| 28 | CASH APPLIED FOR | | | | | | | | | 100% | 100% | 60% | 60% | 60% | 31% | 0% | | | 100% - REF 20 - REF 22; 0% for Yr 8 |
| 29 | REBATE APPLIED FOR-KA | | | | | | | | | 0% | 0% | 40% | 40% | 40% | 40% | 40% | | | See Ex 8 for % by KA brand |
| 30 | REBATE APPLIED FOR-WHR | | | | | | | | | 0% | 0% | 0% | 0% | 0% | 29% | 29% | | | See Ex 8 for % by WHR brand |
| 31 | | | | | | | | | | | | | | | | | | | |
| 32 | CASH BENEFIT $ | | | | | | | | | $ 5,913,540 | $ 5,322,186 | $ 2,842,320 | $ 2,842,320 | $ 2,131,740 | $ 543,583 | $ - | | $19,595,687 | REF 11 X REF 19 X REF 28 |
| 33 | REBATE BENEFIT $ - KA | | | | | | | | | $ - | $ - | $ 2,098,347 | $ 2,098,347 | $ 1,836,054 | $ 1,049,174 | $ 1,049,174 | | $ 8,131,095 | REF 11 X REF 19 X REF 28 |
| 34 | REBATE BENEFIT $ - WHR | | | | | | | | | $ - | $ - | $ - | $ - | $ - | $ 773,759 | $ 773,759 | | $ 1,547,518 | REF 11 X REF 19 X REF 28 |
| 35 | TOTAL BENEFIT | | | | | | | | | $ 5,913,540 | $ 5,322,186 | $ 4,940,667 | $ 4,940,667 | $ 3,967,793 | $ 2,366,515 | $ 1,822,932 | | $29,274,300 | |
| 36 | AVG $/UNIT | | | | | | | | | $ 225 | $ 203 | $ 188 | $ 188 | $ 151 | $ 90 | $ 69 | | 159 | REF35 = REF11 |
| 37 | % AVG REPAIR COST ALLOWED | | | | | | | | | 100% | 90% | 84% | 84% | 67% | 40% | 31% | | 71% | REF36 = REF15 (Col 9) |

(1) Source: Whirlpool Email with Sales Breakdown.pdf
(2) Source: Defendant Mediation Statement - 04-22-21

**EXHIBIT 4**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**REPAIR REIMBURSEMENT**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 | Col 9 | Col 10 | Col 12 | Col 13 | Col 14 | Col 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REF | YEAR | SHIPMENTS (1) | FAILURE RATE % (2) | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 | YR 6 | YR 7 | YR 8 | TOTAL | COMMENT |
| 3 | 2010 | 1,242 | | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 43 | Col 4 X Col 5 (REF11) = 8 |
| 4 | 2011 | 173,178 | | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 6,061 | |
| 5 | 2012 | 425,233 | | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 14,883 | |
| 6 | 2013 | 677,272 | | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 23,705 | |
| 7 | 2014 | 1,088,368 | | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 38,093 | |
| 8 | 2015 | 1,318,014 | | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 46,130 | |
| 9 | 2016 | 1,445,131 | | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 50,580 | |
| 10 | 2017 | 1,602,018 | | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | 56,071 | |
| 11 | TOTAL | 6,730,456 | 4.00% | 33,652 | 33,652 | 33,652 | 33,652 | 33,652 | 33,652 | 33,652 | 33,652 | 235,566 | Failure Rate evenly spread ober 8 yrs; totale xcludes Yr 1 |
| 12 | | | | | | | | | | | | | |
| 13 | PAID QUALIFYING REPAIRS | | $225 | | 100% | 90% | 80% | 80% | 60% | 30% | 0% | | Source: Whirlpool MOU.pdf; cash reimbursement only |
| 14 | OR | | | | | | | | | | | | |
| 15 | PAID REIMBURSEMENTS | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | |
| 17 | CASH CLAIMS $ | | | | $ 225 | $ 203 | $ 180 | $ 180 | $ 135 | $ 68 | $ - | | REF13 (Col 5) X REF 13 (Col 8 - 14) |
| 18 | OR | | | | | | | | | | | | |
| 19 | REBATE - KA | | | | $ 200 | $ 200 | $ 200 | $ 200 | $ 175 | $ 100 | 100 | | Source: Whirlpool MOU.pdf |
| 20 | OR | | | | | | 40% | 40% | 40% | 40% | 40% | | See Ex8 - Brand Kitchenaid (KA) % |
| 21 | REBATE WHR/MT | | | | $ 150 | $ 150 | $ 150 | $ 150 | $ 125 | $ 100 | 100 | | Source: Whirlpool MOU.pdf |
| 22 | | | | | | | | | | 29% | 29% | | See Ex8 - Brand Whirlpool (WP) % |
| 23 | | | | | | | | | | | | | |
| 24 | MAXIMUM AMT | | | | $ 225 | $ 203 | $ 200 | $ 200 | $ 175 | $ 100 | 100 | | MAXIMUM (REF17, REF19, REF 21) |
| 25 | | | | | | | | | | | | | |
| 26 | CASH APPLIED FOR | | | | 100% | 100% | 60% | 60% | 60% | 31% | 0% | | 100% - REF 20 - REF 22; 0% for Yr 8 |
| 27 | REBATE APPLIED FOR-KA | | | | 0% | 0% | 40% | 40% | 40% | 40% | 40% | | See Ex 8 for % by KA brand |
| 28 | REBATE APPLIED FOR-WHR | | | | 0% | 0% | 0% | 0% | 0% | 29% | 29% | | See Ex 8 for % by WHR brand |
| 29 | | | | | | | | | | | | | |
| 30 | CASH BENEFIT $ | | | | $ 7,571,763 | $ 6,814,587 | $ 3,639,338 | $ 3,639,338 | $ 2,729,503 | $ 696,009 | $ - | $ 25,090,538 | REF 11 X REF 17 X REF 26 |
| 31 | REBATE BENEFIT $ - KA | | | | $ - | $ - | $ 2,686,747 | $ 2,686,747 | $ 2,350,904 | $ 1,343,374 | $ 1,343,374 | $ 10,411,146 | REF 11 X REF 19 X REF 27 |
| 32 | REBATE BENEFIT $ - WHR | | | | $ - | $ - | $ - | $ - | $ - | 990,729 | 990,729 | $ 1,981,459 | REF 11 X REF 21 X REF 28 |
| 33 | TOTAL BENEFIT | | | | $ 7,571,763 | $ 6,814,587 | $ 6,326,085 | $ 6,326,085 | $ 5,080,407 | $ 3,030,112 | $ 2,334,103 | $ 37,483,143 | |
| 34 | AVG $/UNIT | | | | $ 225 | $ 203 | $ 188 | $ 188 | $ 151 | $ 90 | $ 69 | $ 159 | REF33 = REF11 |
| 35 | % AVG REPAIR COST ALLOWED | | | | 100% | 90% | 84% | 84% | 67% | 40% | 31% | 71% | REF34 = REF13 |

(1) Source: Whirlpool Email with Sales Breakdown.pdf
(2) Source: Defendant Mediation Statement - 04-22-21

**EXHIBIT 4A**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**PAST REPAIR REIMBURSEMENT**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 | Col 9 | Col 10 | Col 12 | Col 13 | Col 14 | Col 15 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| REF | YEAR | SHIPMENTS (1) | FAILURE RATE % (2) | YR 1 | YR 2 | YR 3 | YR 4 | YR 5 | YR 6 | YR 7 | YR 8 | TOTAL | COMMENT | CLAIM DATE |
| 3 | 2010 | 1,242 | | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 6 | 43 | Col 4 X Col 5 (REF11) ÷ 8 | |
| 4 | 2011 | 173,178 | | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 866 | 6,061 | | |
| 5 | 2012 | 425,233 | | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 2,126 | 14,883 | | |
| 6 | 2013 | 677,272 | | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 3,386 | 23,705 | | |
| 7 | 2014 | 1,088,368 | | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 5,442 | 38,093 | | |
| 8 | 2015 | 1,318,014 | | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | 6,590 | | | 39,540 | | |
| 9 | 2016 | 1,445,131 | | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | 7,226 | | | 36,128 | | |
| 10 | 2017 | 1,602,018 | | 8,010 | 8,010 | 8,010 | 8,010 | 8,010 | | | | 32,040 | | |
| 11 | TOTAL | 6,730,456 | 4.00% | 33,652 | 33,652 | 33,652 | 33,652 | 33,652 | 25,642 | 18,417 | 11,826 | 190,494 | Failure Rate evenly spread ober 8 yrs; totale xcludes Yr 1 | |
| 12 | | | | | | | | | | | | | | |
| 13 | PAID QUALIFYING REPAIRS | | $225 | | 100% | 90% | 80% | 80% | 60% | 30% | 0% | | Source: Whirlpool MOU.pdf; cash reimbursement only | |
| 14 | OR | | | | | | | | | | | | | |
| 15 | PAID REIMBURSEMENTS | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | |
| 17 | CASH CLAIMS $ | | | | $ 225 | $ 203 | $ 180 | $ 180 | $ 135 | $ 68 | - | | REF13 (Col 5) X REF 13 (Col 8 - 14) | |
| 18 | OR | | | | | | | | | | | | | |
| 19 | REBATE - KA | | | | $ 200 | $ 200 | $ 200 | $ 200 | $ 175 | $ 100 | 100 | | Source: Whirlpool MOU.pdf | |
| 20 | OR | | | | | | 40% | 40% | 40% | 40% | 40% | | See Ex8 - Brand Kitchenaid (KA) % | |
| 21 | REBATE WHR/MT | | | | $ 150 | $ 150 | $ 150 | $ 150 | $ 125 | $ 100 | 100 | | Source: Whirlpool MOU.pdf | |
| 22 | | | | | | | | | | 29% | 29% | | See Ex8 - Brand Whirlpool (WP) % | |
| 23 | | | | | | | | | | | | | | |
| 24 | MAXIMUM AMT | | | | $ 225 | $ 203 | $ 200 | $ 200 | $ 175 | $ 100 | 100 | | MAXIMUM (REF17, REF19, REF 21) | |
| 25 | | | | | | | | | | | | | | |
| 26 | CASH APPLIED FOR | | | | 100% | 100% | 60% | 60% | 60% | 31% | 0% | | 100% - REF 20 - REF 22; 0% for Yr 8 | |
| 27 | REBATE APPLIED FOR-KA | | | | 0% | 0% | 40% | 40% | 40% | 40% | 40% | | See Ex 8 for % by KA brand | |
| 28 | REBATE APPLIED FOR-WHR | | | | 0% | 0% | 0% | 0% | 0% | 29% | 29% | | See Ex 8 for % by WHR brand | |
| 29 | | | | | | | | | | | | | | |
| 30 | CASH BENEFIT $ | | | | $ 7,571,763 | $ 6,814,587 | $ 3,639,338 | $ 3,639,338 | $ 2,079,813 | $ 380,898 | - | $ 24,125,736 | REF 11 X REF 17 X REF 26 | |
| 31 | REBATE BENEFIT $ - KA | | | | $ - | $ - | $ 2,686,747 | $ 2,686,747 | $ 1,791,330 | $ 735,174 | $ 472,104 | $ 8,372,102 | REF 11 X REF 19 X REF 27 | |
| 32 | REBATE BENEFIT $ - WHR | | | | $ - | $ - | $ - | $ - | $ - | $ 542,186 | $ 348,173 | $ 890,360 | REF 11 X REF 21 X REF 28 | |
| 33 | TOTAL BENEFIT | | | | $ 7,571,763 | $ 6,814,587 | $ 6,326,085 | $ 6,326,085 | $ 3,871,142 | $ 1,658,258 | $ 820,277 | $ 33,388,198 | | |
| 34 | AVG $/UNIT | | | | $ 225 | $ 203 | $ 188 | $ 188 | $ 151 | $ 90 | $ 69 | 175 | REF33 ÷ REF11 | |
| 35 | % AVG REPAIR COST ALLOWED | | | | 100% | 90% | 84% | 84% | 67% | 40% | 31% | 78% | REF34 ÷ REF13 | |

(1) Source: Whirlpool Email with Sales Breakdown.pdf
(2) Source: Defendant Mediation Statement - 04-22-21

**EXHIBIT 4B**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**FUTURE REPAIR REIMBURSEMENT**

| Col 1 | Col 2 | Col 3 | Col 4 | Col 5 | Col 6 | Col 7 | Col 8 | Col 9 | Col 10 | Col 12 | Col 13 | Col 14 | Col 15 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **REF** | **YEAR** | **SHIPMENTS (1)** | **FAILURE RATE % (2)** | **YR 1** | **YR 2** | **YR 3** | **YR 4** | **YR 5** | **YR 6** | **YR 7** | **YR 8** | **TOTAL** | **COMMENT** |
| 3 | 2010 | 1,242 | | | | | | | | | | - | Col 4 X Col 5 (REF11) = 8 |
| 4 | 2011 | 173,178 | | | | | | | | | | - | |
| 5 | 2012 | 425,233 | | | | | | | | | | - | |
| 6 | 2013 | 677,272 | | | | | | | | | | - | |
| 7 | 2014 | 1,088,368 | | | | | | | | | | - | |
| 8 | 2015 | 1,318,014 | | | | | | | | | 6,590 | 6,590 | |
| 9 | 2016 | 1,445,131 | | | | | | | | 7,226 | 7,226 | 14,451 | |
| 10 | 2017 | 1,602,018 | | | | | | | 8,010 | 8,010 | 8,010 | 24,030 | |
| 11 | **TOTAL** | 6,730,456 | 4.00% | - | - | - | - | - | 8,010 | 15,236 | 21,826 | 45,072 | Failure Rate evenly spread ober 8 yrs; totale xcludes Yr 1 |
| 12 | | | | | | | | | | | | | |
| 13 | **PAID QUALIFYING REPAIRS** | | $225 | | 100% | 90% | 80% | 80% | 60% | 30% | 0% | | Source: Whirlpool MOU.pdf; cash reimbursement only |
| 14 | **OR** | | | | | | | | | | | | |
| 15 | **PAID REIMBURSEMENTS** | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | |
| 17 | **CASH CLAIMS $** | | | | $ 225 $ | 203 $ | 180 $ | 180 $ | 135 $ | 68 $ | - | | REF13 (Col 5) X REF 13 (Col 8 - 14) |
| 18 | **OR** | | | | | | | | | | | | |
| 19 | **REBATE - KA** | | | | $ 200 $ | 200 $ | 200 $ | 200 $ | 175 $ | 100 $ | 100 | | Source: Whirlpool MOU.pdf |
| 20 | **OR** | | | | | | 40% | 40% | 40% | 40% | 40% | | See Ex8 - Brand Kitchenaid (KA) % |
| 21 | **REBATE WHR/MT** | | | | $ 150 $ | 150 $ | 150 $ | 150 $ | 125 $ | 100 $ | 100 | | Source: Whirlpool MOU.pdf |
| 22 | | | | | | | | | | 29% | 29% | | See Ex8 - Brand Whirlpool (WP) % |
| 23 | | | | | | | | | | | | | |
| 24 | **MAXIMUM AMT** | | | | $ 225 $ | 203 $ | 200 $ | 200 $ | 175 $ | 100 $ | 100 | | MAXIMUM (REF17, REF19, REF 21) |
| 25 | | | | | | | | | | | | | |
| 26 | **CASH APPLIED FOR** | | | | 100% | 100% | 60% | 60% | 60% | 31% | 0% | | 100% - REF 20 - REF 22; 0% for Yr 8 |
| 27 | **REBATE APPLIED FOR-KA** | | | | 0% | 0% | 40% | 40% | 40% | 40% | 40% | | See Ex 8 for % by KA brand |
| 28 | **REBATE APPLIED FOR-WHR** | | | | 0% | 0% | 0% | 0% | 0% | 29% | 29% | | See Ex 8 for % by WHR brand |
| 29 | | | | | | | | | | | | | |
| 30 | **CASH BENEFIT $** | | | $ - $ | - $ | - $ | - $ | - $ | 649,691 $ | 315,111 $ | - $ | 964,802 | REF 11 X REF 17 X REF 26 |
| 31 | **REBATE BENEFIT $ - KA** | | | $ - $ | - $ | - $ | - $ | - $ | 559,574 $ | 608,199 $ | 871,270 $ | 2,039,044 | REF 11 X REF 19 X REF 27 |
| 32 | **REBATE BENEFIT $ - WHR** | | | $ - $ | - $ | - $ | - $ | - $ | - $ | 448,543 $ | 642,556 $ | 1,091,099 | REF 11 X REF 21 X REF 28 |
| 33 | **TOTAL BENEFIT** | | | $ - $ | - $ | - $ | - $ | - $ | 1,209,265 $ | 1,371,854 $ | 1,513,826 $ | 4,094,945 | |
| 34 | **AVG $/UNIT** | | | $ - $ | - $ | - $ | - $ | - $ | 151 $ | 90 $ | 69 $ | 91 | REF33 = REF11 |
| 35 | **% AVG REPAIR COST ALLOWED** | | | | 0% | 0% | 0% | 0% | 67% | 40% | 31% | 40% | REF34 = REF13 |

(1) Source: Whirlpool Email with Sales Breakdown.pdf
(2) Source: Defendant Mediation Statement - 04-22-21

**EXHIBIT 5**
**CLASS ACTION - WHIRLPOOL**
**SUMP ASSEMBLY APPORTIONMENT**

| REF | DESCRIPTION | FCTR | AMOUNT | EXH | COMMENT |
|-----|-------------|------|--------|-----|---------|
| 2 | | | | | |
| 3 | DISHWASHER PRICE | | $ 729.86 | 4 | 9/16/21 survey of on-line Whirlpool DW prices |
| 4 | | | | | |
| 5 | COST OF COOGS SOLD MARK-UP | | 20% | 6 | Source: Morningstar.com, Whirlpool I/S 2011-17 |
| 6 | | | | | |
| 7 | DW COGS | | $ 607.77 | | REF3 ÷ (1+REF5) |
| 8 | | | | | |
| 9 | AVERAGE COST OF REPAIR | | $ 225.00 | | Source: Whirlpool MOU.pdf - "Diverter Seal Leak" |
| 10 | a. PARTS | 50% | $ 112.50 | | Sump Assembly; Sears Parts Direct (round 50%) |
| 11 | b..LABOR | 50% | $ 112.50 | | $65/hr - national avg.; 1.5 hrs (round 50%) |
| 12 | | | | | |
| 13 | PARTS MARKUP | 50% | | | |
| 14 | PARTS - SUMP ASSEMBLY (SA COGS) | | $ 75.00 | | REF10 ÷ (1+REF13) |
| 15 | | | | | |
| 16 | % SA COGS / DW COGS | | **12%** | | REF14 ÷ REF7; APPORTIONED SUMP ASSEMBLY |

# EXHIBIT 6
## CLASS ACTION - WHIRLPOOL DISHWASHERS
## PRICING ANALYSIS

| REF | MODEL | MODEL PRICE | SERVICE PLAN - 5YR | SERVICE PLAN - 5YR %PRICE |
|-----|-------|-------------|--------------------|---------------------------|
| 2 | | | 5 | 5 |
| 3 | WDP370PAHB | 764.00 | 149.95 | 20% |
| 4 | WDT730PAHW | 584.00 | 149.95 | 26% |
| 5 | WDTA75SAHN | 880.00 | 168.95 | 19% |
| 6 | WDF518SAHB | 764.00 | 149.95 | 20% |
| 7 | WDT750SAKB | 674.00 | 149.95 | 22% |
| 8 | WDF520PADM | 629.00 | 149.95 | 24% |
| 9 | WDF330PAHB | 479.00 | 138.95 | 29% |
| 10 | UDT518SAHP | 849.00 | 168.95 | 20% |
| 11 | WDTA50SAKW | 749.00 | 149.95 | 20% |
| 12 | WDF550SAHB | 700.00 | 149.95 | 21% |
| 13 | WDT705PAKB | 599.00 | 149.95 | 25% |
| 14 | WDT740SALB | 699.00 | 149.95 | 21% |
| 15 | WDT970SAKV | 1,049.00 | 149.95 | 14% |
| 16 | WDF590SAJM | 799.00 | 149.95 | 19% |
| 17 | | | | |
| 18 | AVERAGE | $ 729.86 | $ 151.88 | 21.4% |
| 19 | | | | |
| 20 | AVG/YR | | $ 30.38 | 4.3% |
| 21 | | | | |
| 22 | **AVG/YR ALL SERVICE PLANS** | | | **4.3%** |

Notes:
(1) Price & SERVICE PLAN by Whirlpool Model Summary; on-line (9/16/21) review of current data

**EXHIBIT 7**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**INCOME STATEMENT ANALYSIS**

| REF | DESCRIPTION | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | TOTAL | % |
|-----|-------------|------|------|------|------|------|------|------|-------|---|
| 2 | Total Revenue | $ 18,666 | $ 18,143 | $ 18,769 | $ 19,872 | $ 20,891 | $ 20,718 | $ 21,253 | $ 138,312 | 100% |
| 3 | | | | | | | | | | |
| 4 | Cost of Goods and Services | $ 16,089 | $ 15,250 | $ 15,471 | $ 16,477 | $ 17,201 | $ 17,036 | $ 17,651 | $ 115,175 | 83% |
| 5 | | | | | | | | | | |
| 6 | Gross Profit | $ 2,577 | $ 2,893 | $ 3,298 | $ 3,395 | $ 3,690 | $ 3,682 | $ 3,602 | $ 23,137 | 17% |
| 7 | | | | | | | | | | |
| 8 | Cost Mark-up to Revenue | | | | | | | | | **20%** |

Notes:
(1) Fiscal year ends in Dec 31 | USD ($MM)
(2) Source: Morningstar.com - Whirlpool Income Statements

**EXHIBIT 8**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**SHIPMENT UNITS BY YEAR**

| REF | YEAR | SHIPMENTS | SHIPMENTS > 4/2014 (2) | % |
|---|---|---|---|---|
| 2 | 2010 | 1,242 | 0 | 0.02% |
| 3 | 2011 | 173,178 | 0 | 2.57% |
| 4 | 2012 | 425,233 | 0 | 6.32% |
| 5 | 2013 | 677,272 | 0 | 10.06% |
| 6 | 2014 | 1,088,368 | 891,317 | 16.17% |
| 7 | 2015 | 1,318,014 | 1,318,014 | 19.58% |
| 8 | 2016 | 1,445,131 | 1,445,131 | 21.47% |
| 9 | 2017 | 1,602,018 | 1,602,018 | 23.80% |
| 10 | | | | |
| 11 | TOTAL | 6,730,456 | 5,256,480 | 100.00% |

Notes:
(1) Source: Whirlpool Email with Sales Breakdown.pdf; revised units for 2015 - 2017 from FN#2 source
(2) Source: Cleveland - April 2014 through December 2017 Units.XLSX

**EXHIBIT 9**
**CLASS ACTION - WHIRLPOOL DISHWASHERS**
**CLAIMS BY BRAND**

| REF | BRAND | CLAIMS COUNT (1) (2) | % |
|---|---|---|---|
| 2 | NOT SPECIFIED | 2,410 | 0% |
| 3 | AMA | 4,981 | 0% |
| 4 | IKE | 9,812 | 1% |
| 5 | JEN | 51,679 | 4% |
| 6 | KAD | 463,882 | 40% |
| 7 | KEN | 287,177 | 25% |
| 8 | WHR | 342,110 | 29% |
| 9 | | 1,162,051 | 100% |

Notes:

(1)  Source: Whirlpool ServiceBench dBase; data for Production Models 2010 through 2017

(2)  Count of Claims (All types) by Brand

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

| | |
|---|---|
| **MICHAEL HAMM, JILL BROWN, AUSTIN RUSSELL, CHRISTIAN LAMMEY, NANCY JAMES, JILL WITTMAN,** and **THOMAS MACONE,** individually and on behalf of themselves and all others similarly situated, | **Civil Action: 5:19-cv-488-Oc-30PRL** <br><br> Judge James S. Moody, Jr. <br><br> Magistrate Judge Philip R. Lammens |
| Plaintiffs, | |
| v. | |
| **SHARP ELECTRONICS CORPORATION,** | |
| Defendant. | |

## FINAL APPROVAL ORDER

This matter is before the Court on Plaintiffs' Unopposed Motion for Final Approval of the Settlement Agreement that Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Christian Lammey, Nancy James, Jill Wittman, and Thomas Macone ("Plaintiffs") have reached with Defendant Sharp Electronics Corporation ("Sharp"). In connection with that Motion, the Court has considered and reviewed the following materials: (1) Plaintiffs' Unopposed Motion for Final Approval of the Settlement (the "Motion"), along with its accompanying declarations and other materials; and (2) the Settlement Agreement and Release and the exhibits attached thereto (the "Settlement Agreement").[1] In addition, the Court has considered the arguments of counsel as well as the pleadings and record in this case. As part of the Settlement Agreement, Sharp is not objecting to the certification of the Settlement Class for settlement purposes only. Having considered all the

---

[1] Unless otherwise stated, all defined terms herein have the meaning given to such terms in the Settlement Agreement.

EXHIBIT C

foregoing materials and information, this Court finds that there is good cause for granting the Motion.

## **BACKGROUND**

1.      As discussed in the Parties' briefing and at the January 7, 2021, Final Approval Hearing in this action, Plaintiffs claim that that Sharp's Microwave Drawers, including model numbers SMD2470AH, SMD2470AS, SMD3070AS, SMD2480CS, KB6524PS, and KB6525PS (collectively, "Microwaves"), have an alleged defect which may in certain instances cause arcing, which renders the Microwaves prone to premature failure. Sharp denies Plaintiffs' allegations, and the Parties engaged in significant hard-fought litigation and arm's length negotiations prior to reaching the Settlement.

2.      The Settlement provides immediate benefits to Settlement Class Members, which the Plaintiffs' expert has collectively valued at approximately $103,049,520 to $113,884,064. *See* ECF No. at Exhibit 2, Expert Report from Frank Bernatowicz. Sharp does not object to the Bernatowicz Declaration for purposes of the Settlement, provided however that nothing in the Bernatowicz Declaration shall be deemed an admission by Sharp or shall be binding in this or any other litigation as against Sharp.

3.      As described in the Preliminary Approval Order (ECF No. 46), in reference to the Settlement Agreement, these benefits include the following:

> a.   Extended Warranty: All Class Members shall receive an extension of the existing manufacturer's warranty for Documented Arcing Claims within any Class Microwave. The Extended Warranty shall extend the term of the existing manufacturer's warranty of one (1) year for parts and labor, and five (5) years for

parts relating only to the magnetron tube, to an enhanced extended warranty of five (5) years for Documented Arcing Claims.

b. <u>Treatment under Extended Warranty:</u>

    i. <u>Replacement Microwave and Reimbursement of Labor and/or Service Costs</u>: The extended warranty includes the opportunity to receive a new replacement Microwave, which is comparable to the existing Class Microwave, in the event of a Documented Arcing Claim, along with reimbursement of any labor and/or service costs in connection with the Documented Arcing Claims of up to $150.00 per class member.

    ii. <u>Cash Option and Reimbursement of Labor and/or Service Costs</u>: In lieu of a replacement Microwave, consumers who have a Documented Arcing Claim during the extended five (5) year warranty period may select a $250 cash payment. Settlement Class Members who elect this cash payment remain entitled to reimbursement of any labor and/or service costs in connection with Documented Arcing Claims of up to $150.00 per Settlement Class Member.

    iii. <u>Voucher and Reimbursement of Labor and/or Service Costs</u>: In lieu of a replacement Microwave or Cash Payment, consumers who have a Documented Arcing Claim may select a $500 voucher for Sharp-branded merchandise. Settlement Class Members who elect this option remain entitled to reimbursement of any labor and/or service costs in connection with Documented Arcing Claims of up to $150.00 per Settlement Class Member.

3

        iv.  <u>Consequential Damages</u>: Settlement Class Members who elect either the cash payment or voucher option may also seek reimbursement for consequential damages of up to $200, for costs incurred to repair or cover the opening in a Settlement Class Member's kitchen cabinetry in which their Microwave was installed.

    4.    In addition, any Settlement Class Member who can establish, with documented proof, that their Class Microwave experienced a Documented Arcing Claim instance within five (5) years of the date of purchase or installation of their Microwave, who did not previously receive a replacement Microwave, is entitled to replacement of their Microwave, or to the cash or voucher option, as described herein. Thus, Settlement Class Members who no longer possess their Microwave, or who possessed a Microwave for a period beyond the five (5) year extended warranty but experienced a Documented Arcing Claim within five (5) years of the date of purchase or installation of their Microwave, have an opportunity to participate in the Settlement.

    5.    On August 5, 2020, the Court entered an Order preliminarily approving the Settlement and authorizing that the Parties and the Settlement Administrator TO implement the Parties' Notice Plan. (ECF No. 46.)

## **CONDITIONAL CERTIFICATION OF SETTLEMENT CLASS**

    6.    In its August 5, 2020 Order, the Court found that Rule 23 certification was appropriate for preliminary approval. (ECF No. 46.) Based on the facts and argument stated herein and for the reasons set forth in the Memorandum in support of the Motion for Preliminary for Approval (ECF No. 44), and Plaintiffs' Motion for Final Approval (ECF No. ),  class certification of the Settlement Class is well warranted here. For the same reasons, also warranted are the designations of Class Counsel and the Plaintiffs as Class Representatives. The Court finds

that the prerequisites for a class action set forth pursuant to Rule 23 of the Federal Rules of Civil Procedure have been met, and, therefore, the Court certifies a nationwide Settlement Class consisting of the following, as more fully defined in paragraph 1.37 of the Settlement Agreement:

> All persons residing in the United States who, at any time during the Class Period, became the First Consumer Purchaser of a Class Microwave.

7.      Based on Plaintiffs' Motion for Preliminary Approval and Plaintiffs' Motion for Final Approval, which Sharp is not opposing for purposes of this Settlement only, this Court finds that:

      a.    The Settlement Class satisfies the requirements of Rule 23(a). The members of the Settlement Class are so numerous that joinder is impracticable; there are questions of law or fact common to the Settlement Class; Plaintiffs' claims are typical of the claims of the Settlement Class; and Plaintiffs and Class Counsel will fairly and adequately represent the interests of the Settlement Class;

      b.    The Settlement Class also satisfies the requirements of Rule 23(b)(3) because this Court finds that issues of law and fact common to the Settlement Class predominate over any issues affecting only individual members of the Settlement Class, and that settlement of this Action as a class action is superior to other means available for fairly and efficiently resolving the controversy; and

      c.    The class definition is sufficiently ascertainable such that an individual can ascertain whether he or she is in the Settlement Class based on objective criteria.

8.      The Court finds that the proposed Class Counsel are competent and capable of exercising their responsibilities, and that they and the proposed Class Representatives have fairly and adequately represented the interests of the Settlement Class.

9.      The Court affirms its appointment of the following counsel as Class Counsel for the Settlement Class:

a.      Gregory F. Coleman, Rachel Soffin, and Lisa A. White of Greg Coleman Law PC;

b.      Daniel K. Bryson and Harper Segui of Whitfield Bryson LLP; and

c.      Andrea Gold and Hassan A. Zavareei of Tycko & Zavareei LLP.

10.     The Court affirms its appointment of Plaintiffs Michael Hamm, Jill Brown, Austin Russell, Christian Lammey, Nancy James, Jill Wittman, and Thomas Macone ("Plaintiffs") as Class Representatives for the Settlement Class in this Action.

## SATISFACTION OF NOTICE REQUIREMENTS

11.     Rule 23(b)(3) class actions must satisfy the notice provisions of Rule 23(c)(2), and upon settlement of a class action, "[t]he court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1). Rule 23(c)(2) prescribes the "best notice that is practicable under the circumstances, including individual notice" of particular information. Fed. R. Civ.P. 23(c)(2)(B) (enumerating notice requirements for classes certified under Rule 23(b)(3)); *Amchem Prods. Inc. v. Windsor*, 521 U.S. 591, 617 (1997). Here, the Class Notice and Notice Plan satisfied due process requirements because they described "the substantive claims . . . [and] contain[ed] information reasonably necessary to make a decision to remain a class member and be bound by the final judgment." *In re Nissan Motor Corp. Antitrust Litig.*, 552 F.2d 1088, 1104-05 (5th Cir. 1977).

12.     This Court previously reviewed, and conditionally approved Plaintiffs' Class Notice. (ECF No. 46 at ¶¶17-22). The Court has reviewed the Declaration of Tiffany Janowicz, Senior Vice President at Rust Consulting, Inc. ("Rust"), attached to the Motion for Final Approval

as Exhibit 4, and affirms once more that notice was adequate and that Plaintiffs complied with the notice plan for the settlement process approved by the Court.

13.   The Court has determined that the Notice given to the Settlement Class fully and accurately informed the Settlement Class of all material elements of the proposed Settlement and constituted valid, due, and sufficient notice with all applicable requirements. The Court further finds that the Notice Plan satisfies due process and has been fully and timely implemented.

14.   Further, the Settlement Administrator properly and timely notified the appropriate government officials of the Settlement, pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1715. The Court has reviewed the substance of that notice and finds that it complied with all applicable requirements of CAFA. In addition, more than ninety (90) days have elapsed since the Settlement Administrator provided notice pursuant to CAFA and the Final Approval Hearing**.**

## **FINAL APPROVAL OF SETTLEMENT**

15.   Under Federal Rule of Civil Procedure 23(e), the "claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval." Fed. R. Civ. P. 23. "In determining whether to approve a proposed settlement, the cardinal rule is that the District Court must find that the settlement is fair, adequate and reasonable . . .." *In re: Corrugated Container Antitrust Litigation,* 643 F.2d 195, 206 (5th Cir. 1981) (citing *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *see also Greco v. Ginn Dev. Co., LLC,* 635 F. App'x 628, 632 (11th Cir. 2015); Fed. R. Civ. P. 23(e)(2).

16.   A strong presumption exists in favor of a settlement's fairness. *Parker v. Anderson*, 667 F.2d 1204, 1209 (5th Cir. 1982); *Cotton*, 559 F.2d at 1331. Settlements are "highly favored" and "will be upheld whenever possible because they are a means of amicably resolving doubts and

preventing lawsuits." *Miller v. Republic Nat'l Life Ins. Co.*, 559 F.2d 426, 428 (5th Cir. 1977). The public policy favoring settlement agreements is particularly strong in complex class action litigation where voluntary pretrial settlements obviate the need for expensive and time-consuming litigation. *See Bass v. Phoenix Seadrill/78, Ltd.*, 749 F.2d 1154, 1164 (5th Cir. 1985); *Manchaca i. Chater*, 927 F. Supp. 962, 966 (E.D. Tex. 1996). *See also Warren v. City of Tampa*, 693 F.Supp. 1051, 1054 (M.D. Fla. 1988) ("settlements are highly favored in the law"); *In re Sunbeam Sec. Litig.*, 176 F. Supp. 2d 1323, 1329 (S.D. Fla. 2001) (citation omitted) (the Court "should always review the proposed settlement in light of the strong judicial policy that favors settlements."). Absent fraud or collusion, trial courts should be hesitant to substitute their own judgment for the judgment of counsel in arriving at a settlement. *Cotton*, 559 F.2d at 1330.

17.     The Eleventh Circuit Court of Appeals uses a six-factor test for assessing the fairness, reasonableness, and adequacy of a class settlement. The factors are: (a) whether the settlement was a product of fraud or collusion; (b) the complexity, expense, and likely duration of the litigation; (c) the stage of the proceedings and the amount of discovery completed; (d) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (e) the possible range of recovery and the certainty of damages; and (f) the respective opinions of the participants, including class counsel, class representatives, and absent class members. *See Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984), citing 1982-2 Trade Cas. at 72, 106, citing, *inter alia, Container II*, 643 F.2d at 207-08; *Cotton*, 559 F.2d at 1330- 31; *Miller*, 559 F.2d at 428-29.

18.     Ultimately, "[a] settlement is fair, reasonable and adequate when 'the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than

pursued.'" *In re Checking Acct. Overdraft Litig*., 830 F. Supp. 2d at 1344 (citation omitted). That is the case here.

19. Based on review of the record, the manner of negotiation, and the Settlement Agreement, there is no evidence indicating that the Settlement falls outside the requirements of the Eleventh Circuit's test articulated above, and the Court concludes the Settlement is fair, adequate, and reasonable. The terms of the Settlement Agreement, including all exhibits thereto, appear to be in the range of reason and are fair, reasonable, and adequate, and the Settlement Agreement is hereby finally approved. This Order incorporates the Settlement Agreement, and terms used in this Order that are defined in the Settlement Agreement have the same meanings.

### The Settlement is the Product of Informed Arm's-Length Negotiations

20. A threshold consideration in determining whether to grant final approval of a class action settlement is whether a proposed settlement is the product of fraud or collusion between the parties. "In determining whether there was fraud or collusion, the Court examines whether the settlement was achieved in good faith through arm's-length negotiations, whether it was the product of collusion between the parties and/or their attorneys, and whether there was any evidence of unethical behavior or want of skill or lack of zeal on the part of class counsel." *Canupp v. Sheldon*, No. 04-cv-260, 2009 WL 4042928, at *9 (M.D. Fla. Nov. 23, 2009) (citing *Bennett*, 737 F.2d at 987, n.9.); *see also Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1318-19 (S.D. Fla. 2005) (approving class settlement where the "benefits conferred upon the Class are substantial, and are the result of informed, arms-length negotiations by experienced Class Counsel").

21. The Court affirms its finding in the Preliminary Approval Order that "there is no evidence of collusion or that Class Counsel placed their interests above those of the Settlement Class in negotiating this Settlement. The material terms of the Settlement were agreed to prior to

the Parties' discussion of attorneys' fees, costs, and expenses, and any attorneys' fees, costs and

expenses awarded will be in addition to the relief provided to Settlement Class Members under

the Settlement Agreement." ECF No. 36, at ¶13.

22.    Having read the Parties' briefing and having heard the Parties' arguments at the

Final Approval Hearing, the Court is satisfied that the Settlement Agreement is the product of

arm's-length negotiation by experienced counsel and is not the product of collusion. *See Ingram*

*v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) ("The fact that the entire mediation

was conducted under the auspices of … a highly experienced mediator, lends further support to

the absence of collusion."); *see also In re Checking Acct. Overdraft Litig.*, 830 F. Supp. 2d at 1345,

1349 (no collusion where settlement reached by capable and experienced counsel with the

assistance of a well-qualified, experienced mediator). "The assistance of an experienced mediator

in the settlement process confirms that the settlement is non-collusive." *Morgan v. Pub. Storage*,

301 F. Supp. 3d 1237, 1247 (S.D. Fla. 2016) (citing *Adams v. Inter–Con Sec. Sys., Inc.*, No. C-06-

5428 MHP, 2007 WL 3225466, at *3 (N.D. Cal. Oct. 30, 2007).

23.    The Settlement Agreement provides comprehensive relief and compensation to

eligible members of the Settlement Class. It was entered into after arm's-length negotiations by

experienced counsel on behalf of the Settlement Class.

### The Complexity, Expense, and Duration of Litigation

24.    Under this factor, the Court "consider[s] the vagaries of litigation and compare[s]

the significance of immediate recovery by way of the compromise to the mere possibility of relief

in the future, after protracted and expensive litigation." *Lipuma*, 406 F. Supp. 2d at 1323. "The law

favors compromises in large part because they are often a speedy and efficient resolution of long,

complex, and expensive litigation." *Perez v. Asurion*, 501 F. Supp. 2d 1360, 1381 (S.D.Fla.

2007). If this case proceeded to trial, the Parties would incur significant expenses, consisting of the payment of expert witnesses and technical consultants, along with a substantial time commitment for the briefing of Plaintiffs' motion for class certification, *Daubert* motions, extensive trial preparation, trial attendance, post-trial motion practice, and appeal. "Complex litigation . . . can occupy a court's docket for years on end, depleting the resources of the parties and the taxpayers while rendering meaningful relief increasingly elusive." *Lipuma*, 406 F. Supp. 2d at 1323, citing *Woodward v. Nor-Am Chem. Co.*, 1996 WL 1063670 *21 (S.D. Ala. 1996) (quoting *In re U.S. Oil & Gas Litig.*, 967 F.2d at 493). And the outcome of litigation is uncertain. Sharp would have vigorously pursued dismissal and contested class certification and proceeded to summary judgment briefing. "With the uncertainties inherent in pursuing a trial and appeal of this case, combined with the delays and complexities presented by the nature of the case, the benefits of a resolution by way of settlement are apparent." *Lipuma*, 406 F. Supp. 2d at 1324.

### The Stage of Proceedings at which the Settlement was Achieved

25. The stage of the proceedings at which settlement is achieved is "evaluated to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Saccoccio v. JP Morgan Chase Bank*, *N.A.*, 297 F.R.D. 683, 694 (S.D. Fla. 2014) (quoting *Lipuma*, 406 F. Supp. 2d at 1324). While the Settlement was reached at a relatively early stage of the litigation, it was reached only after the Parties fully briefed motions to dismiss in related actions,[2] receipt of informal discovery from

---

[2]Related class actions were also filed and litigated by the undersigned Class Counsel against Sharp in the United States District Court for the Northern District of California (*Brown, et al. v. Sharp Electronics Corporation,* No: 3:19-cv-00371-JD, N.D. Cal.) ("California Action") on January 22, 2019; the United States District Court for the Middle District of Georgia (*Lammey v. Sharp Electronics Corporation*, 3:19-cv-00048-CAR, M.D. Ga.) ("Georgia Action") on May 13, 2019; the United States District Court for the Southern District of Ohio (*James, et al. v. Sharp Electronics Corporation*, No. 2:19-cv-03246-SDM-EPD, S.D. Ohio) ("Ohio Action") on July 26, 2019; and

Sharp, retention of knowledgeable and qualified experts, and expert inspection of the subject Microwaves. Thus, the record was sufficiently developed to enable the Parties to make a reasoned and informed judgment regarding the Settlement. Indeed, early settlements are encouraged so long as a reasonable investigation is conducted. *Oakes*, 2016 U.S. Dist. LEXIS 147252 at *5-6, quoting *Ressler v. Jacobson*, 822 F. Supp. 1551, 1555 (M.D. Fla. 1992) ("The law is clear that early settlements are to be encouraged, and accordingly, only some reasonable amount of discovery should be required to make these determinations."); *Lipuma*, 406 F. Supp. 2d at 1324 (citation omitted) ("'Early settlements benefit everyone involved in the process and everything that can be done to encourage such settlements—especially in complex class action cases—should be done.'"). Further, the Settlement was not achieved so early in litigation to prevent Class Counsel from having sufficient information to engage in arms-length negotiations.

26.     Here, the record was sufficiently developed to enable Class Counsel to make a reasoned and informed judgment regarding the Settlement. Further, the Settlement here was informed by expert analysis of the Class Microwaves, and by numerous, ongoing discussions with the mediator regarding each party's factual and legal theories.

### The Probability of the Plaintiffs' Success on The Merits

27.     "The likelihood of success on the merits is weighed against the amount and form or relief contained in the settlement." *Lipuma*, 406 F. Supp. 2d at 1319. Where success at trial is uncertain, this factor weights in favor of approving the settlement. *Newman v. Sun Capital, Inc.*, No. 09-cv-445, 2012 WL 3715150, at *11 (M.D. Fla. Aug. 28, 2012). As addressed in the Parties'

---

the United States District Court for the District of Massachusetts (*Macone v. Sharp Electronics Corporation*, No. 1:19-cv-12021-WGY, D. Mass) ("Massachusetts Action") on September 25, 2019. Each of these actions involved claims that the Class Microwaves contain a defect that causes arcing, which may make the Class Microwaves prone to premature failure.

briefing, and at the Final Approval Hearing, while Plaintiffs were largely successful in defeating Sharp's Motion to Dismiss in the California action, Sharp asserted numerous additional defenses such as lack of standing, expiration of statute of limitations, disclaimer or limitation of warranties, lack of privity, comparative fault, and failure to mitigate. (California Action, at ECF No. 56, at 34-40). Further, Plaintiffs were facing similar motions to dismiss in the other actions, not to mention battles at class certification and summary judgment. If the Parties had not negotiated the Settlement resolving the claims of all five cases, Sharp would have pursued motions to dismiss in all of the other actions. Further, Sharp planned to argue various defenses as to the existence and/or cause of the alleged defect, which included a myriad of individual issues that would make class certification more challenging. Given the countless risks attending ongoing litigation, as well as the likelihood of significant delay and expense of ongoing litigation, the Settlement represents a fair compromise.

### The Range of Possible Recovery and the Point on or Below the Range of Recovery at Which a Settlement is Fair.

28.     "The range of possible recovery spans from a finding of non-liability to a varying range of monetary and injunctive relief. In considering the question of a possible recovery, the focus is on the possible recovery at trial." *Saccoccio*, 297 F.R.D. at 693 (citation and internal quotation marks omitted). However, "[m]onetary relief is difficult to quantify." *Lipuma*, 406 F. Supp. 2d at 1322. Thus, in evaluating a class settlement, "the Court's role is not to engage in a claim-by-claim, dollar-by-dollar evaluation, but rather, to evaluate the proposed settlement in its totality." *Id*. at 1323. When evaluating "the terms of the compromise in relation to the likely benefits of a successful trial . . . the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330. "Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Id*. Courts have determined that settlements may be reasonable even where plaintiffs recover only part of their

13

actual losses. *See Behrens*, 118 F.R.D. at 542 ("[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."). "[T]he existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323.

29.     As described in detail in the Settlement Agreement, and above, the relief secured for the Settlement Class provides the Class with the precise relief the litigation was brought to obtain: the right to file claims to address the defect in question – either via a replacement Class Microwave or receipt of cash or a voucher, plus reimbursement of labor and/or costs in connection with Documented Arcing Claims. Further, Settlement Class Members who elect either the cash payment or voucher option may also seek reimbursement for consequential damages of up to $200, for costs incurred to repair or cover the opening in a Settlement Class Member's kitchen cabinetry in which their Microwave was installed.

30.     According to Plaintiffs' expert, the value of the Settlement is approximately $103,049,520.00 to $113,884,064.00 (*see* ECF No. at Exhibit 2, Expert Report from Frank Bernatowicz), and the Settlement clearly meets the critical test of gauging its fairness and reasonableness because it provides significant, concrete relief to Settlement Class Members and directly remedies the injury alleged.

31.     Indeed, given the risks associated with continued litigation, the range of recovery is zero through varying levels of monetary and injunctive relief.

### The Substance and Amount of Opposition to the Settlement

32.     Objections to class action settlements are an important part of the Rule 23 process. In determining whether a class action settlement is fair, reasonable, and adequate, the Court must consider the reaction of absent class members. *Bennett*, 737 F.2d at 986; *Hall v. Bank of Am.*,

*N.A.*, No. 12-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014). Here, only one purported Settlement Class Member, Steven Helfand, submitted an objection, which he has since withdrawn. Thus, there are no objections to the Settlement. In any event, Mr. Helfand's now-withdrawn objection was legally and factually baseless. Further, to date, only six Settlement Class Members have submitted valid opt-outs. These "low opt-out and objection rates weighs in favor of granting final approval" of the Settlement. *Burrow v. Forjas Taurus S.A.*, No. 16-21606-CIV, 2019 WL 4247284, at *10 (S.D. Fla. Sept. 6, 2019) (citing *Lipuma*, 406 F. Supp. 2d at 1324); *see also Saccoccio*, 297 F.R.D. at 694. Further, no state or federal government officials filed objections, which also weighs in favor of granting final approval.

## SERVICE PAYMENTS

33. As part of the Settlement, Sharp agreed to pay Service Payments, if awarded by the Court, of up to $1,500 to each of the Class Representatives in this Action in recognition of the time and effort they personally invested in this litigation and in exchange for the claims of Class Representatives in this Action being released. Following this Court's entry of the Order Granting Preliminary Approval (ECF No. 46), the Eleventh Circuit decided *Johnson v. NPAS Sols., LLC*, No. 18-12344, 2020 U.S. App. LEXIS 29682, at *17-28 (11th Cir. Sept. 17, 2020). In that case, the Eleventh Circuit found that service awards to class representatives were prohibited. Following entry of the *Johnson* opinion, on October 22, 2020, the *Johnson* plaintiff/appellee filed a Petition for Panel Rehearing or Rehearing En Banc. Following that request, on November 5, 2020, the Eleventh Circuit granted multiple parties' petitions to file amicus briefs in support of the rehearing en banc and, on November 9, 2020, the Eleventh Circuit withheld issuance of the mandate in that case.

34.    Because of the Eleventh Circuit's possible rehearing en banc in *Johnson*, on December 7, 2020, in an order granting final approval of a class action settlement in *Harvey v. Hammel Kaplan Co.*, LLC, No. 3:19-cv-640, 2020 U.S. Dist. LEXIS, at *9-10, 22 (M.D. Fla. Dec. 7, 2020), the court directed the defendant to deposit the agreed service awards of $1500.00 in the registry of the court, to be held until the Eleventh Circuit's issuance of a mandate in *Johnson*. *Id.* at 10, citing *Metzler et al. v. Med. Mgmt. Int'l, Inc. et al.,* No. 8:19- CV-2289-T-33CPT, 2020 U.S. Dist. LEXIS 187478, at *7-8 (M.D. Fla. Oct. 9, 2020) (court granted final approval of class action settlement and retained jurisdiction for limited purpose of revisiting service awards if Eleventh Circuit reverses *Johnson*).

35.    In light of the opinion in *Johnson,* Class Representatives are presently not moving for Court approval of the Service Payments. However, similar to the rulings in *Harvey* and *Metzler*, this Court will retain jurisdiction for the limited purpose of revisiting the approval of the Service Payments if the Eleventh Circuit holds a hearing en banc in *Johnson* and reverses its decision. If the *Johnson* decision is reversed, in relevant part, Plaintiffs will promptly petition the Court for an order approving payment of the Service Payments to the Class Representatives. Sharp has agreed to pay the Service Payments in the event *Johnson* is reversed and this Court awards the Service Payments.

## **CONCLUSION**

For the reasons discussed herein:

1.    The Court hereby finally approves the Settlement Agreement and the Settlement contemplated thereby, and finds that the terms constitute, in all respects, a fair, adequate and reasonable settlement as to all Settlement Class Members in accordance with Rule 23 of the Federal Rules of Civil Procedure and directs its consummation pursuant to its terms and conditions.

Further, the class definition is sufficiently ascertainable such that an individual can ascertain whether he or she is in the Settlement Class based on objective criteria.

2. The Court hereby finds and concludes that the Settlement Class Notice and procedures set forth in the Settlement Agreement fully satisfy Rule 23 of the Federal Rules of Civil Procedure and the requirements of due process, were the best notice practicable under the circumstances, and support the Court's exercise of jurisdiction over the Settlement Class as contemplated in the Settlement and this Order. The Court hereby finds and concludes that the notice provided by Sharp to the appropriate State and federal officials pursuant to 28 U.S.C. § 1715 fully satisfied the requirements of that statute.

3. The Court retains exclusive jurisdiction for one (1) year to consider all further matters arising out of or connected with the Settlement Agreement, including the issue of approval of the Service Payments if the Eleventh Circuit holds a hearing en banc in *Johnson* and reverses its earlier decision.

4. The Court hereby orders that each of those individuals listed in Exhibit J of the Declaration of Tiffaney Janowicz (ECF. No., Ex. J) who requested timely exclusions are excluded from the Settlement Class and will not be bound by the Settlement Agreement, and neither will they be entitled to any of its benefits.

5. Plaintiffs and each and every one of the Settlement Class Members who have not requested exclusion from the Settlement Class, hereby unconditionally, fully, and finally release and forever discharge the Released Parties from the Released Claims. Each and every Settlement Class Member, and any person actually or purportedly acting on behalf of any Settlement Class Member(s), is hereby barred from commencing, instituting, continuing, pursuing, maintaining,

prosecuting, or enforcing any Released Claims (including, without limitation, in any individual, class or putative class, representative or other action or proceeding), directly or indirectly, in any judicial, administrative, arbitral, or other forum, against the Released Parties.

6.     The Court hereby finds that the Settlement Class Members have been adequately represented by the Class Representatives and Class Counsel, and that the relief provided is fair, adequate, and reasonable, considering the costs, risks, and delay of trial and appeal, the effectiveness of the proposed method of distributing relief and method of processing claims, and all other relevant factors, and that the Settlement treats Class Members equitably relative to each other.

7.     If for any reason the Settlement terminates, then certification of the Settlement Class shall be deemed vacated. In such an event, the certification of the Settlement Class for settlement purposes or any briefing or materials submitted seeking certification of the Settlement Class shall not be considered in connection with any subsequent class certification issues, and the Parties shall return to the status quo ante in the Action, without prejudice to the right of any of the Parties to assert any right or position that could have been asserted if the Settlement had never been reached or proposed to the Court.

8.     There are no pending objections to the Settlement. One objection was received from Steven Helfand but was later withdrawn. In any event, Mr. Helfand's objection was legally and factually baseless.

9.     Nothing stated in the Settlement Agreement or in this Order shall be deemed an admission or waiver of any kind by any of the Parties or used as evidence against, or over the objection of, any of the Parties for any purpose in this Action, the Related Actions, or in any other action or proceeding of any kind.

10. The Court hereby dismisses the Action, with prejudice, without costs to any party, except as expressly provided for in the Settlement Agreement.

11. The Clerk of the Court is directed to close this case.

**DONE AND ORDERED** in Tampa, Florida, on this 7th day of January, 2021.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

19



Firm Resume

EXHIBIT D



**MILBERG COLEMAN BRYSON PHILLIPS GROSSMAN, PLLC ("MILBERG") IS A LEADING GLOBAL PLAINTIFFS' FIRM,** successfully pioneering and litigating complex litigations in the following practice areas: class actions, antitrust and competition law, securities fraud, consumer protection, cyber security and data breach litigation, financial and insurance litigation, environmental law, securities litigation, and product liability. Our attorneys possess a renowned depth of legal expertise, employ the highest ethical and legal standards, and pride themselves on providing stellar service and achieving extraordinary results for their clients.

Milberg was founded in 1965, taking the lead in landmark cases that have set groundbreaking legal precedents and prompted changes in corporate governance benefiting shareholders and consumers. For more than 50 years, the firm has protected victims' rights, recovering over $50 billion in verdicts and settlements. Milberg was one of the first law firms to prosecute class actions in federal courts on behalf of investors and consumers. The firm pioneered this type of litigation and became widely recognized as a leader in defending the rights of victims of corporate and other large-scale wrongdoing.

Milberg has offices in New York, California, Florida, Georgia, Kentucky, Louisiana, Mississippi, North Carolina, South Carolina, Kentucky, Tennessee and Puerto Rico.  Recently, Milberg opened an office in London that serves clients in the European Union. In addition, Milberg has expanded in South America, with primary emphasis in Brazil.

The firm's reputation has been built by successfully taking on challenging cases across a spectrum of practice areas for the past half-century. From resolving business disputes to proving antitrust conspiracies, Milberg is equipped to handle complex, high-stakes cases at any stage of the litigation process.

The firm's lawyers have been regularly recognized as leaders in the plaintiffs' bar by the National Law Journal, Legal 500, Chambers USA, and Super Lawyers, among others.

MILBERG IS COMPRISED OF MORE THAN 80 ATTORNEYS ACROSS THE COUNTRY, THE FOLLOWING OF WHOM ARE CERTAIN REPRESENTATIVES OF THE FIRM WHO HAVE HELD LEADING ROLES IN SUCCESSFUL CONSUMER CLASS ACTIONS, ALONG WITH MILBERG ATTORNEYS WHO ARE LICENSED IN OR PRACTICE IN NEW YORK.

**GREG COLEMAN** is a managing partner at Milberg and has 30 years of trial and appellate experience. Greg received his B.A. with highest honors and distinction from Jacksonville State University in 1986. He attended The University of Tennessee College of Law, graduating in 1989. In addition to distinguishing himself academically, Greg was a member of the National Trial Moot Court Team, was the recipient of the American Jurisprudence Award for National Trial Team and was listed in Who's Who Among Rising Young Americans. In addition, the College of Law bestowed upon Greg the honor of inclusion into the National Order of Barristers for outstanding oral advocacy and trial skills. Greg's practice focuses on class actions, products liability, medical malpractice, personal injury, complex multi-district litigation, toxic torts, premises liability, ERISA, ERISA class actions, drug and medical device litigation, and workers' compensation. He was co-lead counsel in a defective products case against Electrolux in which he and co-counsel successfully obtained a settlement on behalf of a class of more than one million members regarding defectively manufactured dryers. The settlement resulted in an expected utilization settlement value of over $35 million. Greg was co-lead counsel in a series of automobile defect class actions against General Motors in Florida, Illinois, and California, in which he and co-counsel successfully obtained a $42 million settlement on behalf of a class of 1.6 million consumers regarding excessive oil consumption. He was lead trial counsel in an ERISA class action against AK Steel Corporation in which he successfully obtained a $178.6 million settlement on behalf of a class of over 3,000 retirees of AK Steel's Butler Works Plant in Pennsylvania in 2011.

**DANIEL K. BRYSON** is a managing partner at Milberg and is one of the nation's most respected and experienced attorneys in the area of consumer class actions and mass torts. Dan also has significant experience working with attorneys, funders, and other partners on international litigation projects in the Courts in Amsterdam, the United Kingdom, Belgium, France, Spain and Portugal, among others. For over 32 years, Dan has focused his practice on complex civil litigation, successfully representing thousands of consumers in a wide variety of defective product suits, class actions, and various mass torts and recovering more than $1.25 billion for his clients in numerous states throughout the country. He frequently collaborates with other attorneys in order to assemble the most effective team possible. Dan has been lead or co-lead counsel in numerous national class actions and MDLs. Dan is a frequent lecturer and writer on a variety of consumer class action, insurance, and mass tort related disputes. He has been quoted by a variety of media outlets over the years including the Wall Street Journal, Washington Post, New York Times, Law360, and Lawyers Weekly to name a few. He has been named as a member of the Legal Elite and Super Lawyers in North Carolina on numerous occasions. He has been awarded the designation of one of the Top 25 lawyers in Raleigh by Charlotte Magazine for a number of years including 2020. Dan is current serving as President of Public Justice, a nationwide public interest law firm. Dan is also an adjunct professor at Campbell Law School in Raleigh, NC where he teaches "Introduction to Class Actions and Multi-district litigation."

**R. GLENN PHILLIPS** is a managing partner at Milberg and has been practicing law since 1984 and has tried more than 100 civil jury trials. He is a managing partner at Milberg, and director of the firm's global operations. Mr. Phillips has received the highest rating from Martindale-Hubbell (5.0 out of 5.0) and is an AV rated attorney. Mr. Phillips started his legal career representing insureds on behalf of insurance companies, handling primarily wrongful death and product liability cases. In the mid-1990s, he began representing those injured by others, corporations, or by defective drugs and devices. Since then, he has been actively involved in the aggregation and prosecution of large groups of individual clients injured by corporate neglect. Mr. Phillips is a firm believer in the phrase, "leveling the playing field," allowing ordinary citizens to have access to justice through the courts and to being guided by experienced, aggressive, and ethical counsel. Mr. Phillips is a member of the Washington state bar. He is also a member of the American Association for Justice, an Eagle member of the Washington Association for Justice, and the non-profit organization, Public Justice. He is a frequent speaker before such national groups as The National Trial Lawyers, American Association for Justice, and Mass Torts Made Perfect, as well as various state trial lawyer groups.

**MARC D. GROSSMAN** is a managing partner at Milberg. Since beginning his law career in 1993, Mr. Grossman has focused primarily on representing large groups of plaintiffs against common defendants. In 1999, after six years of practicing plaintiff's personal injury law in state and federal courts in New York and New Jersey, Mr. Grossman founded the law firm of Sanders and Grossman, P.C. specifically to pursue claims on behalf of medical providers. This firm, and its successors, grew dramatically under his leadership, and now represent thousands of medical providers litigating claims against insurance companies, and thousands of injury victims.

Mr. Grossman had a vision of uniting the medical profession by affording them the opportunity to litigate nominal claims that were being written off by medical providers as uncollectible and had not previously been practical for most attorneys to litigate. By coordinating discovery, utilizing the most up-to-date case management technology, and recruiting top office administrators and trial attorneys, Mr. Grossman's firm was able to greatly improve efficiencies throughout the litigation process and ultimately the viability of collecting these claims. By filing over 100,000 individual lawsuits, Mr. Grossman's firms garnered the attention of the insurance industry and the medical profession in New York eventually leading to a series of mass settlements on behalf of his clients and recoveries in the hundreds of millions of dollars. In just 2006 and 2007, Mr. Grossman's firm personally litigated, negotiated, and recovered over 100 million dollars for his medical provider clients. The unique experience Mr. Grossman garnered as an innovator and leader in the mass settlement of medical claims and mass torts made him a leader in his field in negotiating and obtaining large recoveries.

Most recently, Mr. Grossman has represented hundreds of injured clients in lead paint litigations, asbestos litigations, mold litigations, and thousands of victims of defective drugs and products. Mr. Grossman received recognition litigating Vioxx cases in New Jersey Superior Court where he served as a liaison to the media as a member of the Vioxx Plaintiffs' Steering Committee's ("PSC's") Public Relations Committee, and as a liaison for the Committee to many financial institutions and governmental agencies, offering a common voice for the hundreds of attorneys handling such cases and the tens of thousands of victims they represent. These efforts and the hard work of many other relentless attorneys ultimately led Merck to agree to one of the largest Civil Settlements in American History for $4.85 Billion.

3

In December 2010, Mr. Grossman was nominated and invited to join both The Board of Directors of the New York State Trial Lawyers Association and the Executive Committee of Association of Trial Lawyers of America. Mr. Grossman is also a member of the Mass Tort Trial Lawyers Association and the Leaders Forum of the American Association of Justice.

Mr. Grossman has actively litigated for other large groups of plaintiffs in the following matters: *In re Avandia Mktg., Sales Practices and Prods. Liab. Litig.*; *In re N.Y. Bextra and Celebrex Prod. Liab. Litig.* in New York's Supreme Court, New York County; Case No. 273, *In re Bextra and Celebrex Litig.*, Superior Court of New Jersey, Atlantic County; Oxycontin Litigation in New York's Supreme Court, Richmond County; MDL-1708, *In re Guidant Corp. Implantable Defibrillators Prods. Liab. Litig.* in Minnesota; MDL-1699, *In re Bextra and Celebrex Mktg., Sales Practices and Prods. Liab. Litig.* in California; MDL-1742, *In Re Ortho Evra Prods. Liab. Litig.* in Ohio; MDL-1789, *In re Fosamax Prods. Liability Litig.* in New York; and MDL-1804, *In Re Stand 'N Seal, Prods. Liability Litig.*, where one of Mr. Grossman's firms serves on the PSC. One of Mr. Grossman's firms is also a court-appointed member of the PSC in the following mass tort litigations: *In Re Avandia*, *In Re Chantix, In Re Zicam*, *In Re Zimmer Knee*, *In Re Fosamax*, and the New Jersey state court coordination of Levaquin. One of Mr. Grossman's firms is co-lead in the NY Chantix Coordination and the New Jersey Reglan Coordination, as well as Risperdal in California, all Transvaginal Mesh PSC, and Propecia coordination.

After an $8 million verdict in *Boles v. Merck* for a victim of Fosamax, Mr. Grossman, along with co-counsel, led the Trial Team in *Rosenberg v. Merck* which was the first bellwether New Jersey Trial in Atlantic County Superior Court. Mr. Grossman has become well known as a speaker and host of approximately 20 educational seminars designed to educate victims, the medical community, and other attorneys. Mr. Grossman has been quoted and has appeared in numerous local and national forums and in the media as a legal commentator and advocate of victims' rights against the corporate greed that plagues our nation. In January 2016, Mr. Grossman received the 2015 Litigator Award a significant distinction, achieved by less than 1% of all trial attorneys. This award is considered among the top honors bestowed on trial attorneys.

**PEGGY J. WEDGWORTH** is a senior partner and Chair of the Antitrust Practice Group at Milberg. She was an Assistant District Attorney in Brooklyn, New York from 1986 to 1989. Since leaving the public sector in 1989, she has handled numerous securities, commodities, antitrust and whistleblower matters, and is a Super Lawyer in New York, New York since 2016 and recommended in the Legal 500 United States for 2016. Ms. Wedgworth represents defrauded investors and consumers, and she currently represents consumers in *In re Contact Lens Antitrust Litig.*, and car dealerships in an antitrust action brought against software suppliers. She actively litigated *In re Initial Public Offering Sec. Litig.* for over five years, which settled for $586 million, and *In re Merck & Co. Sec. Litig.*, which had a combined settlement totaling $1.062 billion. She also won a jury trial against R.J. Reynolds in a wrongful death tobacco case in Florida state court. Ms. Wedgworth has litigated antitrust and commodities class actions on behalf of plaintiffs including extensive experience in all aspects of pre-trial discovery in, among other cases, *In re Brand Name Prescription Drugs Antitrust Litig.*, No. 94-897, 1996 WL 351180 (N.D. Ill. June 24, 1996) (approving $351 million settlement); *In re NASDAQ Market-Makers Antitrust Litig.*, 187 F.R.D. 465 (S.D.N.Y.) ($1,027,000,000 settlement); *In re Microsoft Litig.*, MDL 1332 (D. Md.) (consolidated class actions alleging long term unlawful maintenance of a monopoly and other anticompetitive conduct by Microsoft resulting favorable partial settlements); *In re Soybean Futures Litig.*, No. 89-7009 (N.D. Ill.) ($21,500,000 class settlement providing claiming class

4

members/soybean futures traders a full recovery under plaintiffs' expert's formula); *In re Sumitomo Copper Litig.*, 74 F. Supp. 2d 393, 395 (S.D.N.Y. 1999) ("The recovery is the largest class action recovery in the 75 plus year history of the Commodity Exchange Act."); *Kohen v. Pac. Inv. Mgmt. Co., LLC*, No. 05-4681 (N.D. Ill.) (certified class of treasury bond futures purchasers alleging manipulation of the futures market); *Leider v. Ralfe*, No. 01-3137 (D.N.J.) (alleging price-fixing and monopolization in the diamond market by DeBeers resulting in a settlement of $250,000,000 and extensive injunctive relief); and *In re Natural Gas Commodities Litig.*, 03-6186 (S.D.N.Y.) ($101 million settlement). Ms. Wedgworth regularly speaks on topics relating to antitrust litigation, multi-district litigation and class action issues, and consumer matters. She is a member of the New York State Bar Association's Antitrust Committee, where she has served as both a speaker and panelist, and the American Bar Association, Antitrust Committee, and a member of the American Association of Justice.

**HARPER SEGUI** is a partner and practice leader in the Consumer Products Group at Milberg. Ms. Segui is an experienced litigator who focuses her practice on representing plaintiffs in complex class action litigation, including defective products, false advertising and mislabeling, and data breaches. Ms. Segui has actively lead a variety of complex cases across the country, having been instrumental in procuring millions of dollars in recoveries for plaintiffs and class members. In addition to individual class actions, Ms. Segui has enjoyed playing active roles in multidistrict litigation and has several times been appointed by courts to serve on Plaintiffs' Steering Committees. She was recently appointed as Co-Lead Counsel in multidistrict litigation involving a data breach. Ms. Segui has a broad spectrum of class actions and complex litigation experience that includes consumer product defects, building product defects, construction defects, unlawful fee charges, automobile defects, false advertising, and data breaches. Although integrally involved in every aspect of her cases, Ms. Segui has particularly honed technical skills which arm her with the ability to develop complex issues of science and technology at the heart of her cases, including the ability to engage experts and present these technical aspects in court. She been appointed to a number of leadership roles, and provided integral support for many more. Representative cases include *In Re: Windsor Wood Clad Windows Prods. Liab. Litig.*, 16-md-02668, MDL No. 2688 (E.D. Wis.) and *In Re: Allura Fiber Cement Siding Litig.*, No. 2:19-mn-02886 (D.S.C.), where she also serves as Co-Class Counsel. She also played essential supporting roles, including as a member of expert teams, in *In Re: MI Windows and Doors, Inc, Prods. Liab. Litig.*, 2:12-mn-00001, MDL No. 2333 (D.S.C.), *In Re: Pella Corp. Architect and Designer Series Windows, Mktg., Sales Prac. and Prods. Liab. Litig.*, 2:14-mn-00001, MDL No. 2514 (D.S.C.). Ms. Segui has been regularly selected to Super Lawyers as a Top-Rated Attorney in the areas of "Class Action & Mass Torts." She has co-authored several publications on product liability and other topics, and has been a lecturer on complex legal issues.

**RACHEL SOFFIN** is a partner and practice leader in the Consumer Products Group at Milberg. Ms. Soffin has spent the majority of her career prosecuting class action cases, including state and federal class actions involving product manufacturers and retailers, deceptive trade practices, privacy violations, and insurance and banking disputes. Prior to joining Milberg, Ms. Soffin worked in the area of consumer class actions in Morgan & Morgan's Tampa office. Prior to her time at Morgan & Morgan, Ms. Soffin served as in-house counsel for one of Florida's largest employee leasing companies. For the last eleven years, Ms. Soffin's practice has been exclusively

dedicated to consumer class action litigation. Ms. Soffin has successfully represented consumers in numerous class action cases involving a wide range of subjects affecting consumers, including product defects, deceptive trade practices, regulatory violations, and statutory violations: *Cleveland v. Whirlpool Corp.*, No. 0:20-cv-01906-WMV-KMM (D. Minn.) (recent preliminary approval of over $20M value settlement involving defective dishwashers); *Hamm v. Sharp Electronics Corporation,* 5-19-cv-00488 (S.D. Fla.) (over $100M value settlement in action involving allegedly defective microwaves); *Berman et al v. General Motors LLC*, No. 2:18-cv-14371-RLR (S.D. Fla.) ($40 million value settlement for consumers whose vehicles experienced excessive oil consumption and resulting damages); *De Leon v. Bank of America, N.A.* (USA), No. 6:09-cv-01251-JA-KRS (M.D. Fla.) ($10 million settlement for consumers subjected to violations of the Fair Credit Billing Act, a breach of their Cardholder Agreement and deceptive trade practices); *Swift v. Bank of America*, No. 3:14-cv-01539 (M.D. Fla) ($1 million settlement for consumers subjected to TCPA violations); *In re: Horizon Organic Milk Plus DHA Omega-3 Marketing and Sales Practice Litigation*, 1:12-MD-02324-JAL (S.D. Fla.) ($1.3 million settlement value for consumers subjected to deceptive trade practices for misrepresentations regarding a milk product); *In re: Tracfone Unlimited Service Plan Litigation*, No. 13-cv-03440-EMC (N.D. Cal) ($40 million settlement for consumers subjected to deceptive cellular phone data plan practices); *Corbett v. PharmaCare U.S. Inc.*, No. 3:21-cv-00137-GPC-AGS (S.D. Cal) (recent order denying, in part, motion to dismiss class action involving dietary supplements that are illegal to sell under the FDCA, rejecting defendant's preemption arguments); *Kanan et al v. Thinx Inc.*, No. 20-cv-10341-JVS-JPR (C.D. Cal.) (recent order denying, in part, motion to dismiss class action involving menstrual products that contain allegedly harmful Polyfluoroalkyl substances associated with a variety of negative health effects for humans, including cancer).

Ms. Soffin has held numerous leadership roles in MDLs. Currently, Ms. Soffin serves on the Plaintiffs' Steering Committee in litigation involving defective breast implants, *In re: Allergan Biocell Textured Breast Implant Product Liability Litigation*, No. 2:19-md-02921-BRM-ESK (D.N.J.), where she is on the law and briefing and class certification committees. Ms. Soffin also currently serves as Co-Lead Counsel in the defective cookware MDL, *All-Clad Metalcrafters, LLC, Cookware Marketing and Sales Practices Litigation*, No. 2:21-mc-00491-NR (W.D. Pa.). In addition, Ms. Soffin  served as co-lead settlement class counsel in *In Re: Allura Fiber Cement Siding Prods. Liability Litig.*, No. 2:19-mn-02886-DCN (D.S.C.) MDL, which resulted in a $12.5M settlement involving defective fiber cement siding.

Ms. Soffin has also been a lecturer at several conferences involving class action topics. Ms. Soffin is admitted to practice in the state courts of Florida and Georgia, and in the United States District Court for the Middle District of Florida, the United States District Court for the Southern District of Florida, the United States District Court for the Northern District of Georgia, the United States District Court for the Northern District of Illinois, and the United States Court of Appeals for the Eleventh Judicial Circuit. Ms. Soffin has been designated by Super Lawyers as a Florida Rising Star (2011-2013), and as a Florida Super Lawyer (2014-2018, 2022) in the fields of Class Actions/Mass Torts.

**ADAM EDWARDS** is a partner and practice leader in the Consumer Products Group at Milberg. Mr. Edwards acts as the lead attorney on many of the firm's serious personal injury cases. He also serves as a primary litigator on many of the firm's class action, multi-district litigation, and

defective product cases. He attended The University of Tennessee where he received his undergraduate degree in political science and served as a field office intern for United States Senator and former Senate Majority Leader, Dr. Bill Frist. After graduating from UT, Mr. Edwards was accepted into the Juris Doctor program at the Washburn University School of Law where he was awarded an academic merit scholarship after his first year of coursework. While at Washburn, Adam excelled in oral advocacy and was selected as the President of the Moot Court Counsel on Oral Advocacy. He was also selected as a member of the Order of Barristers. He received his JD after graduating with Dean's Honors in 2000. Adam's formal legal career started when he accepted a position as an Attorney at Husch Blackwell (formerly Blackwell Sanders) in Kansas City, Missouri in 2000. During the first four years of his legal career, Mr. Edwards successfully defended a number of well-known insurance companies and corporations in a wide range of litigation matters. Today, Mr. Edwards utilizes his extensive trial experience and diverse background to advocate for personal injury victims and consumers who have suffered damages resulting from dangerous and defective products. Mr. Edwards was selected by fellow members of the Knoxville Bar as a "Top Attorney" in CITYVIEW Magazine's annual Top Attorney's issue. He was selected as a Top Attorney for a second time in 2010. In 2017, Mr. Edwards was named one of the Top 100 Trial Lawyers by the American Trial Lawyers Association. He was also selected for membership into the Million Dollar Advocates Forum, an honor reserved for trial lawyers who have secured a settlement or verdict in excess of one million dollars.

**ANDREI RADO** is a partner at Milberg and focuses his practice on securities litigation, consumer class actions, and SEC whistleblower matters. The cases Mr. Rado is working on currently, or has litigated recently, are typical of his 20-year career: a class action pending in Manhattan federal court on behalf of universal life customers victimized by inflated cost of insurance deductions from the cash value of their policies; a class action in Los Angeles federal court on behalf of investors victimized by a Ponzi scheme; and class actions in Chicago federal court on behalf of consumers whose biometrics have been captured in violation of the Illinois Biometrics Information Privacy Act.   Mr. Rado's securities practice has included numerous litigations nationwide that have resulted in massive recoveries, including, among the most complex, *In re Initial Public Offering Sec. Litig.*, which alleged, in hundreds of consolidated cases, that investment banks manipulated the initial public offerings of hundreds of companies. Mr. Rado has also represented investors against mutual funds including a series of cases alleging that mutual fund managers allowed select investors to profit by improperly timing their trading in fund shares. In another mutual fund litigation, Mr. Rado represented investors victimized by overvaluation of illiquid securities.  Mr. Rado was important in the firm's launching and organization of litigation of Mr. Rado's practice has focused on investigating, launching, and litigating securities class actions and consumer class actions.  These cases are as diverse as consumer fraud itself. Early in his career, Mr. Rado litigated a case against jewelry company Zales for improperly denying credit-insurance claims made by unemployed and retired consumers, and a class action against computer maker Gateway for improperly understating in advertising the costs of internet access to consumers, some of whom incurred internet-access fees of hundreds of dollars. More recently, among other cases, Mr. Rado has launched and litigated consumer cases against companies that misled consumers by inflating the technical specifications of their products, and "all natural" food cases, including the first case alleging that products made from genetically modified organisms (GMOs) should not be advertised as natural.   Prior to joining Milberg, Mr. Rado worked as an attorney at a New York City-based investment bank focusing on compliance, with rules and regulations relating to re-sales

of control and restricted securities under the Securities Act of 1933. Mr. Rado also worked at another prominent New York City law firm specializing in plaintiffs' securities class action litigation. Mr. Rado received his Juris Doctor degree from St. John's University School of Law, cum laude, in 1999, and is admitted to practice law in New York. While in law school, Mr. Rado served as a senior member of the New York International Law Review. He is admitted to practice in the courts of the State of New York, as well as the United States District Court for the Southern District of New York. Mr. Rado was born in Bucharest Romania, and lived in Israel for several years before immigrating to New York in the early 80s. Since the passage of the Dodd-Frank Act in 2010, Mr. Rado has represented numerous whistleblowers before the commission under a program that rewards and protects whistleblowers that report violations of securities laws to the Securities and Exchange Commission. These involved a variety of complaints, including allegations of bribing foreign officials to gain business, accounting fraud, and consumer fraud, against a variety of companies diverse in size and business.

**ROY SHIMON** is a partner at Milberg and focuses his practice on securities and stockholder derivative litigation in both state and federal courts. Mr. Shimon also has experience in the areas of insider trading and antitrust litigation. Super Lawyers recognized him as a "Rising Star" in the New York Metro area each year from 2014-2018. Mr. Shimon has served as lead or co-lead counsel in a number of complex matters on behalf of stockholders and employee investors, including *In re PLX Tech. Inc. S'holders Litig.* (Del Ch.) (stockholder recovery of $14.1 million); *In re Zynga Inc. Sec. Litig.* (N.D. Cal.) (investor recovery of $23 million); *In re Popular Inc. ERISA Litig.* (D.P.R.) (employee investor recovery of $8.2 million); and *Shanehchian v. Macy's Inc.* (S.D. Ohio) (employee investor recovery of $8.5 million). Mr. Shimon currently represents the City of Charlotte, North Carolina in ongoing antitrust litigation in *In re Liquid Aluminum Sulfate Antitrust Litig.*, No. 16-md-2687 (D.N.J. 2015). Mr. Shimon graduated *cum laude* from Franklin & Marshall College in 2003, where he was inducted into the Pi Sigma Alpha and Alpha Kappa Delta National Honor Societies. He received his J.D. from St. John's University School of Law in 2006, where he served on the Executive Board of the Moot Court Honor Society and as Vice President of the Entertainment & Sports Law Society. Mr. Shimon is admitted to practice in the state and federal courts of New York.

**ROBERT A. WALLNER** is a Partner at Milberg and received his B.A. degree from the University of Pennsylvania in 1976 graduating *magna cum laude*. He attended New York University School of Law, earning his J.D. degree in 1979. He was elected to the law school's Order of the Coif and served as an editor of the New York University Law Review. Mr. Wallner has litigated complex securities, consumer and antitrust class actions throughout the country. He has represented plaintiffs in lawsuits arising out of the Madoff Ponzi scheme, including the court-appointed litigation trustee of two Madoff "feeder funds." He has also represented investors in *In re Merck & Co., Inc. Sec. Litig.* (D.N.J.), which resulted in a $1.062 billion recovery, *In re Initial Public Offering Sec. Litig.* (S.D.N.Y), *In re CMS Energy Corp. Sec. Litig.* (E.D. Mich.), and *In re Deutsche Telekom AG Sec. Litig.* (S.D.N.Y.), and consumers in *In re Synthroid Mktg. Litig.* (N.D. Ill.) and the *Mercedes-Benz Tire Litig.* (D.N.J.). Mr. Wallner is a frequent lecturer on securities and complex litigation issues. He has served on the editorial board of Securities Litigation Report, as a faculty member of the American Bar Association's First Annual National Institute on Securities Litigation and Arbitration, and as a member of the Federal Courts Committee of the

Association of the Bar of the City of New York. He has been recognized in Lawdragon's "100 Lawyers You Need to Know in Securities Litigation."

**LEIGH SMITH** is Senior Counsel at Milberg.  Ms. Smith has practiced law at firms in New York and New Jersey and has prosecuted a broad range of cases during her career. Her cases have included complex class actions brought on behalf of injured consumers and investors and also actions alleging discrimination, breaches of fiduciary duty, fraudulent transfers, and legal malpractice. Her noteworthy repre-sentations include *In re Tyco Int'l Sec. Litig.*, No. 02-266-PB (D.N.H. 2002), a case involving complex allegations of fraud in which she played a leading role in achieving a multi-billion dollar settlement, and U.S. ex rel. *Cordingley v. Good Shepherd Hospice, Mid-America, Inc.*, No.4:11-cv-1087 (W.D. Mo. 2011), a qui tam action in which she successfully represented the relator. Ms. Smith earned a B.A. and an M.A. in French from Rutgers University. Prior to law school, Ms. Smith taught French language and literature, and she also taught English in a Parisian suburb. At Cornell Law School, Ms. Smith was on the editorial board of the Journal of Law and Public Policy, was an active member of the Moot Court Board, and was co-president of Cornell's Lambda Law Student Association. Ms. Smith is a member of the Women's Bar Association of the State of New York and the Westchester Women's Bar Association.

**BARRY A. WEPRIN** is Of Counsel at Milberg and graduated from Harvard College in 1974. He received a J.D. degree from the New York University School of Law in 1978, and a master of public affairs from the Woodrow Wilson School of Princeton University in 1978. While in law school, Mr. Weprin was notes and comments editor of the New York University Law Review. Since joining the firm, Mr. Weprin has specialized in securities and insurance litigation. He has served as lead or co-lead counsel in a number of complex securities class action litigations. He was one of the principal attorneys in the sales practice litigations against The New York Life Insurance Company, The New England Life Insurance Service Company, The Massachusetts Mutual Life Insurance Company, The John Hancock Mutual Life Insurance Company, and The Prudential Life Insurance Company which recovered billions of dollars for policyholders. Mr. Weprin is a frequent lecturer on complex litigation issues.  Previously, Mr. Weprin served as law clerk to Judge Charles P. Sifton of the United States District Court for the Eastern District of New York and was associated with the law firm of Wachtell Lipton Rosen & Katz where he specialized in commercial and securities litigation. He also served as general counsel to the New York State Housing Finance Agency and the New York State Medical Care Facilities Finance Agency, two agencies that issue tax exempt bonds for financing nonprofit medical facilities and qualified housing projects.  Mr. Weprin is very active in his community of Mamaroneck, New York, having served as a Town Councilman and a member of the Zoning Board of Appeals. He is a former President of the National Association of Shareholder and Consumer Attorneys (NASCAT) as well as Vice President of the Institute for Law and Economic Policy (ILEP). Mr. Weprin is a member of the American Bar Association, the Association of the Bar of the City of New York, the New York County Lawyers Association, and the New York State Bar Association. Mr. Weprin is admitted to practice in New York, the United States District Court for the Southern and Eastern Districts of New York, the United States Court of Appeals for the Second Circuit, and the United States Supreme Court.

**SANFORD P. DUMAIN** is Of Counsel at Milberg and attended Columbia University where he received his B.A. degree in 1978. He graduated *cum laude* from Benjamin N. Cardozo School of Law of Yeshiva University in 1981.Mr. Dumain represents plaintiffs in cases involving securities fraud, consumer fraud, insurance fraud, and violations of the antitrust laws. Mr. Dumain was co-lead counsel in *In re Tyco Int'l Ltd., Sec. Litig.* in which $3.2 billion was recovered for investors. Mr. Dumain also served as lead counsel in the securities class actions against Nortel and Biovail, which are the highest and third highest recoveries ever in cases involving Canadian companies. The Nortel settlement was valued at over $1 billion and Biovail settled for over $138 million in cash. Mr. Dumain successfully represented the City of San Jose, California against 13 of the City's broker-dealers and its outside accountants in connection with major losses in unauthorized bond trading. Mr. Dumain began his career as a law clerk to Judge Warren W. Eginton, United States District Court for the District of Connecticut 1981-1982. During the early years of his practice, he also served as an Adjunct Instructor in Legal Writing and Moot Court at Benjamin N. Cardozo School of Law.Mr. Dumain has lectured for ALI-CLE concerning accountants' liability and has prosecuted several actions against accounting firms.Judge Janet C. Hall of the District of Connecticut made the following comment in *In re Fine Host Corp. Securities Litig.*, No. 97-2619 (D.Conn.): "The court also finds that the plaintiff class received excellent counseling, particularly from the Chair of the Plaintiffs' Executive Committee, Attorney Dumain." Mr. Dumain is admitted to practice in the State of New York, United States District Court for the Southern, Eastern, and Western Districts of New York, District of Colorado, and District of Connecticut, and United States Courts of Appeals for the First, Second, Third, Sixth, Seventh, and Eighth Circuits.

**BLAKE HUNTER YAGMAN** is an associate at Milberg attorney with a focus on representing consumers, investors, and small businesses in antitrust and consumer protection litigation. Mr. Yagman's career in the law began as an undergraduate while at the University of Miami, where he worked as a judicial intern to the Honorable Lawrence Schwartz of the Eleventh Judicial Circuit Court of the State of Florida. As a student at the University of Miami, Mr. Yagman was formatively shaped by his experience as a member of student government; he was a passionate advocate on behalf of the school's mental health programs and was twice elected Senator for his graduating class. As a member of the Senate, he passed more bills than any other Senator and Chaired the Policy and Finance Committee. As a junior, Mr. Yagman was a nominee for Vice President of the student body. Mr. Yagman received a scholarship to attend the Benjamin N. Cardozo School of Law and completed his juris doctorate with a concentration in Intellectual Property and Data Law. While in law school, he championed the rights of athletes – working on concussion litigation as an intern and writing for major publications on sports legal issues from the athlete's perspective. In 2017, Mr. Yagman spoke on behalf of collegiate athletes on a sports law symposium panel on antitrust issues pertaining to the National Collegiate Athletic Association. As an attorney, prior to joining Milberg, Mr. Yagman litigated antitrust, consumer fraud, and securities fraud cases at a national plaintiffs' class action firm based in New York City. With respect to antitrust cases, Mr. Yagman has extensive experience in food industry-based antitrust actions; including experience in price fixing cases against the tuna industry (In re Packaged Seafood Antitrust Litigation), the egg industry (In re Processed Egg Products Antitrust Litigation), and the broiler chicken industry (In re Broiler Chicken Antitrust Litigation). With respect to consumer fraud cases, Mr. Yagman has experience in technology-focused consumer actions, including working on a case brought on behalf of Apple iPhone users (In re Apple Inc. Device Performance Litigation). Mr. Yagman has represented plaintiffs in high profile class action litigation during his time at Milberg. Examples

10

of plaintiffs he has represented include: consumers in a class action against a sports league for refund practices during a pandemic; purchasers of gasoline at retail who allegedly paid artificially higher prices as a result of manipulation on the spot market; and investors who paid undisclosed hard-to-borrow interest fees to a stock trading platform. In 2020, Mr. Yagman was a guest lecturer at Hofstra University's law school on the topic of Indirect Purchaser Standing in Private Plaintiffs Antitrust Class Actions After the Supreme Court's Decision in Apple v. Pepper. Mr. Yagman is admitted to practice in the State of New York. His passion for economic and social justice drives his practice. He is a member of the LGBT Bar Association of Greater New York (LeGaL).

**ADAM H. COHEN** is an associate at Milberg. His practice focuses on data breach, pharmaceutical and consumer protection class actions, as well as false claims act litigation. Mr. Cohen has dedicated his entire legal career to protecting consumers. Prior to joining Milberg, Mr. Cohen was an Enforcement Attorney for the Consumer Financial Protection Bureau (CFPB) where he led complex investigations of large banks, financial services companies, and others for violations of federal laws and regulations across a wide range of consumer financial products. Mr. Cohen also provided expertise to bank examiners during supervisory examinations of banks and financial services companies and served on multiple Bureau-wide policy groups. Before working for the CFPB, Mr. Cohen served as an Assistant Attorney General for the New York Attorney General's (NYAG) Consumer Frauds and Protection Bureau where he investigated and litigated consumer protection actions with a focus on mortgage-related investigations and litigation. The NYAG awarded Mr. Cohen the Lefkowitz Memorial Award for Outstanding Service for his work on financial services enforcement litigation. Mr. Cohen began his legal career at Mobilization for Justice where he launched a pro bono foreclosure defense practice that helped hundreds of families remain in their home during the foreclosure crisis. Mr. Cohen graduated from the Sandra Day O'Connor College of Law at Arizona State University with Highest Honors for Pro Bono Service and obtained his B.A. from New York University *magna cum laude*. He is admitted to practice in New York, the Southern District of New York and the Eastern District of New York

**J. BIRT REYNOLDS** is an associate at Milberg and represents whistleblowers who bring claims under the federal False Claims Act and its state counter-parts. Since joining the firm's Qui Tam practice group, he has worked on several cases that have brought substantial recoveries to federal and state governments. Mr. Reynolds also represents plaintiffs in complex commercial litigation involving contractual, tort, and statutory claims. Before joining Milberg, Mr. Reynolds clerked for a magistrate judge in the Middle District of Florida, as well as Florida appellate and trial court judges. Mr. Reynolds earned his J.D. from Case Western Reserve University School of Law in 2004. He is admitted to practice in the state courts of Florida and New York, the United States District Courts for the Eastern and Southern Districts of New York, the Northern, Middle, and Southern Districts of Florida, and the Western District of Michigan.

11

**Additional Notable Class Action Cases**

**Antitrust**

*In re: TFT-LCD (Flat Panel) Antitrust Litigation,* No. 3:07-cv-01827, MDL No. 1827 (N.D. Cal.) (combined settlement totaling nearly $1.1 billion in suit alleging the illegal formation of an international cartel to restrict competition in the LCD panel market) (2012).

**Appliances**

*Ersler, et. al v. Toshiba America et. al*, No. 07- 2304 (D.N.J.) (settlement of claims arising from allegedly defective television lamps) (2009).

*Maytag Neptune Washing Machines* (class action settlement for owners of Maytag Neptune washing machines).

*Stalcup, et al. v. Thomson, Inc.* (Ill. Cir. Ct.) ($100 million class settlement of clams that certain GE, PROSCAN and RCA televisions may have been susceptible to temporary loss of audio when receiving broadcast data packages that were longer than reasonably anticipated or specified) (2004).

*Hurkes Harris Design Associates, Inc., et al. v. Fujitsu Computer Prods. of Am., Inc.*  (settlement provides $42.5 million to pay claims of all consumers and other end users who bought certain Fujitsu Desktop 3.5" IDE hard disk drives) (2003).

*Turner v. General Electric Company*, No. 2:05-cv-00186 (M.D. Fla.) (national settlement of claims arising from allegedly defective refrigerators) (2006).

**Automobiles**

*In re General Motors Corp. Speedometer Prods. Liability Litig.,* MDL 1896 (W.D. Wash.) (national settlement for repairs and reimbursement of repair costs incurred in connection with defective speedometers) (2007).

*Baugh v. The Goodyear Tire & Rubber Company* (class settlement of claims that Goodyear sold defective tires that are prone to tread separation when operated at highway speeds;  Goodyear agreed to provide a combination of both monetary and non-monetary consideration to the Settlement Class in the form of an Enhanced Warranty Program and Rebate Program) (2002).

*Lubitz v. Daimler Chrysler Corp.,* No. L-4883-04 (Bergen Cty. Super. Ct, NJ 2006) (national settlement for repairs and reimbursement of repair costs incurred in connection with defective brake system; creation of $12 million fund; 7th largest judgment or settlement in New Jersey) (2007).

*Berman et al. v. General Motors LLC,* Case No. 2:18-cv-14371 (S.D. Fla.) (Co-Lead Counsel; national settlement for repairs and reimbursement of repair costs incurred in connection with Chevrolet Equinox excessive oil consumption).

## Civil Rights

*In re Black Farmers Discrimination Litigation*, Case No. 1:08-mc-00511 (D.D.C.) ($1.25 billion settlement fund for black farmers who alleged U.S. Department of Agriculture discriminated against them by denying farm loans) (2013).

*Bruce, et. al. v. County of Rensselaer et. al.,* Case No. 02-cv-0847 (N.D.N.Y.) (class settlement of claims that corrections officers and others employed at the Rensselaer County Jail (NY) engaged in the practice of illegally strip searching all individuals charged with only misdemeanors or minor offenses) (2004).

## Commercial

*In re: Outer Banks Power Outage Litigation,* 4:17-cv-141 (E.D.N.C) (Co-Lead Counsel; $10.35 million settlement for residents, businesses, and vacationers on Hatteras and Ocracoke Islands who were impacted by a 9-day power outage) (2018)

## Construction Materials

*Cordes et al v. IPEX, Inc.*, No. 08-cv-02220-CMA-BNB (D. Colo.) (class action arising out of defective brass fittings; court-appointed member of Plaintiffs' Steering Committee) (2011).

*Elliott et al v. KB Home North Carolina Inc. et al* 08-cv-21190 (N.C. Super. Ct. Wake County) (Lead Counsel; class action settlement for those whose homes were constructed without a weather-resistant barrier)(2017)

*In re: Pella Corporation Architect and Designer Series Windows Marketing, Sales Practices and Products Liability Litigation,* MDL No. 2514 (D.S.C.)(class action arising from allegedly defective windows; Court-appointed Co-Lead Counsel).

*In re MI Windows and Doors, Inc., Products Liability Litigation*, MDL No. 2333 (D.S.C) (National class action settlement for homeowners who purchased defective windows; Court-appointed Co-Lead Counsel).

*In re: Atlas Roofing Corporation Chalet Shingle Products Liability Litig.*, MDL No. 2495 (N.D. Ga.) (class action arising from allegedly defective shingles; Court-appointed Co-Lead Counsel).

*Helmer et al. v. Goodyear Tire & Rubber Co.*, No. 12-cv-00685-RBJ (D. Colo. 2012) (class action arising from allegedly defective radiant heating systems; Colorado class certified, 2014 WL 3353264, July 9, 2014)).

*In re: Zurn Pex Plumbing Products Liability Litigation*, No. o:08-md-01958, MDL No. 1958 (D. Minn.) (class action arising from allegedly plumbing systems; member of Executive Committee; settlement) (2012).

*Hobbie, et al. v. RCR Holdings II, LLC, et al.*, No. 10-1113 , MDL No. 2047 (E.D. La.) ($30 million settlement for remediation of 364 unit residential high-rise constructed with Chinese drywall) (2012).

*In re: Chinese Manufactured Drywall Products Liability Litigation,* No. 2:09-md-02047, MDL No. 2047 (E.D. La.) (litigation arising out of defective drywall) (appointed Co-Chair, Insurance Committee) (2012).

*Galanti v. Goodyear Tire & Rubber Co.*, No. 03-209 (D.N.J. 2003) (national settlement and creation of $330 million fund for payment to owners of homes with defective radiant heating systems) (2003).

*In re Synthetic Stucco Litig.*, Civ. Action No. 5:96-CV-287-BR(2) (E.D.N.C.) (member of Plaintiffs' Steering Committee; settlements with four EIFS Manufacturers for North Carolina homeowners valued at more than $50 million).

*In re Synthetic Stucco (EIFS) Prods. Liability Litig.*, MDL No. 1132 (E.D.N.C.) (represented over 100 individuals homeowners in lawsuits against homebuilders and EIFS manufacturers).

*Posey, et al. v. Dryvit Systems, Inc.,* Case No. 17,715-IV (Tenn. Cir. Ct) (Co-Lead Counsel; national class action settlement provided cash and repairs to more than 7,000 claimants) (2002).

*Sutton, et al. v. The Federal Materials Company, Inc., et al*, No. 07-CI-00007 (Ky. Cir. Ct) (Co-Lead Counsel; $10.1 million class settlement for owners of residential and commercial properties constructed with defective concrete).

*Staton v. IMI South, et al.* (Ky. Cir. Ct.) ((Co-Lead Counsel; class settlement for approximately $30 million for repair and purchase of houses built with defective concrete).

*In re Elk Cross Timbers Decking Marketing, Sales Practices and Products Liability Litigation*, No. 15-cv-0018, MDL No. 2577 (D.N.J.) (Lead Counsel; national settlement to homeowners who purchased defective GAF decking and railings).

*Bridget Smith v. Floor and Decor Outlets of America, Inc.*, No. 1:15-cv-4316 (N.D. Ga.) (Co-Lead Counsel; National class action settlement for homeowners who purchased unsafe laminate wood flooring).

*In re Lumber Liquidators Chinese-Manufactured Flooring Products Marketing, Sales Practices and Products Liability Litigation* MDL No. 1:15-md-2627 (E.D.Va.) (Formaldehyde case; $36 million national class action settlement for member who purchased a certain type of laminate flooring).

14

*In re Lumber Liquidators Chinese-Manufactured Laminate Flooring Durability Marketing, Sales Practices Litigation* MDL No. 1:16-md-2743 (E.D.Va.) (Co-Lead Counsel; Durability case; $36 million national class action settlement for member who purchased a certain type of laminate flooring).

*In re Windsor Wood Clad Window Products Liability Litigation* MDL No. 2:16-md-02688 (E.D. Wis.) (National class action settlement for homeowners who purchased defective windows; Court-appointed Lead Counsel).

*In re Allura Fiber Cement Siding Products Liability Litigation* MDL No. 2:19-md-02886 (D.S.C.) (class action arising from allegedly defective cement board siding; Court-appointed Lead Counsel).

## Environmental

*Nnadili, et al. v. Chevron U.S.A., Inc*, No. 02-cv-1620 (D.D.C.) ($6.2 million settlement for owners and residents of 200 properties located above underground plume of petroleum from former Chevron gas station) (2008).

*In re Swanson Creek Oil Spill Litigation*, No. 00-1429 (D. Md.) (Lead Counsel; $2.25 million settlement of litigation arising from largest oil spill in history of State of Maryland) (2001).

## Fair Labor Standards Act/Wage and Hour

*Craig v. Rite Aid Corporation*, Civil No. 08-2317 (M.D. Pa.) (FLSA collective action and class action settled for $20.9 million) (2013).

*Stillman v. Staples, Inc.,* Civil No. 07-849 (D.N.J. 2009) (FLSA collective action, plaintiffs' trial verdict for $2.5 million; national settlement approved for $42 million) (2010).

*Lew v. Pizza Hut of Maryland, Inc.*, Civil No. CBB-09-CV-3162 (D. Md.) (FLSA collective action, statewide settlement for managers-in-training and assistant managers, providing recompense of 100% of lost wages) (2011).

## Financial

*Roberts v. Fleet Bank (R.I.), N.A.*, Civil Action No. 00-6142 (E. D. Pa.) ($4 million dollar settlement on claims that Fleet changed the interest rate on consumers' credit cards which had been advertised as "fixed.") (2003).

*Penobscot Indian Nation et al v United States Department of Housing and Urban Development*, N. 07-1282 (PLF) (D.D.C. 2008) (represented charitable organization which successfully challenged regulation barring certain kinds of down-payment assistance; Court held that HUD's promulgation of rule violated the Administrative Procedure Act) (2008).

**Impact Fees**

*Town of Holly Springs,* No. 17-cvs-6244, 17-cvs-6245, 18-cvs-1373 (Wake Co., NC) (Court appointed Class Counsel; Class action settlement with a $7.9 million fund for builders and developers to recover improper capacity replacement and transportation fees paid to the town) (2019).

*Larry Shaheen v. City of Belmont,* No. 17-cvs-394 (Gaston Co., NC) (Court appointed Class Counsel; Class action settlement with a $1.65 million fund for builders and developers to recover improper capacity replacement and transportation fees paid to the city) (2019).

*Upright Builders Inc. et al. v. Town of Apex,* No. 18-cvs-3720 & 18-cvs-4384, (Wake Co., NC) (Court appointed Class Counsel; Class action settlement with a $15.3 million fund for builders and developers to recover improper capacity replacement and transportation paid fees to the town) (2019).

*Mayfair Partners, LLC et al. v. City of Asheville,* No. 18-cvs-04870 (Buncombe County) (Court appointed Class Counsel; Class action settlement with a $1,850,000 million fund for builders and developers to recover improper impact fees paid to the city) (2020).

*Shenandoah Homes, LLC v. Town of Clayton,* No. 19-cvs-640 (Johnston County) (Court appointed Class Counsel; Class action settlement with a $2.7 million fund for builders and developers to recover improper impact fees paid to the town) (2020).

*Brookline Homes LLC v. City of Mount Holly*, Gaston County file no. 19-cvs-1163 (Gaston County) (Court appointed Class Counsel; Class action settlement with a $483,468 fund for builders and developers to recover improper impact fees paid to the city) (2020).

*Eastwood Construction, LLC et. al v. City of Monroe*, Union County file nos. 18-CVS-2692 (Union County) (Court appointed Class Counsel; Class action settlement with a $1,750,000 million fund for builders and developers to recover improper impact fees paid to the city) (2020).

**Insurance**

*Young, et al.  v. Nationwide Mut. Ins. Co, et al*., No. 11-5015 (E.D. Ky.) (series of class actions against multiple insurance companies arising from unlawful collection of local taxes on premium payments; class certified and affirmed on appeal, 693 F.3d 532 (6th Cir., 2012); settlements with all defendants for 100% refund of taxes collected) (2014).

*Nichols v. Progressive Direct Insurance Co., et al*., No. 2:06cv146 (E.D. Ky.) (Class Counsel; class action arising from unlawful taxation of insurance premiums; statewide settlement with Safe Auto Insurance Company and creation of $2 million Settlement Fund; statewide settlement with Hartford Insurance Company and tax refunds of $1.75 million ) (2012).

**Privacy/Data Breach**

*In Re: U.S. Office of Personnel Management Data Security Breach Litigation*, No. 15-1393 (ABJ), MDL No. 2664 (D.D.C.) (court appointed interim Liaison Counsel).

*In re Google Buzz Privacy Litigation,* No. 5:10-cv-00672 (N.D. Cal.) (court-appointed Lead Class Counsel; $8.5 million cy pres settlement) (2010).

*In re: Dept. of Veterans Affairs (VA) Data Theft Litig.,* No. 1:2006-cv-00506, MDL 1796 (D.D.C.) (Co-Lead counsel representing veterans whose privacy rights had been compromised by the theft of an external hard drive containing personal information of approximately 26.6 million veterans and their spouses; creation of a $20 million fund for affected veterans and a cy pres award for two non-profit organizations) (2009).

*In re: Adobe Systems Inc. Privacy Litigation,* No. 5:13-cv-05226 (N.D. Cal. 2015) (settlement requiring enhanced cyber security measures and audits) (2015).

17

# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

| | |
|---|---|
| TROY FATH, HIGINIO BAUTISTA, and CHRISTOPHER HAMILTON, individually and on behalf of others similarly situated, | Case No. 18-CV-1549 (NEB/LIB) |
| Plaintiffs, | ORDER GRANTING FINAL APPROVAL OF CLASS ACTION SETTLEMENT AND ATTORNEYS' FEES |
| v. | |
| AMERICAN HONDA MOTOR CO., INC., | |
| Defendant. | |

This matter came before the Court on Plaintiffs' Unopposed Motion for Final Approval of the Class Action Settlement (ECF No. 139) and Plaintiffs' Unopposed Motion for Class Counsel Fees and Expenses Award and Named Plaintiffs' Service Awards (ECF No. 130). Troy Fath, Higinio Bautista, and Christopher Hamilton (collectively, the "Named Plaintiffs") have sued American Honda Motor Co., Inc. ("Honda") on behalf of a putative class in the above-captioned litigation (the "Litigation"). The Named Plaintiffs seek an order granting final approval of the Class Action Settlement Agreement and Release dated July 22, 2019, and its attached exhibits (ECF No. 75-1 (collectively, the "Settlement Agreement")),[1] certifying a class for settlement purposes only, and

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Settlement Agreement.

EXHIBIT E

dismissing the case with prejudice. They also seek an order granting their requested attorneys' fees, expenses, and service awards. For the reasons set forth below, the motions are granted.

## BACKGROUND

In November 2018, the Court ordered the consolidation of two putative class actions alleging a latent fuel dilution defect in the engines of certain Honda vehicles. (ECF No. 42.) On December 13, 2019, the Court entered an order: (1) granting preliminary approval of the Settlement Agreement; (2) preliminarily certifying a class for settlement purposes; (3) appointing the Named Plaintiffs as "Settlement Class Representatives" and their counsel Matthew D. Schelkopf of Sauder Schelkopf as Lead Counsel, Matthew Mendelsohn of Mazie Slater Katz & Freeman, LLC as Chair of the Executive Committee, Nicholas Migliaccio and Jason Rathod of Migliaccio & Rathod LLP to the Executive Committee, and Daniel Hedlund of Gustafson Gluek PLLC as Liaison Counsel; (4) directing that the Notice be disseminated to the Settlement Class Members using the method described in the Settlement Agreement; and (5) setting a Final Approval Hearing. (ECF No. 84 (the "Preliminary Approval Order").) The full factual background of this matter as set out in the Preliminary Approval Order, including its description the Settlement Agreement, is incorporated by reference.

After Honda, as Settlement Administrator, disseminated Notice and posted Notice on the settlement website, Settlement Class Members had the opportunity to submit

timely requests to be excluded from the Settlement Class or object to the Settlement Agreement (including the Class Counsel Fees and Expenses Award and the Named Plaintiffs' Incentive Award). Honda received a total of fifty-five (55) objections and two hundred and ninety-eight (298) requests for exclusion. Two of those objections discussed Class Counsel's fee request.

The Court held the Final Approval Hearing, at which time it also heard argument on the Named Plaintiffs' Unopposed Motion for Class Counsel Fees and Expenses Award and Named Plaintiffs' Service Awards, on July 31, 2020. (ECF No. 147.) No Settlement Class Member appeared at that hearing.

## DISCUSSION

### I.    Named Plaintiffs' Motion for Final Approval of the Settlement Agreement

Rule 23(e)(2) of the Federal Rules of Civil Procedure provides the circumstances in which a court may prove a proposed class action settlement that "would bind class members." Fed. R. Civ. P. 23(e)(2). And so, courts must consider: (1) whether "class representatives and class counsel have adequately represented the class," Fed. R. Civ. P. 23(e)(2)(A); (2) whether "the proposal was negotiated at arm's length," Fed. R. Civ. P. 23(e)(2)(B); (3) whether "the relief provided for the class is adequate," taking certain specified considerations into account, Fed. R. Civ. P. 23(e)(2)(C); and (4) whether "the proposal treats class members equitably relative to each other," Fed. R. Civ. P. 23(e)(2)(D). The Eighth Circuit has set forth its own largely overlapping test to ascertain the fairness

and adequacy of a proposed settlement. *See Swinton v. SquareTrade*, Inc., No. 418CV00144SMRSBJ, 2020 WL 1862470, at *5 (S.D. Iowa Apr. 14, 2020). In particular, Eighth Circuit courts consider: "the merits of the plaintiff's case, weighed against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement." *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988).

In its Preliminary Approval Order, the Court held that the proposed class action settlement likely satisfied the requirements of Rule 23(e)(2) and the Eighth Circuit's four-factor test. (Preliminary Approval Order at 5–10.) Having heard oral argument and having fully considered the Settlement Agreement and all submissions made in connection with it (including the objections of class members and the Named Plaintiffs' responses to their criticisms), the Court now concludes that the proposed settlement indeed satisfies the requirements of Rule 23(e)(2) and the Eighth Circuit.

To reach this determination, the Court has carefully considered the fifty-five (55) objections that have been filed on its docket or sent to Honda (as Settlement Administrator) as well as the fact that two hundred and ninety-eight (298) class members have requested to be excluded. At the time the Court ruled on the Named Plaintiffs' preliminary request for approval of the settlement, it had no occasion to consider the amount of opposition to the Settlement Agreement or to rule on any objections raised to its terms. (Preliminary Approval Order at 10.)

As to the quantitative amount of opposition, the Court notes that the number of objections filed (55) and the number of class members who opted out of the settlement (298) is low when compared to the number of class members who received notice of the settlement. In addition to making the terms of the settlement available on a website, Honda "caused to be mailed a total of 1,111,104 notices" to addresses identified according to the procedures described in the Settlement Agreement. (ECF No. 146 ¶ 4.) The objections and opt-outs constitute roughly 0.0318% of those who were mailed notice of the settlement. Quantitatively, this represents an insignificant amount of opposition to the Settlement Agreement. *E.g., Marshall v. Nat'l Football League*, 787 F.3d 502, 513 (8th Cir. 2015) (holding this factor favored approval of settlement where "only one-tenth of one percent of the class objected, and less than ten percent of the class ha[d] requested exclusion from the settlement." (citation omitted)).

As to the substance of the objections, the vast majority criticize that the Settlement Agreement makes the Product Update available only to Class Vehicles registered in the twenty-one (21) designated cold-weather states and/or that the Settlement Agreement only extends Honda's Powertrain Limited Warranty for an additional year. At bottom, these objections complain that the Settlement Agreement does not offer enough to class members in exchange for the release of their claims against Honda. Certain other objections also protest that the Settlement Agreement does not provide enough to class members and specifically request, among other things, reimbursement for the cost of

future oil changes, a new vehicle or engine at Honda's expense, or reimbursement for the diminished value of their vehicles.

In response to these objections, the Named Plaintiffs correctly argue that "a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017) (citation omitted); *see also In re UnitedHealth Grp. Inc. PSLRA Litig.*, 643 F. Supp. 2d 1094, 1099 (D. Minn. 2009) (determining proposed settlement was fair and adequate even though "one or more defendants could possibly pay more" than the settlement amount). Indeed, Honda represented at the Final Approval Hearing that accommodating the objectors' demands would cause Honda to reevaluate the benefits of settling as compared with pursuing this litigation. As noted in its Preliminary Approval Order, it is the Court's view that the risks of proceeding to trial are substantial. That the Settlement Agreement offers less than the objectors would like to receive does not render the proposed settlement unfair or otherwise inadequate.[2] In sum, the Court concludes that the proposed settlement satisfies the requirements of Rule 23(e)(2) and the Eighth Circuit's four-factor test.

---

[2] The remaining objections similarly provide no basis for the Court to reassess its determination that the Settlement Agreement satisfies Rule 23(e)(2) and the Eighth Circuit's four-factor test. Among other things, they fault the Settlement Agreement for not remedying issues unrelated to the alleged oil dilution defect (*e.g.*, ECF No. 126-2 at 33 (complaining of electrical issues)), protest that because Honda began offering the additional year of Powertrain Limited Warranty prior to final approval the Settlement Agreement does not offer anything to the class members in exchange for the release of

## II. Named Plaintiffs' Motion for Class Counsel Fees and Expenses Award and Named Plaintiffs' Service Awards

### A. Attorneys' Fees and Expenses

Rule 23(h) provides that "[i]n a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). As a general matter, to assess the reasonableness of the requested attorneys' fees, courts use either the "lodestar" method or the "percentage of the benefit" approach. *See Caligiuri v. Symantec Corp.*, 855 F.3d 860, 865 (8th Cir. 2017). The "percentage of the benefit" approach "permits an award of fees that is equal to some fraction of the common fund that the attorneys were successful in gathering during the course of the litigation." *Id.* (citing *Johnston v. Comerica Mortg. Corp.*,

---

their claims (*e.g.*, *id.* at 27–28), and claim that Honda's Product Update did not sufficiently remedy the alleged dilution defect (*e.g.*, *id.* at 78, ECF No. 118). First, the Released Claims are defined to include claims "relating to or arising out of the alleged ODC issue" specifically, and so class members can still presumably pursue litigation against Honda for unrelated issues. (Settlement Agreement ¶ 1.19.) Second, the Settlement Agreement does not confer less value to class members simply because, in anticipation of final approval, the Named Plaintiffs and Honda agreed the additional year of Powertrain Limited Warranty would be made available prior to securing final court approval. In particular, Class Counsel represented that they sought to make relief available to class members before winter, when the parties believe the oil dilution defect is most likely to manifest. Third, Class Counsel has represented that Honda and one of the two objectors who complained about the Product Update are in the process of investigating his complaints and emphasized that the fact that only two objectors have complained of the Product Update indicates its overall success. The Court is thus disinclined to reassess its determination of the value of the Product Update relief.

83 F.3d 241, 244 (8th Cir. 1996)). There is no such common fund here, so the Court will apply the "lodestar" method to analyze Class Counsel's request for attorneys' fees.

The so-called "lodestar" method "multiplies the number of hours reasonably expended by reasonable hourly rates." *Bryant v. Jeffrey Sand Co.*, 919 F.3d 520, 529 (8th Cir. 2019). This figure may then be adjusted up or down to reflect the specific characteristics of a given action. *Johnston*, 83 F.3d at 244 (noting the lodestar amount "can be adjusted, up or down, to reflect the individualized characteristics of a given action").. Under Eighth Circuit precedent, the ultimate reasonableness of the award is evaluated according to the factors the district court finds relevant from among those listed in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir 1974). *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018).[3]

Class Counsel request $850,000 to cover attorneys' fees and unreimbursed expenses. The $850,000 requested here is consistent with the Settlement Agreement,

---

[3] Those factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*In re Target Corp.*, 892 F.3d at 977 & n.7 (citations omitted).

which provides that Class Counsel will request no more than $850,000 for fees and expenses. (Settlement Agreement ¶ 5.3.) According to Class Counsel's submissions, they worked approximately 1,038 hours to litigate this matter thus far. (ECF No. 133 ("Schelkopf Decl.") ¶ 5 (430.3 hours); ECF No. 134 ("Mendelsohn Decl.") ¶ 10 (264 hours); ECF No. 135 ("Migliaccio Decl.") ¶ 6 (196.8 hours); ECF No. 136 ("Hedlund Decl.") ¶ 6 (192.25 hours).) Class Counsel represent that, among other things, these hours include time spent on reviewing discovery from Honda and conducting their own independent factual investigation into the oil dilution defect. (*See, e.g.*, Schelkopf Decl. ¶ 11; Migliaccio Decl. ¶ 8; Hedlund Decl. ¶ 11.) Class Counsel represent that they billed their time at the current rates charged to their clients, resulting in a combined lodestar of $658,561.35. (Schelkopf Decl. ¶ 5 ($260,585.00); Mendelsohn Decl. ¶ 11 ($159,830.50); Migliaccio Decl. ¶ 6 ($131,664.60); Hedlund Decl. ¶ 6 ($106,481.25).) Hourly rates for the attorneys and paralegals involved ranged from $300 to $950 and $150 to $203, respectively. (Schelkopf Decl. ¶ 5; Mendelsohn Decl. ¶ 11; Migliaccio Decl. ¶ 6; Hedlund Decl. ¶ 6.) The lodestar multiplier based on the requested amount for attorneys' fees and expenses is 1.29.

When assessed in light of the relevant factors, the Court concludes that the request of $850,000 for attorneys' fees and expenses is reasonable. First, the time and labor spent on this case—which included work on discovery and independent investigation into the oil dilution defect—supports the fee request. Second, as noted above, consumer class actions such as this one raise complex legal issues that are contested across the nation and

in the Eighth Circuit. Third, the skill with which the Class Counsel performed here supports their fee request, as they efficiently brought this case to a fair, reasonable, and adequate resolution. Fourth, as the Court noted above, the benefit obtained for class members is commensurate with the value and risk of the Released Claims. Finally, comparison with other cases shows that the lodestar multiplier of 1.29 here is lower than the multipliers approved in many other cases in the Eighth Circuit. *See, e.g., In re Xcel Energy, Inc., Sec., Derivative & ERISA Litig.*, 364 F. Supp. 2d 980, 999 (D. Minn. 2005) (approving fees with a multiplier of 4.7 in securities class action); *In re St. Paul Travelers Sec. Litig.*, No. 04-CV-3801 (JRT/FLN), 2006 WL 1116118, at *1 (D. Minn. Apr. 25, 2006) (approving fees with a multiplier of 3.9 in a securities class action). In sum, in the Court's view, the request of $850,000 for attorneys' fees and expenses is reasonable.

The two objections that raise concerns about Class Counsel's request do not compel a different conclusion. (ECF No. 113 at 4; ECF No. 126-2 at 36.) Both reflect general concerns about the attorney fees. As noted above, the benefit to the class members under the Settlement Agreement appears commensurate to the value and risk of the surrendered claims.

As to the expenses Class Counsel seek to have reimbursed, these, too, will be paid out of the $850,000. (*See* ECF No. 132 at 22 (representing to the Court that "[t]he requested expenses will be paid from the total $850,000 fee and expense request").) Specifically, Class Counsel assert that they have incurred $6,321.64 in unreimbursed expenses.

(Schelkopf Decl. ¶ 14 ($2,743.54); Mendelsohn Decl. ¶ 15 ($965.20); Migliaccio Decl. ¶ 12 ($595.25); Hedlund Decl.¶ 14 ($2,017.65).) The Court does not find it unreasonable for these costs to be reimbursed from the $850,000 requested by counsel.

**B.    *Named Plaintiffs' Service Awards***

Considerations relevant to deciding whether service awards are warranted include "(1) actions the plaintiffs took to protect the class's interests, (2) the degree to which the class has benefitted from those actions, and (3) the amount of time and effort the plaintiffs expended in pursuing litigation." *Caligiuri*, 855 F.3d at 867. The Named Plaintiffs request service awards of $3,000 each. Their briefing asserts that "[t]hey participated in numerous conferences and meetings with their attorneys, searched for and produced documents to their attorneys that were relevant to their claims in the litigation, and stayed abreast of significant developments in the case." (ECF No. 132 at 23.) Under these circumstances, the Court approves the incentive award of $3,000 to each Named Plaintiff.

**III.    In Summary**

This matter having been brought before the Court on the motion of the Named Plaintiffs, through their attorneys, the Court having fully considered the terms of the Settlement Agreement and all submissions made in connection with it, finds that the Settlement Agreement and the settlement should be finally approved as fair, reasonable and adequate and the Litigation dismissed with prejudice as to all Settlement Class

Members who have not excluded themselves from the Settlement Class, and without prejudice as to all persons who timely and validly excluded themselves from the Settlement Class as set forth on the list of Opt Outs, and further finds the Released Claims are subject to the Release in accordance with Rule 54 of the Federal Rules of Civil Procedure and applicable laws.

The Court hereby makes the following findings of fact and conclusions of law:

1.      The Court finds it has personal jurisdiction over the Named Plaintiffs and all members of the Settlement Class and has subject matter jurisdiction to approve the settlement and Settlement Agreement and all Exhibits thereto.

2.      The Court finds this order is being entered more than ninety (90) days after Honda provided notice of the proposed settlement to the Attorney General of the United States and the attorneys general of the States as required by 28 U.S.C. § 1715(b), complying fully with 28 U.S.C. § 1715(d).

3.      The Court finds that the manner of dissemination and content of the Notice as specified in detail in the Settlement Agreement: (i) constituted the best notice practicable; (ii) constituted notice that was reasonably calculated under the circumstances to apprise Settlement Class Members of the pendency of the Litigation, of their right to object to or exclude themselves from the proposed settlement, of their right to appear at the Final Approval Hearing and of their right to seek monetary and other relief; (iii) constituted reasonable, due, adequate and sufficient notice to all persons entitled to

receive notice, and (iv) satisfied the requirements of due process and applicable law. Full and fair opportunity has been afforded to the members of the Settlement Class to be heard at and to participate in the Final Approval Hearing.

4.      The Court finds the settlement set forth in the Settlement Agreement is fair, reasonable, and adequate as to each of the Parties and as it applies to the Settlement Class, and in compliance with all requirements of due process and applicable law, as to and in the best interests of each of the Parties and members of the Settlement Class, and directs consummation of all of its terms and provisions, and any timely and valid objections thereto are hereby overruled.

5.      With respect to the Settlement Class, the Court finds and concludes, for settlement purposes only, that: (i) the Settlement Class Members are so numerous as to make joinder impracticable; (ii) there are questions of law and fact common to the Settlement Class, and such questions predominate over any questions affecting only individual Settlement Class Members; (iii) the Named Plaintiffs' claims and the defenses thereto are typical of the claims of Settlement Class Members and the defenses thereto; (iv) the Named Plaintiffs and their counsel can protect and have fairly and adequately protected the interests of the Settlement Class Members in the Litigation; and (v) a class action is superior to all other available methods for fairly and efficiently resolving the Litigation and provides substantial benefits to the Settlement Class Members and the Court. The Court therefore determines that this action satisfies the prerequisites for class

certification for settlement purposes pursuant to Rule 23 of the Federal Rules of Civil Procedure.

6.      The Court further finds that the Settlement Agreement is supported by the vast majority of the members of the Settlement Class. As of the last date by which requests for exclusion were to be postmarked in accordance with the terms of the Preliminary Approval Order, the Settlement Class Members who have opted out of the Settlement Class and any objections submitted are relatively few when compared to the total number of members of the Settlement Class. The terms of this Final Order and Judgment and the Settlement Agreement do not apply to the Opt-Outs or to any other persons the Parties agree in writing submitted timely and valid requests for exclusion, unless such Opt-Outs or persons elect to claim the benefits set forth in the Settlement Agreement, thereby choosing to rescind their requests for exclusion from the Settlement Class.

7.      The Court finds that the Settlement Agreement and the settlement provided for therein and any proceeding taken pursuant thereto are not and should not in any event be offered or received as evidence of, a presumption, concession or an admission of liability, a defect, or of any misrepresentation or omission in any statement or written document approved or made by Honda or any Releasee of the suitability of these or similar claims to class treatment in active litigation and trial; provided, however, that reference may be made to the Settlement Agreement and the settlement provided for therein in such proceedings as may be necessary to effectuate the settlement.

8. The Court finds that the Parties and the Settlement Administrator have fully complied with their respective obligations as set forth in the Preliminary Approval Order.

Based upon the foregoing findings of fact and conclusions of law, which are based upon and supported by the substantial evidence presented by the Parties hereto and members of the Settlement Class, all of which the Court has considered and is in the record before the Court, IT IS HEREBY ORDERED as follows:

9. The preliminary certification of the Settlement Class in the Preliminary Approval Order is hereby confirmed and made final for purposes of the Settlement Agreement as approved by this Final Order and Judgment. Pursuant to Rule 23 of the Federal Rules of Civil Procedure, the Court hereby certifies, for settlement purposes only, a Settlement Class defined as follows:

> All current and former owners or lessees of MY 2017–18 Honda CR-Vs, or MY 2016–18 Honda Civics equipped with the 1.5 liter turbocharged engine, who reside in, and who purchased or leased their vehicles in the United States (other than for purposes of resale or distribution) in, the United States, Puerto Rico, and all United States territories.

10. The Settlement Class also includes all United States military personnel who purchased a Settlement Class Vehicle during military duty. Specifically excluded from the Settlement Class are the following persons: (1) Honda; (2) any affiliate, parent, or subsidiary of Honda; (3) any entity in which Honda has a controlling interest; (4) any officer, director, or employee of Honda; (5) any successor or assign of Honda; (6) any

Judge to whom the Litigation is assigned; (7) anyone who purchased a Settlement Class Vehicle for the purpose of resale; and (8) any owners or lessees of Settlement Class Vehicles that were not distributed for sale or lease in the United States; and (9) all persons who have timely elected to opt out of or exclude themselves from the Settlement Class in accordance with this Court's Orders.

11.     The Settlement Class shall include all original purchasers and lessees as well as subsequent purchasers and lessees who purchased or leased a Class Vehicle on or before the date of entry of the Preliminary Approval Order.

12.     The proposed method for providing relief to Settlement Class Members, as set forth in the Settlement Agreement, is finally approved as fair, reasonable, adequate, just, and in the best interests of the Settlement Class, and the Parties are hereby ordered to provide and comply with the relief described in the Settlement Agreement in accordance with its terms. For settlement purposes only, the Court confirms its appointment of Honda as Settlement Administrator, and finds the Settlement Administrator has fully discharged its duties as set forth in the Settlement Agreement.

13.     The Court confirms its appointment of Class Counsel, for settlement purposes only, of: (1) Sauder Schelkopf LLC; (2) Mazie Slater Katz & Freeman, LLC; (3) Gustafson Gluek PLLC; and (4) Migliaccio and Rathod LLP and finds Class Counsel adequately represents the Settlement Class for purposes of entering into and implementing the settlement and Settlement Agreement.

14.     The Court confirms its appointment of Named Plaintiffs Troy Fath, Higinio Bautista, and Christopher Hamilton, for settlement purposes only, and finds Named Plaintiffs adequately represents the Settlement Class for purposes of entering into and implementing the settlement and Settlement Agreement.

15.     The Court awards a Named Plaintiffs' Incentive Award of $3,000 to each Named Plaintiff and a Class Counsel Fees and Expenses Award in the amount of $850,00 to Class Counsel. These amounts shall be paid and distributed in accordance with the provisions of the Settlement Agreement.

16.     The motion for final approval of all the terms set forth in the Settlement Agreement is GRANTED, and the Court hereby overrules all objections, as either untimely, not in accordance with the Court's previous order, or on their merits, and directs consummation of all of its terms and provisions.

17.     The Court approves the list of Opt-Outs attached hereto as Exhibit 1 and determines that Exhibit 1 is a complete list of all Settlement Class Members who timely have requested exclusion from the Settlement Class and, accordingly, shall neither share in nor be bound by the Final Order and Judgment, subject to the terms of the Settlement Agreement.

18.     The Court adjudges that the Named Plaintiffs and Settlement Class Members have conclusively compromised, settled, dismissed, and released any and all claims against Honda and the Releasees.

19.     The Court declares that the Settlement Agreement and this Final Order and Judgment to be binding on, and have res judicata and preclusive effect in all pending and future lawsuits or other proceedings encompassed by the Release and the Released Claims maintained by or on behalf of the Named Plaintiffs and all other Settlement Class Members, as well as their successors, assigns, past, present, and future parents, subsidiaries, joint venturers, partnerships, related companies, affiliates, unincorporated entities, divisions, groups, directors, officers, shareholders, employees, agents, representatives, servants, partners, executors, administrators, assigns, predecessors, successors, descendants, dependents, and heirs.

20.     By operation of this Final Order and the Judgment entered therewith, effective as of the Effective Date, and in consideration of the Settlement Agreement and the benefits extended to the Settlement Class, the Named Plaintiff, on behalf of himself and the Settlement Class Members, and each Settlement Class Member, on behalf of himself or herself or itself and his or her or its respective successors, assigns, past, present, and future parents, subsidiaries, joint venturers, partnerships, related companies, affiliates, unincorporated entities, divisions, groups, directors, officers, shareholders, employees, agents, representatives, servants, partners, executors, administrators, assigns, predecessors, successors, descendants, dependents, and heirs, do or by operation of this Final Order and Judgment are deemed to have fully released and forever discharged the Releasees from the Released Claims in accordance and consistent with the terms of the

Settlement Agreement, but not as to any obligations created or owed to them under the terms of the Settlement Agreement.

21.    The Court dismisses on the merits and with prejudice the Amended Consolidated Class Action Complaint in this Litigation without fees or costs except as provided in the Settlement Agreement. Upon the Effective Date, the Named Plaintiff and all members of the Settlement Class who have not been excluded from the settlement, whether or not they submit a Claim Form within the time and in the manner provided for, shall be barred from asserting any Released Claim against Honda, and any such members of the Settlement Class shall have released any and all Released Claims against the Releasees.

22.    Effective as of the date of this Order, to the fullest extent permitted by law, the Court orders and enters a permanent injunction barring and enjoining the Settlement Class Members from: (i) filing, commencing, prosecuting, intervening in or participating (as class members or otherwise) in any other lawsuit or administrative, regulatory, arbitration or other proceeding in any jurisdiction based on, relating to or arising out of the claims and causes of action or the facts and circumstances giving rise to the Litigation or the Released Claims; and (ii) organizing Settlement Class Members who have not been excluded from the class into a separate class for purposes of pursuing as a purported class action any lawsuit or arbitration or other proceeding (including by seeking to amend a pending complaint to include class allegations or seeking class certification in a pending

action) based on, relating to or arising out of the claims and causes of action or the facts and circumstances giving rise to the Litigation and/or the Released Claims; the terms of the Release shall not apply to the Opt-Outs listed on Exhibit 1 hereto or to any other persons the Parties agree in writing submitted timely and valid requests for exclusion and should also be listed as Opt-Outs unless such persons elect to claim the benefits set forth in the Settlement Agreement thereby choosing to rescind their requests for exclusion from the Settlement Class.

23.     The Court hereby authorizes the Parties, without further approval from the Court, to adopt such amendments, modifications and expansions of the Settlement Agreement and all Exhibits hereto as: (i) shall be consistent in all material respects with this Final Order and Judgment; and (ii) do not limit the rights of the Parties or Settlement Class Members.

24.     If (i) the Effective Date does not occur for any reason whatsoever, or (ii) the Settlement Agreement becomes null and void pursuant to the terms of the Settlement Agreement, this Final Order and Judgment shall be deemed vacated and shall have no force or effect whatsoever.

25.     Without affecting in any way the finality of the judgment entered under this Final Order and Judgment, this Court reserves continuing and exclusive jurisdiction over the Parties, including all Settlement Class Members, and the execution,

consummation, administration and enforcement of the terms of the Settlement Agreement.

26.    The Court finds that there is no reason for delay and directs the Clerk to enter this Final Order and Judgment in accordance with the terms of this Final Order and Judgment as of the date of this Order.

IT IS SO ORDERED.

LET JUDGMENT BE ENTERED.


Dated: September 11, 2020                    BY THE COURT:

                                            s/Nancy E. Brasel
                                            Nancy E. Brasel
                                            United States District Judge